## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF WISCONSIN

CHRYSTAL EDWARDS, TERRON
EDWARDS, JOHN JACOBSON,
CATHERINE COOPER, KILEIGH
HANNAH, KRISTOPHER ROWE, KATIE
ROWE, CHARLES DENNERT, JEAN
ACKERMAN, WILLIAM LASKE, JAN
GRAVELINE, TODD GRAVELINE,
ANGELA WEST, DOUGLAS WEST, and all
others similarly situated,

     Plaintiffs,

     v.

Case No. 20-CV-340

ROBIN VOS, in his official capacity as
Speaker of the Wisconsin State Assembly;
SCOTT FITZGERALD, in his official
capacity as Majority Leader of the Wisconsin
State Senate; STATE OF WISCONSIN;
WISCONSIN STATE ASSEMBLY;
WISCONSIN STATE SENATE;
WISCONSIN ELECTIONS COMMISSION;
MARGE BOSTELMANN, JULIE M.
GLANCEY, ANN S. JACOBS, DEAN
KNUDSON, ROBERT F. SPINDELL, JR.,
and MARK L. THOMSEN, in their official
capacities as members of the Wisconsin
Elections Commission, and MEAGAN
WOLFE, in her official capacity as the
Administrator of the Wisconsin Elections
Commission,

     Defendants.

## CLASS ACTION COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

### NATURE OF THE CASE

1.     This is a putative class action pursuant to Fed. R. Civ. P. 23 seeking declaratory as

well as remedial and prospective injunctive relief related to the April 7, 2020 Wisconsin

Presidential Primary and Spring Election (the "Spring Election"). Despite a worldwide pandemic involving a novel coronavirus known as COVID-19 that to date has infected more than 1.7 million people and killed approximately 107,000 individuals worldwide, the Wisconsin Legislature made up of the Wisconsin State Assembly and Wisconsin State Senate and led by Defendants Robin Vos and Scott Fitzgerald (collectively, the "Legislative Defendants"), chose politics over the interests of all Wisconsin citizens in an intentional and self-serving attempt to disenfranchise thousands of voters in the Spring Election.  While this District is no stranger to the pre-election dispute that called attention to the enormous indignity of forcing Wisconsin voters to the polls last Tuesday, this action is directed at the now-established harm that came about as a result of the Legislative Defendants' action and inaction.

2. Plaintiffs seek relief for violations of their right to vote, protected by the First Amendment to the U.S. Constitution and by their Fourteenth Amendment right to equal protection of the laws, pursuant to 42 U.S.C. § 1983; their rights under  Section 2 of the Voting Rights Act (codified at 52 U.S.C. § 10101 *et seq.*); and in accordance with the voting provisions of the Americans with Disabilities Act (codified at 42 U.S.C. § 12101 *et seq.*).  Each of the representative plaintiffs tells a story about how the Legislative Defendants' insistence on conducting the Spring Election during the pandemic left them disenfranchised and unable to exercise their fundamental right to vote without impairment of that choice. This lawsuit demonstrates that there is no compelling justification, let alone rational basis, for the Wisconsin Legislature to have refused to take action in rescheduling the election despite full knowledge of the inherent risks to the electorate of proceeding.

3. Voting is a fundamental right guaranteed by the U.S. Constitution as the United States Supreme Court told us long ago in *Reynolds v. Sims*, 477 U.S. 533 (1964):

Undeniably the Constitution of the United States protects the right **of all qualified citizens** to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that **all qualified voters have a constitutionally protected right to vote**, *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274, and **to have their votes counted**, *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355. In *Mosley* the Court stated that it is 'as equally unquestionable that the right to have one's vote counted is as open to protection . . . as the right to put a ballot in a box.' 238 U.S., at 386, 35 S.Ct., at 905. **The right to vote can neither be denied outright**, *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340, *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281, nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368, nor diluted by ballot-box stuffing *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717, *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. As the Court stated in *Classic*, 'Obviously included within the right to choose, secured by the Constitution, **is the right of qualified voters within a state to cast their ballots and have them counted** . . . .' 313 U.S., at 315, 61 S.Ct., at 1037. Racially based gerrymandering, *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, and the conducting of white primaries, *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759, *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible.

* * *

Undoubtedly, the right of suffrage is a **fundamental matter** in a free and democratic society. Especially since the right to exercise the franchise in a **free and unimpaired** manner is preservative of other basic civil and political rights, **any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized**. Almost a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, the Court referred to '**the political franchise of voting' as 'a fundamental political right, because preservative of all rights**.' 118 U.S., at 370, 6 S.Ct., at 1071. Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free **and unimpaired** fashion is a bedrock of our political system.

4.     The Legislative Defendants understood the dangers of COVID-19 before the Spring Election and cavalierly (and for clearly political reasons) refused to take action to postpone the election, which decision runs counter to every credible public health pronouncement about

COVID-19 in the United States and the decisions of at least 18 other states and territories which followed the direction of doctors, scientists, epidemiologists, virologists, infectious disease specialists, and public health experts by making alternative arrangements for their spring elections.

5.      Through this action, Plaintiffs seek, on behalf of themselves and each class member that they seek to represent, the unimpaired right to vote in the Spring Election, which right was denied to them last Tuesday. Specifically, they ask the Court to create a Class and specified sub-classes as asserted in this Complaint and order the following:

>    a.   A statewide revote akin to that established in *McNally v. Tollander*, 100 Wis. 2d 490, 302 N.W.2d 440 (1981);
>
>    b.   Mail-in voting procedures to allow **all** registered and unregistered voters in the State of Wisconsin who either (a) did not vote in the Spring Election; (b) sought to vote absentee but did not receive a ballot despite requesting one from the State of Wisconsin prior to April 7, 2020; or (c) completed and delivered via U.S. Mail or in person an absentee ballot that is now invalid based on either the April 3, 2020 decision of the United States Court of Appeals for the Seventh Circuit or subsequent April 6, 2020 decision of the United States Supreme Court in the matter generally known as *Republican National Committee, et al. v. Democratic National Committee*, 19A1016, 589 U.S. ___ (2020) (the "Pre-Election Litigation").

6.      For the reasons alleged in this Complaint, Plaintiffs further seek prospective relief to protect the voting franchise for the electors seeking to participate in all other elections scheduled in Wisconsin this year. This includes (a) the May 12, 2020 Special Election for Congressional District 7; (b) the August 11, 2020 Partisan Primary; and (c) the November 3, 2020 General and

Presidential Election. As recently as the evening of April 10, 2020, Dr. Anthony Fauci, the head of the National Institute of Allergy & Infectious Diseases and a member of President Trump's Coronavirus Task Force, stated only that it was his "hope" that "**by November** we would have things under such control that we could have a real degree of normality." COVID-19 is a pervasive and silent enemy and there simply is no medical or scientific certainty that "normality" will exist as of the time this Country votes on November 3, 2020.

7.      Wisconsin voters deserve orderly process and procedures to vote this year that do not obligate them to choose between risking (or being terrified for) their lives (guaranteed against State interference to each of them pursuant to the Fourteenth Amendment of the U.S. Constitution) and their fundamental right to vote, which since the Supreme Court's 1886 decision in *Yick Wo* has been recognized as a fundamental element of citizenship for all qualified citizens in the United States. Because there is no compelling justification or rational basis for the Legislative Defendants' insistence on pursuing the Spring Election or any election this year in a manner that forces voters to choose between their health and their right to vote, Plaintiffs ask the Court to establish fair procedures to remedy the past wrongs associated with the Spring Election and to ensure their rights are not abridged in future elections in 2020 while the pandemic runs its course.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 12133 because this action arises under the U.S. Constitution and federal statutory law. It seeks relief for the Plaintiffs based on a deprivation of constitutional and federally guaranteed statutory rights. Defendants have taken action, and refused to act, under color of state law. Jurisdiction further vests pursuant to 42 U.S.C. §§ 1983 and 1988;

52 U.S.C. § 10101 *et seq.*; and 42 U.S.C. § 12101 *et seq.*  Because this action seeks declaratory relief, the Court is further authorized to grant such relief pursuant to 28 U.S.C. § 2201 *et seq*.

9.      The Court has personal jurisdiction over each and every Defendant as they are all state actors who have been sued in their official capacities based on their conduct surrounding the Spring Election.  All of the Defendants are state officials who reside in Wisconsin and work in their official capacities in and around Madison, Wisconsin.

10.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants reside in Wisconsin and one or more of them resides in this judicial district. In addition, venue is proper in this district because a substantial part of the events giving rise to these claims occurred in this district as contemplated by 28 U.S.C. § 1391(b)(2).

## PARTIES

**<u>Plaintiffs</u>**

11.     Plaintiffs Chrystal and Terron Edwards are 37 and 40 years old, respectively.  They are married adults and African American residents of Milwaukee, Wisconsin. They vote regularly in state and local elections. Terron is also diabetic. They have three children residing with them; their son has spina bifida and a daughter has asthma. Both because of race and illness they are at high risk of contracting and transmitting COVID-19. They educated themselves as much as possible about the pandemic and the government reaction to the pandemic. They were not able to vote early; while they did order absentee ballots in mid-March 2020, they never received them. The Edwards did not vote in person in the Spring Election due to health and safety concerns of illness or death, for themselves, their family, and the community. They were also very concerned about the very few polling places – only 5 (out of a typical 180) throughout the City of Milwaukee – and the high numbers of voters going to each one. They usually vote at a nearby polling place on Green Bay Avenue, but for the Spring Election they would have gone to Riverside High School.

The Edwards are adequate class representatives within the meaning of Fed. R. Civ. P. 23(a)(4) and are prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

12.     Plaintiff John Jacobson is an adult resident of Milwaukee, Wisconsin. He is a teacher at Shorewood High School in the areas of social studies, politics, and history. He votes regularly in state and local elections. He ordered an absentee ballot for the Spring Election on or about March 18, 2020 and requested that it be sent to his family home in Southern Illinois. He was in Illinois before and on April 7, 2020, because he needed to care for his elderly parents during the COVID-19 pandemic. He was available to do so because Governor Evers closed all the public schools as part of his efforts to promote "social distancing" during the pandemic. Mr. Jacobson's ballot never came, and he was not able to vote in the Spring Election. Mr. Jacobson is an adequate class representative within the meaning of Fed. R. Civ. P. 23(a)(4) and is prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

13.     Plaintiff Catherine Cooper is an adult resident of Fox Point, Wisconsin. She votes regularly in state and local elections. Ms. Cooper requested an absentee ballot from the State of Wisconsin before the Spring Election. The ballot never came. Ms. Cooper did vote in the Spring Election but was torn doing so because of the health risks of COVID-19; more specifically, her mother who has compromised lungs and other health issues lives with her and she was concerned about exposing her mother to the virus.  Ms. Cooper is an adequate class representative within the meaning of Fed. R. Civ. P. 23(a)(4) and is prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

14.     Kileigh Hannah is an adult resident of Fox Point, Wisconsin. She votes regularly in state and local elections. Ms. Hannah ordered an absentee ballot on or about March 22, 2020 and

the ballot never came. She and her husband were out of town at their cottage until just before the Spring Election. Ms. Hannah has multiple sclerosis and is immunosuppressed, so she is at a very high risk for contracting the COVID-19 virus and for life-threatening complications if she did. She was unable to vote because of her disability and fear of death or sickness.  Ms. Hannah is an adequate class representative within the meaning of Fed. R. Civ. P. 23(a)(4) and is prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

15.     Plaintiffs Kristopher and Katie Rowe are adult residents of Glendale, Wisconsin. They regularly vote in state and local elections. The Rowes each ordered absentee ballots for the first time in the Spring Election and received them by mail. They completed and mailed their ballots back on April 1, 2020. Upon checking Wisconsin's online database, there is no record of either of them voting since the February 18, 2020 election. Upon information and belief, despite their compliance with every facet of the law, their ballots were never received by elections authorities and they will not count.  The Rowes are adequate class representatives within the meaning of Fed. R. Civ. P. 23(a)(4) and are prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

16.     Plaintiff Charles Dennert is an adult resident of Milwaukee, Wisconsin. He is a sophomore at Marquette University and usually votes. He ordered an absentee ballot on March 24, 2020, but never received it. In April, he was temporarily staying in his family home in Waukesha, Wisconsin, recovering from a fractured leg and was unable to drive. He had no means of transportation to his Milwaukee polling location in order to vote and was therefore unable to vote in the Spring Election.  Mr. Dennert is an adequate class representative within the meaning of Fed. R. Civ. P. 23(a)(4) and is prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

17.     Plaintiff Jean Ackerman is 89 years old and an adult resident of Milwaukee, Wisconsin. Ms. Ackerman votes in regularly in state and local elections. She is mentally sharp but has physical health issues and is not mobile. Ms. Ackerman ordered an absentee ballot before the Spring Election, but never received it. She was unable to vote because of fear of illness or death due to COVID-19 and her mobility issues. Ms. Ackerman also did not want to risk the health of others around her. Ms. Ackerman is an adequate class representative within the meaning of Fed. R. Civ. P. 23(a)(4) and is prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

18.     Plaintiff William Laske is an adult resident of Milwaukee, Wisconsin. He regularly votes in state and local elections. He ordered an absentee ballot on March 20, 2020, but never received it; he did receive a mailing on March 25, 2020 confirming that the request had been received. He called the Milwaukee Election Commission on April 6, 2020, the day before the Spring Election, and was put on hold for over an hour; he ultimately was told that his ballot was mailed out on March 22, 2020. The election official he spoke to told Mr. Laske he could vote in person, or he had until April 14, 2020 to deliver a ballot to the Zablocki Library polling site. The latter option became unavailable because of the United States Supreme Court's April 6, 2020 decision reversing the April 2, 2020 decision of the Honorable William M. Conley. Mr. Laske has a respiratory disease and is on immune-suppressant medication and oxygen; exposure to the COVID-19 virus would likely kill him. He ultimately did not vote because he would not risk illness or death.  Mr. Laske is an adequate class representative within the meaning of Fed. R. Civ. P. 23(a)(4) and is prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

19.     Plaintiffs Jan and Todd Graveline are adult residents of Milwaukee, Wisconsin; they are married. The Gravelines regularly vote in state and local elections. They ordered absentee ballots before the Spring Election, but never received them. On April 7, 2020, the Gravelines decided to try to vote in person and went to Riverside High School to do so. Ms. Graveline did vote; while standing in line, Mr. Graveline grew concerned with the number of people in line and their proximity him. Out of fear of contracting the COVID-19 virus, Mr. Graveline decided to leave the polling site because he feared illness or death. He did not vote as a result.  The Gravelines are adequate class representatives within the meaning of Fed. R. Civ. P. 23(a)(4) and are prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

20.     Plaintiffs Angela and Douglas West are 61 and 55 years old, respectively. They are adult African American residents of Milwaukee, Wisconsin. Mr. West is disabled with a lung and heart condition; he uses oxygen on a regular basis. Ms. West works in the healthcare field. The Wests regularly vote in state and local elections. They usually vote at a school just three blocks from their house, but due to the limitations on the number of polling locations in the City of Milwaukee for the Spring Election, they would have had to travel to Washington High School to exercise their franchise. The Wests ultimately chose not to vote out of concerns for their safety. The Wests are adequate class representatives within the meaning of Fed. R. Civ. P. 23(a)(4) and are prepared to represent one or more of the sub-classes defined in paragraphs 71 and 72(a)-(h) of this Complaint.

**Defendants**

21.     Defendant Robin Vos ("Vos") is, pursuant to Section IV, Article 4 of the Wisconsin Constitution, a duly elected member of the Wisconsin State Assembly, the lower house in the

Wisconsin Legislature established pursuant to Article IV, Section 1 of the Wisconsin Constitution. Vos serves as Speaker of the Assembly pursuant to Wis. Stat. §§ 13.13(1) and 13.46(1). As Speaker, Vos controls the legislative agenda in the Assembly and maintains the authority to close down debate and votes considered by the Assembly. Vos is sued in his official capacity.

22.     Defendant Scott Fitzgerald ("Fitzgerald") is, pursuant to Section IV, Article 5 of the Wisconsin Constitution, a duly elected member of the Wisconsin State Senate, the upper house in the Wisconsin Legislature established pursuant to Article IV, Section 1 of the Wisconsin Constitution. Fitzgerald serves as Majority Leader of the Senate pursuant to Wis. Stat. §§ 13.13(3) and 13.46(1). As Majority Leader, Fitzgerald controls the legislative agenda in the Senate and maintains the authority to close down debate and votes considered by the Senate. Fitzgerald is sued in his official capacity.

23.     Defendant State of Wisconsin ("Wisconsin" or the "State") was the thirtieth state to join what had become known as the United States; it did so in 1848.  Wisconsin is a political entity, the elected and appointed officials of which are charged with the responsibility to represent all of the citizens of the State consistent with obligations imposed on them by the Constitution of the State of Wisconsin and the U.S. Constitution.

24.     Defendant Wisconsin State Assembly (the "Assembly") is the lower house in the Wisconsin Legislature established pursuant to Article IV, Section 1 of the Wisconsin Constitution. Its leadership is controlled by Vos.

25.     Defendant Wisconsin State Senate (the "Senate") is the upper house in the Wisconsin Legislature established pursuant to Article IV, Section 1 of the Wisconsin Constitution. Its leadership is controlled by Fitzgerald.

26.     Defendant Wisconsin Elections Commission (the "Commission") is a governmental agency created under Wis. Stat. § 5.05. It administers and enforces Wisconsin election laws and is made up of six members. Four are appointed by Wisconsin's four legislative leaders and two are appointed by the Governor. The Commission staff is non-partisan. The Commission has its offices and principal place of business at 212 E. Wisconsin, Third Floor, Madison, WI, 53703.

27.     Defendant Marge Bostelmann ("Bostelmann") is a member in good standing of the Commission. Bostelmann resides in Green Lake, Wisconsin and was appointed to the Commission by then-Governor Scott Walker. Her term ends on May 1, 2024. Bostelmann is sued in her official capacity.

28.     Defendant Julie M. Glancey ("Glancey") is a member in good standing of the Commission and its Secretary.  Glancey resides in Sheboygan Falls, Wisconsin and was appointed to the Commission by Governor Tony Evers. Her term ends on May 1, 2021. Glancey is sued in her official capacity.

29.     Defendant Ann S. Jacobs ("Jacobs") is a member in good standing of the Commission.  Jacobs resides in Milwaukee, Wisconsin and was appointed to the Commission by Senate Minority Leader Jennifer Shillings. Her term ends on May 1, 2021.  Jacobs is sued in her official capacity.

30.     Defendant Dean Knudson ("Knudson") is a member in good standing of the Commission and its Chairman.  Knudson resides in Hudson, Wisconsin and was appointed to the Commission by Vos. His term ends on May 1, 2024.  Knudson is sued in his official capacity.

31.     Defendant Robert F. Spindell, Jr. ("Spindell") is a member in good standing of the Commission. Spindell resides in Milwaukee, Wisconsin and was appointed to the Commission by Fitzgerald. His term ends on May 1, 2021. Spindell is sued in his official capacity.

32.     Defendant Mark L. Thomsen ("Thomsen") is a member in good standing of the Commission. Thomsen resides in Milwaukee, Wisconsin and was appointed to the Commission by Assembly Minority Leader Gordon Hintz. His term ends on May 1, 2024. Thomsen is sued in his official capacity.

33.     Defendant Meagan Wolfe ("Wolfe") is the Administrator of the Commission. Wolfe resides in Madison, Wisconsin and oversees the Commission's work as a non-partisan employee. Wolfe is sued in her official capacity.

## FACTUAL BACKGROUND

**COVID-19 and the Novel Coronavirus**

34.     On December 31, 2019, medical officials in Wuhan City, Hubei Province of China ("Wuhan") reported to the China Country Office of the World Health Organization ("WHO") about cases of pneumonia with unknown cause.  Within four days, Wuhan had a total of 44 patients fitting this description. By January 7, 2020, Chinese authorities had isolated the disease as a novel coronavirus. The term "coronavirus" applies to a large group of viruses that cause disease in animals and humans. They often circulate among camels, cats, and bats. Sometimes they evolve and affect human beings.  WHO named the novel coronavirus "COVID-19" on February 11, 2020 and we use that term in this Complaint to refer to the disease giving rise to the current global pandemic affecting Wisconsin.

35.     On January 20, 2020, a 35-year old man from Seattle, Washington was diagnosed with COVID-19, the first such case identified in the United States. In its first "Situation Report" a day later, WHO informed that there were 282 known cases of COVID-19 worldwide; most of those

cases were in various Chinese provinces but a few others existed in Japan, Korea, and Thailand. The Seattle case obviously had just entered the data set and did not make WHO's first published report. By the time of WHO's publication, six individuals had died of COVID-19.  On January 30, 2020, WHO declared COVID-19 a Public Health Emergency of International Concern.

36.    COVID-19 took off like a rocket. By March 11, 2020, WHO reported that there were more than 118,000 cases of the disease worldwide in at least 110 countries and territories, with great concern about a sustained risk of global spread. That day, WHO classified COVID-19 as a pandemic, which the U.S. Centers for Disease Control ("CDC") defines as follows:

> Pandemics happen when new (novel) . . . viruses emerge which are able to infect people easily **and** spread from person to person in an efficient and sustained way. Because the virus is new to humans, very few people will have immunity against the pandemic virus, and a vaccine might not be widely available. The new virus will make a lot of people sick. How sick people get will depend on the characteristics of the virus, whether or not people have any immunity to that virus, and the health and age of the person being infected.

CDC Website, accessed on April 11, 2020 at https://www.cdc.gov/flu/pandemic-resources/basics/index.html.  Dr. Tedros Adhanom Ghebreyesus, WHO Director-General, said at the time of the pandemic declaration: "This is not just a public health crisis, it is a crisis that will touch **every sector**.  So every sector and every individual must be involved in the fights." Jamie Ducharme, "World Health Organization Declares COVID-19 a 'Pandemic:' Here's What That Means," *Time*, March 11, 2020, accessed on April 11, 2020 at https://time.com/5791661/who-coronavirus-pandemic-declaration/.

37.    COVID-19 is a disease that spreads exponentially and has demonstrated its ability to transmit easily among the population, often without detection, with the ability to wreak havoc on healthcare resources throughout the world.  For these reasons (and others), on March 12, 2020 Wisconsin Governor Tony Evers declared a public health emergency to direct all resources needed

to respond to and contain COVID-19 in Wisconsin.  The following day, President Donald J. Trump declared a National Emergency concerning the pandemic.

38.     The prophecy of WHO's Dr. Ghebreyesus seems quite obvious in hindsight. A mere month after WHO's declaration of a pandemic, Johns Hopkins University (Coronavirus Resource Center) (the "JHU Website") reported a total of 1,754,457 COVID-19 cases worldwide and 107,520 deaths.  *See* JHU Website, last accessed on April 11, 2020 at https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

39.     As of April 11, 2020, the JHU Website reported 514,415 COVID-19 cases in the United States with 18,586 deaths. According to the Wisconsin Department of Public Health Services (the "DHS"), there have been 3,213 laboratory-confirmed COVID-19 cases in Wisconsin with 137 deaths. DHS Website, accessed on April 11, 2020 at https://www.dhs.wisconsin.gov/outbreaks/index.htm.  Just as with the rest of the world, Wisconsin is experiencing exponential growth in COVID-19; as of March 15, 2020, Wisconsin had no reported cases, but as these graphs from the DHS website demonstrate new cases and deaths are climbing exponentially on a daily basis:





Updated: 4/11/2020

—— Cumulative total deaths    —— Newly reported deaths

40.     The data being exchanged by scientists and medical professionals are largely incomplete and likely understate the number of people who are and have been infected with COVID-19, because a large number of individuals who have the disease are believed to be asymptomatic.  For example, the Centre for Evidence-Based Medicine at Oxford University in England studied the proportion of COVID-19 carriers who were either entirely asymptomatic or presenting mild symptoms and concluded that between 5 and 80 percent of people testing positive for the disease may be asymptomatic.  *See* Carl Heneghan, Jon Brassey, and Tom Jefferson, COVID-19: What Proportion are Asymptomatic, Centre for Evidence Based Medicine, accessed on April 11, 2020 at https://www.cebm.net/covid-19/covid-19-what-proportion-are-asymptomatic/. For example, 18 percent of those who tested positive for COVID-19 on the Diamond Princess Cruise showed no symptoms, as did 57 percent of the residents at the King County, Washington long-term care facility where the disease first took hold in the United States. Whether the number of asymptomatic individuals is on the low range (five percent) or the high range (80 percent), it is quite clear that many people are carrying COVID-19 without knowing it. The result is that hundreds of thousands of people around the world are presently ensuring the

disease's ongoing spread, despite a growing effort by governments around the world to "flatten the curve."

41.     The wildly disparate data on who presents with symptoms illustrates an even larger point about COVID-19, namely the inaccuracy of testing to date with false positives and negatives as well as the inability to test populations on a larger scale to gain knowledge about the contagion and how best to isolate it.  *See* Sheila Kaplan and Katie Thomas, "Despite Promises, Testing Delays Leave Americans 'Flying Blind,'" *New York Times*, April 6, 2020, last accessed on April 11, 2020 at https://www.nytimes.com/2020/04/06/health/coronavirus-testing-us.html.

42.     While science is still catching up to the virus, we also know that COVID-19 presents a life-threatening challenge to certain highly vulnerable segments of the population. Those over the age of 65; with lung conditions (including chronic asthma); who are immune-compromised (such as cancer patients, those with HIV/AIDS, and those on immunosuppressant medication for diseases such as rheumatoid arthritis); diabetic or pre-diabetic patients; those suffering from chronic kidney or liver disease; individuals living in long-term nursing facilities; and those with a body mass index of over 40 are all particularly vulnerable to this virus based on the medical community's experiences on the frontlines of the fight.  In Wisconsin, DHS has been recommending for more than a month that individuals in these groups, in particular, stay home to avoid exposing themselves to COVID-19.  *See* DHS Website, "COVID-19: Are You at Higher Risk of Serious Illness," last accessed on April 11, 2020 at  https://www.dhs.wisconsin.gov/covid-19/risks.htm.

43.     With full knowledge of the medical confusion on who is carrying the disease in Wisconsin, how easily it transmits from person to person, and the deadly and seemingly random nature of COVID-19, the Legislative Defendants nevertheless intentionally chose to shirk their

oaths of office, do nothing to postpone the Spring Election, and disenfranchise a large segment of Wisconsin's population in the process. The Commission, and the Defendants named in this Complaint who were charged with running and administering the Spring Election on its behalf, sent a large segment of Wisconsin's 5,822,000 citizens to vote in person in a statewide election involving, among other things, the 2020 presidential nomination and a Wisconsin Supreme Court seat, amidst the first pandemic of this scale since the 1918 influenza that killed approximately 50 million people worldwide.   This is remarkable, as 18 other states and territories (Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, Montana, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, West Virginia, Wyoming, and Puerto Rico) deemed it reasonable and necessary to postpone or alter the approach to their spring elections because of the risk to public health due to the COVID-19 situation.

**Wisconsin's Safer at Home Order**

44.   The first COVID-19 diagnosis in Wisconsin occurred on March 15, 2020.  On March 24, 2020, Governor Evers announced that he intended to enter an executive order setting forth the rules by which citizens of Wisconsin would be allowed to engage with each other during the term of the order.  The following day Andrea Palm, the Secretary-Designee of Wisconsin's DHS, entered Emergency Order No. 12 (the "Safer at Home Order") at the direction and with the authority of the Governor, which took effect at 8:00 a.m. on March 25, 2020.  The Safer at Home Order authorizes law enforcement to enforce it, the violation of which is punishable up to 30 days imprisonment or up to a $250 fine, or both.   A copy of the order is at https://evers.wi.gov/Documents/COVID19/EMO12-SaferAtHome.pdf, last accessed on April 11, 2020.  Plaintiffs hereby incorporate by reference into this Complaint the Safer at Home Order.

45.     The Safe at Home Order makes a number of findings and orders that are relevant to this litigation. They include:

    a.   Establishing that "social distancing," the practice of keeping at least six feet apart from others and avoiding direct physical contact, is the only effective means of slowing the rate of COVID-19 infections (Safer at Home Order, pp. 2);

    b.   Concluding that, despite prior emergency orders from Wisconsin and elsewhere banning mass gatherings, the rates of infection continue to drastically increase such that additional measures were needed to slow the rate of COVID-19 infections in Wisconsin (Safer at Home Order, pp. 2);

    c.   Prohibiting all non-essential businesses and operations from remaining open during the crisis and limiting all public and private gatherings of any number of people not part of a single household (Safer at Home Order, pp. 3);

    d.   Closing public schools and libraries, public amusement, and salons and spas (Safer at Home Order, pp. 4);

    e.   Imposing an obligation on all citizens of Wisconsin to follow DHS and CDC guidelines regarding COVID-19 care (Safer at Home Order, pp. 4);

    f.   Obligating those "at high risk of severe illness from COVID-19 and people who are sick . . . to stay in their home or residence to the extent possible except as necessary to seek medical care;" (Safer at Home Order, pp. 4);

    g.   Identifying "essential" activities, governmental functions, and businesses and operations (Safer at Home Order, pp. 2, 7-14);

    h.   Exempting healthcare and public health operations, human service operations, and essential infrastructure from the effects of the order (Safer at Home Order, pp. 6);

    i.    Establishing the meaning of "essential" travel (Safer at Home Order, pp. 2, 15);

    j.    Implementing minimum basic operational rules for how "essential" businesses and government functions should operate during the term of the order (Safer at Home Order, pp. 2, 15); and

    k.    Requiring all persons residing in Wisconsin to follow "social distancing" rules, including maintaining appropriate distancing from each other and washing their hands in a manner provided within the order (Safer at Home Order, pp. 15-16.)

46.    While Wisconsin's court system and its personnel were exempt from the order, Governor Evers acknowledged the Wisconsin Supreme Court's authority over how to manage COVID-19 and the caseload in all 72 circuit courts of Wisconsin. Presently, the Wisconsin Supreme Court has closed down substantially all jury trials through May 22, 2020, and most other in-person proceedings through at least April 30, 2020. This Court and the Eastern District of Wisconsin have imposed similar restrictions on in-person activities such as oral argument and hearings.  Other court systems throughout the nation have imposed similar restrictions consistent with the public health need to practice "social distancing."

47.    In what can only be the height of irony in this particular case, the Wisconsin Supreme Court and the United States Supreme Court met virtually to consider and decide their respective April 6, 2020 orders allowing the Spring Election to proceed uninterrupted as if no pandemic was occurring. Without considering the legal basis for those orders, they create a paradox— i.e. that judges are entitled to be safe from COVID-19 and obligated to follow social distancing requirements but the Wisconsin electorate is obligated to violate the Safer at Home Order to vote.

**The Pre-Election Litigation and the Governor's Order to Postpone**

48.     On March 18, 2020, the Democratic National Committee and Democratic Party of Wisconsin filed an action seeking to modify Wisconsin's approach to the Spring Election in a matter captioned *Democratic National Committee, et al. v. Bostelmann, et al.*, Case No. 3:200cv-00249-wmc (W.D. Wis.) (the "DNC Litigation").  On March 26, 2020, Reverend Greg Lewis of Souls to the Polls and a host of others filed for similar relief in a matter captioned *Lewis, et al. v. Knudson, et al.*, Case No. 3:20-cv-00284-wmc (W.D. Wis.); the plaintiffs in that case specifically sought to postpone the Spring Election.  That same day, Sylvia Gear and others filed a similar lawsuit in a matter captioned *Gear, et al. v. Knudson*, Case No. 3:20-cv-00278 (W.D. Wis.). These cases (collectively the "Pre-Election Litigation") sought, among other things, to postpone the Spring Election due to concerns with in-person voting during the COVID-19 crisis and to adjust absentee balloting procedures to enable Wisconsin voters to use mail-in procedures to exercise their right to vote without fear of contracting a potentially lethal disease.

49.     On March 20, 2020, the district court presiding over the DNC Litigation extended the deadline to register to vote electronically from March 18, 2020 to March 30, 2020. It concluded that the burden imposed on the State to extend the deadline to allow would-be voters to register to vote electronically was outweighed by the value of allowing such voters additional time to register electronically in the face of evidence suggesting that in-person registration was restricted due to public health concerns about COVID-19 transmission.  In so deciding, the district court heard evidence showing that 11 to 12 percent of unregistered voters in previous elections had registered at their polling place on the day of the election.

50.     As the COVID-19 crisis continued to escalate, on March 27, 2020 Governor Evers urged the Wisconsin Legislature to enact legislation allowing absentee ballots to be sent to every

registered voter.  While he had the authority to order the Wisconsin Legislature into session, the Governor encouraged the Legislative Defendants to serve the greater good, stating: "This is not a Republican issue or a Democratic issue—this is an issue of democracy. I don't care who gets the credit, I just want to make sure that everyone has the chance to vote this April. We don't have time for politics—we have to get this done, folks."

51.     Defendants Fitzgerald and Vos never took the Governor up on his request and refused to call the Assembly and Senate into session to consider an alternative approach to the Spring Election. Instead, the next day, on March 28, 2020 they admonished Dane County Clerk Scott McDonell and Milwaukee County Clerk George Christenson for advising voters who wanted absentee ballots, but were unable to upload an image of a photo ID to obtain one (a requirement on the website where such requests were made), to deem themselves "indefinitely confined," which classification would exempt them from the image-uploading requirement. The clerks had been advising people that the Safer at Home Order meant everyone is indefinitely confined, which Defendants Vos and Fitzgerald belittled.

52.     On April 2, 2020, the district court presiding over the Pre-Election Litigation rendered a decision on the motions and relief sought by the plaintiffs in those three (now consolidated) cases.  Before rendering that decision, Judge Conley discussed the consequences of the Wisconsin Legislature's refusal to postpone the Spring Election:

> [T]he three most likely consequences of proceeding with the election on this basis are (1) a dramatic shortfall in the number of voters on election day as compared to recent primaries, even after accounting for the impressive increase in absentee voters, (2) a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State, or (3) a failure to achieve sufficient in-person voting to have a meaningful election *and* an increase in the spread of COVID-19. Nevertheless, the Wisconsin State Legislature and Governor apparently are hoping for a fourth possibility: that the efforts of the WEC Administrator, her staff, the municipalities and poll workers, as well as voters willing to ignore the obvious risk to themselves and others of

proceeding with in-person voting, will thread the needle to produce a reasonable voter turnout and no increase in the dissemination of COVID-19.

(4/2/20 Decision and Order, pp. 3.)

53.     The April 2, 2020 decision of the district court gave plaintiffs in the Pre-Election Litigation partial relief.  Among other things, Judge Conley (a) enjoined the enforcement of the requirement under Wis. Stat. § 6.87(6) that absentee ballots must be received by 8:00 p.m. on election day to be counted and extended the deadline for receipt of absentee ballots to 4:00 p.m. on April 13, 2020; (b) enjoined the enforcement of the requirement of Wis. Stat. §6.86(1)(b) that absentee ballot requests must be received by April 2, 2020, and extended the deadline for receipt of absentee ballot requests by mail, fax or email (and if deemed administratively feasible, in the sole discretion of the WEC Administrator, online) to 5:00 p.m. on April 3, 2020; and (c) enjoined the enforcement of Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to obtain a witness certification despite reasonable efforts to do so, provided that the ballots are otherwise valid.

54.     In its April 2, 2020 decision, the district court did not decide the question as to whether the actual voter turnout, ability to vote on election day, or overall conduct of the election and counting votes timely has undermined citizens' right to vote. (4/2/20 Decision and Order, pp. 5 n.3.)  Now, with the benefit of the facts of the Spring Election in hand, this action seeks to remedy these very issues by holding the Defendants responsible for the Wisconsin Legislature's inaction in failing to alter the date and procedures for the election. With the Assembly and Senate entirely controlled by Defendants Vos and Fitzgerald, the Legislative Defendants deprived thousands of Wisconsin citizens of their fundamental constitutional right to vote and concomitant rights under the Voting Rights Act and the Americans with Disabilities Act that are designed to avoid impairment of the right to vote due to race and disability.  As Judge Conley determined in his April

2, 2020 decision in the Pre-Election Litigation, the "infringement on the fundamental right to vote amounts to an irreparable injury" that "cannot be redressed by money damages" such that "traditional legal remedies would be inadequate in this case." (4/2/20 Decision and Order, pp. 25.)

55.     On April 3, 2020, the day after the district court resolved the motions in the Pre-Election Litigation cases, Governor Evers exercised his authority to compel the Wisconsin Legislature into session to take up the issue of postponing the Wisconsin Primary.  In calling the legislature into special session, the Governor urged the legislature to enact legislation allowing an all-mail election, to send a ballot to every registered voter who has not already requested one by May 19, 2020, and to extend the time for those ballots to be received to May 26, 2020.

56.     By this point, the Republican National Committee (which Judge Conley had allowed to intervene in the Pre-Election Litigation cases) **and** the Wisconsin Legislature (which later obtained the right to intervene from the Seventh Circuit) appealed Judge Conley's April 2, 2020 decision to the United States Court of Appeals for the Seventh Circuit.  They sought to stay the decision pending a full appeal. In a short 4-page ruling, the Seventh Circuit denied the requested stay as to Judge Conley's order (a) extending the deadline for the receipt of absentee ballots to 4:00 p.m. (Central Daylight Time) on April 13, 2020; and (b) extending the deadline for the receipt of absentee ballot requests to 5:00 p.m. on April 3, 2020.  Notwithstanding those results, the Court of Appeals granted the stay with respect to Judge Conley's decision altering the need for witness certification on absentee ballots on the basis that the district court did not give sufficient consideration to the appellants' concerns with the risk of voter fraud.

57.     In a joint statement following the Governor's April 3, 2020 executive order calling the Wisconsin Legislature into special session, Defendants Vos and Fitzgerald disingenuously blamed Governor Evers for causing confusing at such a late date:

> In a crisis, people look for certainty. In elections during uncertain times, it's important that no one questions the process. That's why it's so disappointing that Gov. Evers has flip-flopped on the very question that we have been discussing over the past month. If the governor had legitimate concerns, we could have come to a bipartisan solution weeks ago. This discussion would have happened long before today. The only bipartisan discussion we've had was to ensure the election would continue safely and to maximize the opportunity to vote absentee.

There is nothing rational about this assertion. Less than three weeks before this statement, Wisconsin did not have a single COVID-19 case diagnosed. As Governor Evers pointed out in response to Defendants' political rhetoric, the pandemic was worsening with each passing day and like any responsible leader he acted on the facts as they evolved, not as they once were. Of course, neither Vos nor Fitzgerald ever intended to "ensure the election would continue safely and to maximize the opportunity to vote absentee."

58.     The Legislative Defendants in fact chose to do the exact opposite. Nothing proves this more than the approach the Assembly and Senate took to the first special legislative session held on April 4, 2020 at 4:00 p.m. Each chamber spent less than 20 seconds in their session to "gavel in and gavel out" without considering Governor Evers' request to take action about the Spring Election. Instead, they simply adjourned and agreed to reconvene at 10:00 a.m. on April 6, 2020 where, as it turned out, they again spent a sum total of 20 seconds each in the sham exercise of pretending to address the people's business before adjourning. This legislative **inaction** forms the heart of this case, because the failure of the State and the Legislative Defendants to postpone the Spring Election or otherwise establish absentee balloting procedures to ensure that all qualified voters could vote directly caused the deprivation of the constitutional and statutory rights of the Plaintiffs and the class members they seek to represent.

59.     On Sunday, April 5, 2020, numerous Wisconsin mayors sent a letter to Secretary-Designee Palm at DHS asking her to use the power provided to her office under Wis. Stat. §

252.03(2) to "close schools and forbid public gatherings in schools, churches, and other places to control outbreaks and epidemics."

60.     The following morning, Governor Evers entered Executive Order No. 74 delaying the Spring Election to June 9, 2020 or other agreed-upon date established by the Assembly and Senate.  In the order, he again convened the legislature into special session and further authorized all persons duly serving in office and up for election to continue to serve until the election was held and certified by the Commission.

61.     True to form and personality, Defendant Vos promptly tweeted in response to the Governor's executive order: "We don't live in a banana republic where the executive can just cancel elections because he doesn't want to hold them."  The intent of the Legislative Defendants has never been to hold a full and fair election. At every opportunity where they could have both accounted for the safety of the electorate and preserved the fundamental right to vote, they chose to adhere to a process they knew would restrict the franchise in violation of the Plaintiffs' constitutional rights.

62.     Within hours of the Governor's order on April 6, 2020, the Wisconsin Legislature at Defendant Vos and Fitzgerald's direction filed an original action in the Wisconsin Supreme Court seeking to overturn the order suspending the Spring Election to June 9, 2020.  In a matter of hours, the Court enjoined Executive Order No. 74, concluding that none of the provisions cited in the order for suspending the election supported Governor Evers' decision to do so. Ignoring all the policy rationales asserted by the Governor and the dissent, a majority of the Wisconsin Supreme Court enjoined the order and freed the Wisconsin Legislature (and Vos and Fitzgerald) to allow the Spring Election to proceed despite the deadly pandemic.

63.     Several hours later, the United State Supreme Court issued a *per curiam* decision that reversed Judge Conley's April 2, 2020 decision extending the deadline for the receipt of both absentee ballot requests and completed absentee ballots. In so doing, the Court stayed enforcement of Judge Conley's order and held that a Wisconsin voter's absentee ballot must either be (a) post-marked by election day, April 7, 2020 and received by the Commission no later than April 13, 2020; or (b) hand-delivered to a certified polling location by 8:00 p.m. (Central Daylight Time) on April 7, 2020, the day of the Special Election.

64.     What constitutes a "post-mark" is unclear. On April 10, 2020, the Commission vigorously debated how it would define a ballot envelope as post-marked when it was asked to certify the election results after they were announced on April 13, 2020.

65.     The Legislative Defendants' protests about election fraud concerns and voter confusion are mere pablum. Indeed, at one-point Defendants Vos and Fitzgerald sought to move the election for their preferred Wisconsin Supreme Court candidate (Dan Kelly) when they learned he would face election on the same day as Wisconsin's presidential primary. Knowing that national contests involving presidential elections typically result in higher voter turnout and believing that higher voter turnout favored Democrats and nonpartisan candidates supported by Democrats (like Kelly's challenger), political expedience was always on Vos and Fitzgerald's mind. Their latest turn is just more of the same – at the sake of Plaintiffs' constitutional rights.

**The Spring Election**

66.     On April 7, 2020, Wisconsin proceeded to conduct its in-person election despite having no substantial justification or rational basis for doing so in the midst of the worst public health emergency in America since the 1918 influenza pandemic.  Plaintiffs purposefully bring this action before the 4 p.m. April 13, 2020 deadline for the announcement of the Spring Election

results.  They do so to show directly and specifically to the Court that this action is not partisan (about winners and losers) but rather a challenge to the fundamental unfairness of the Legislative Defendants' intentional act to force voters into an unreasonable, unfair, and unconstitutional choice between (a) exercising their fundamental right to vote in an in-person election during a pandemic; and (b) forgoing their right to vote in order to preserve their life and health and the lives and health of those close to them and the public overall. To this end, we remind the Court that in a mere 4 days since the Spring Election was conducted, another 5,864 people died in the United States of COVID-19.  (*Cf.* April 7, 2020, CNN, "US Marks Record for Most New Coronavirus Deaths Reported in a Single Day", last accessed on April 11, 2020 at https://www.cnn.com/world/live-news/coronavirus-pandemic-04-07-20/index.html                   with paragraph 38 above.).

        67.     Nearly every community in Wisconsin faced volunteer shortages at the polls, during the Spring Election, because many who typically would volunteer as poll-workers chose or were required to forego that work in order to comply with the Safer at Home Order and in order to be prudent about their health (as well as that of their family and the public at large) by not exposing themselves to carriers of COVID-19 for fear of becoming infected to their own detriment and the detriment of others.  In Milwaukee, a community of approximately 592,028 people, **180** polling places were reduced to **five**. Lines of more than two hours surrounded some polling locations while each person standing in line violated the Safer at Home Order and exposed themselves to each other and ultimately the poll-workers and National Guard members who ran the polls, despite their best efforts to maintain distance.

        68.     Pursuant to Article IV, Section 28 of the Wisconsin Constitution, Defendants Vos and Fitzgerald (indeed, each member of the Assembly and Senate) each took an oath to "support

the constitution of the United States and the constitution of the State of Wisconsin" where they agreed to, "faithfully and impartially discharge the duties of said office to the best of [their] ability."  This action seeks to redress the Legislative Defendants' ongoing and flagrant acts in relation to the Spring Election which demonstrate the violations of the oath each member of the Assembly and Senate took to support – not infringe –  the constitutional rights of Wisconsin residents generally and its voters specifically.

69.     Having achieved his legislative aim of pushing through the Spring Election despite the concerns for public safety, Defendant Vos proclaimed on election day that there was nothing to worry about and that voters should simply come on out and vote. The morning of April 7, 2020, he tweeted: "You are **incredibly safe** to go out."  (Emphasis added.) In what should be considered the most perverse and tone-deaf exercise of judgment in history, this is how Defendant Vos showed up, purportedly to work at the "incredibly safe" polls, on April 7, 2020:



Defendant Vos later described his polling place, in sparsely populated Burlington, as less risky than shopping for groceries. Needless to say, few if any of the voters that Vos forced to the polls had the kind of personal protective equipment ("PPE") he obviously believed to be necessary to be in the vicinity of the very voters he ordered to the poll that day.

70.     Despite an established shortage of PPE for medical personnel in our nations' hospitals, Defendant Vos insisted that Wisconsin voters throw caution to the wind and show up to exercise their fundamental right to vote. Long ago, the United States Supreme Court concluded that state legislatures could not take action (or inaction) that thwarted or otherwise established impediments to voting. By forcing electors like Plaintiffs and the class of voters they seek to represent to choose between their personal safety and exercising their constitutional right to fully and fairly vote, the Legislative Defendants placed a massive impediment in the way of Wisconsin voters' ability to exercise the franchise on April 7, 2020.  Each of the Defendant Commissioners (and the Commission's Administrator) had no choice but to implement this illegal scheme, and would be called upon to implement the remedies requested by Plaintiffs in this action, and for this reason are joined as Defendants in this suit.

**Class Allegations**

71.     Plaintiffs propose a Class consisting of all registered Wisconsin voters and unregistered Wisconsin voters who were eligible to register who (a) did not vote in person on April 7, 2020; (b) sought to vote absentee but did not receive a ballot despite requesting one from the State prior to April 7, 2020; or (c) completed and delivered via U.S. Mail or in person an absentee ballot that is now invalid based on the April 3, 2020 decision of the United States Court of Appeals for the Seventh Circuit or the April 6, 2020 decision of the United States Supreme Court in the matters referred to in this Complaint as the Pre-Election Litigation.

72.     Plaintiffs specifically allege the following sub-classes:

a.   A "Covid-19 Registered Impediment Class" made up of registered Wisconsin voters who did not vote absentee and chose to forego in-person voting on April 7, 2020 due to health and safety concerns stemming from the pandemic;

b. A "Covid-19 Unregistered Impediment Class" made up of unregistered Wisconsin voters who did not vote absentee and chose to forego registering and voting in person on April 7, 2020 due to health and safety concerns stemming from the pandemic;

c. An "Untimely Absentee Ballot Receipt Class" made up of registered Wisconsin voters who sought to vote absentee, requested a ballot prior to April 3, 2020, did not receive the ballot prior to April 7, 2020, and chose to forego voting in person on April 7, 2020 due to health and safety concerns stemming from the pandemic;

d. An "Absentee Ballot Subsequently Rendered Invalid Class" made up of registered Wisconsin voters who voted absentee consistent with Judge Conley's April 2, 2020 decision or the April 3, 2020 decision of the Seventh Circuit Court of Appeals whose ballots will be invalidated by the Commission due to the April 6, 2020 decision of the United States Supreme Court;

e. A "Post-Mark Invalid Class" made up of registered Wisconsin voters who timely mailed their absentee ballots consistent with the April 6, 2020 decision of the United States Supreme Court but whose ballots will ultimately be rejected because of confusion at the Commission over what constitutes a "post-mark" within the meaning of that decision;

f. A "Showed Up to Vote Class" made up of registered and unregistered Wisconsin voters who showed up to a polling location to vote or to register (and vote) and decided (once there) that the risk of being exposed to COVID-19 was too high and subsequently left the polling location without voting or otherwise registering to vote;

g.  An "ADA Class" made up of registered and unregistered Wisconsin voters who due to their disabilities were protected as of April 7, 2020 under the Americans with Disabilities Act and who were unable to exercise their vote in person or via absentee ballot; and

h.  A "VRA Class" made up of all individuals who qualify for protection under the Voting Rights Act and whose membership in the VRA Class entitles them to protection under the Voting Rights Act to be free of voting impediments such as those instituted by Defendants on April 7, 2020.

73.  This case may be appropriately maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because all of the prerequisites set forth under Rule 23 (a) and 23(b) are met.

### Rule 23(a) Factors

74.  <u>Numerosity</u>. Members of the Class are so numerous that joinder of all such members is impracticable, if not impossible. Although the exact size of the Class is unknown to Plaintiffs at this juncture, the Commission reported as of April 1, 2020 that Wisconsin had 3,387,130 registered voters.  While obviously many of these individuals voted by absentee ballot or in-person (despite the risk), it is believed and alleged that the number of persons that were denied the right to vote based on the allegations in this Complaint far exceeds 100,000 people.

75.  <u>Existence of Common Questions of Fact and Law</u>. There are questions of law and fact common to the Class with respect to the liability issues, remedies, and anticipated affirmative defenses. Specifically, such common issues include, but are not limited to:

a.  Class members are all residents of the State;

32

b.  Class members were either registered to vote in-person or by absentee ballot on April 7, 2020 or unregistered but sought to register and vote in the Spring Election;

c.  All members of the Class were subject to COVID-19 exposure and are presumed as of April 7 2020 to have lacked immunity to the disease;

d.  The Safer at Home Order applied to all residents of Wisconsin, including registered or unregistered voters in the Class;

e.  The requirements for in-person and absentee voting are identical for each member of the Class;

f.  Those who attempted to vote via absentee ballot and took action consistent with Judge Conley's April 2, 2020 decision were equally affected by the Seventh Circuit's April 3, 2020 modifications to that decision and the United States Supreme Court's April 6, 2020 decision reversing Judge Conley's decision;

g.  Members of the ADA Class are defined by the Americans with Disabilities Act and the scope of their rights under that statute are defined and limited by the provisions of that federal legislation;

h.  Members of the VRA Class are defined by the Voting Rights Act and the scope of their rights under that statute are defined and limited by the provisions of that federal legislation;

i.  Whether Defendants' conduct warrants preliminary and/or permanent injunctive, declaratory, and ancillary relief.

76.  Typicality. Plaintiffs are members of the Classes alleged above. Their claims have a common origin and share common bases. Plaintiffs' claims originate from the same illegal and constitutionally invalid practices of the Defendants, and the Defendants have acted in the same

way toward the Plaintiffs and each member of the Class. If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

77.    Adequacy. Each Plaintiff named in this Complaint will fairly and adequately protect the interests of the Class because they and their counsel possess the requisite resources and experience to prosecute this case as a class action. Plaintiffs' interests do not conflict with the interests of the members of the Classes they seek to represent.

### Rule 23(b) Factors

78.    Fed. R. Civ. P. 23(b)(1). The prosecution of separate actions by Class members would create a risk of inconsistent or varying adjudications with respect to individuals that would establish incompatible standards of conduct for parties opposing the class under Fed. R. Civ. P. 23(b)(1)(A).  In addition, the prosecution of separate actions would create a risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, and substantially impair, or impede their ability to protect their interests under Fed. R. Civ. P. 23(b)(1)(B).

79.    Fed. R. Civ. P. 23(b)(2).  Plaintiffs seek prospective and remedial injunctive and declarative relief to remedy the wrong engaged in by Defendants on April 7, 2020 in relation to the Spring Election. Defendants have acted or refused to act on grounds that apply generally to the class by refusing to promote the constitutional rights of the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

80.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The names and addresses of the members of the Class are available from the Commission, which maintains a list of all registered

voters, those who voted in the April 7, 2020 election in-person or by absentee ballot, and those who sought the right to vote absentee.

## CLAIMS FOR RELIEF

### First Claim for Relief
**Violations of Amendments I and XIV of The U.S. Constitution**
**42 U.S.C. § 1983**
**Total Deprivation of Voting Rights**

81.     Plaintiffs reallege Paragraphs 1 through 80 as if set forth in full.

82.     The First Amendment guarantees the rights of citizens to participate in the political process, including the right to vote.

83.     The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

84.     The United States Supreme Court ruled in *Reynolds v. Sims* that because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."

85.     States are not obligated by the U.S. Constitution to allow absentee voting. However, once they decide to make absentee voting available, under ordinary circumstances, a state that denies absentee ballots to some voters while allowing other voters in similar or identical circumstances to use absentee ballots, without affording a comparable alternative means to vote, is engaging in arbitrary, invidious discrimination that violates the Equal Protection Clause. When the State's arbitrary discrimination rests on its stubborn refusal to acknowledge how the most serious public health crisis in the United States for more than a century would certainly destroy many voters' ability to participate in the Spring Election, the State's violation of its citizens' most fundamental right is outrageous.

86.     The Wisconsin Supreme Court's ruling of April 6, 2020 established that Governor Evers did not have the right to issue an executive order postponing the election, meaning that right and authority in Wisconsin existed solely and exclusively with the Assembly and the Senate which chose not to take action despite the pandemic.  Such inaction is the equivalent of action under the law.

87.     The United States Supreme Court's *per curiam* decision on April 6, 2020 stayed the April 2, 2020 order of the United States District Court in the Pre-Election Litigation, and thus rendered unenforceable the District Court's rulings allowing voters using absentee ballots one additional week to have their ballots post-marked and received by municipal clerks. The Supreme Court ruled that under its precedents, the District Court should have refused to alter state election rules on the eve of an election.

88.     The inescapable result of the April 6, 2020 decisions by the Wisconsin Supreme Court and the United States Supreme Court is that the only institution with the power and the authority to postpone the Spring Election is the Wisconsin Legislature.

89.     When the Wisconsin Legislature, under the leadership of Defendant Fitzgerald in the Senate and of Defendant Vos in the Assembly, convened on Saturday, April 4, 2020 under Governor Evers's call for a special session seeking to postpone the Spring Election, Defendants Fitzgerald and Vos each gaveled their sessions dead within 17 seconds in total.

90.     The April 4, 2020 special session was like a fixed fight; the outcome had obviously been decided in advance. Plaintiffs, and all members of the Class they seek to represent, then faced a Hobson's choice:  risk their health and lives – along with the health and lives of their families and neighbors – by voting in person during a pandemic, or preserve their health, stay home, and forego exercising a citizen's most fundamental right. Plaintiffs were in this impossible position

only because the Legislative Defendants gave literally no weight to the agonizing choice that Plaintiffs faced.

91.     The Spring Election took place as scheduled. Fears that eligible citizens would not vote are no longer mere speculation. Instead, those fears became real deprivations of constitutional rights thousands and thousands of times all over Wisconsin, as people chose to stay home and sacrifice their vote rather than run the risk of in-person voting during America's worst infectious disease outbreak in more than a century.

92.     The outright denial of the right to vote is unquestionably the most egregious possible infringement of that right.

93.     Plaintiffs, who chose to stay home and preserve their lives and health, may well have made the wise choice. Lines to vote at many polling places stretched for blocks, and in Milwaukee some voters waited more than two hours before they cast their ballots. Many voters did not wear masks or gloves to minimize the chances that they would transmit the virus if they were unaware they were contagious. At some polling places, there were not enough election workers to sanitize the ballot-marking tables regularly, let alone between each voter's use.  This is no criticism of the limited number of poll-workers, who did the best they could in a near-impossible situation.  Instead, the fault lies entirely with the Legislative Defendants, who acted without regard for the health and safety of the poll-workers or the citizens who voted, or for the voting rights of the citizens who chose instead to preserve their health and safety in lieu of voting.

94.     When Defendants Fitzgerald and Vos ended the special session on April 4, 2020, it was well known that approximately 18 other states had already postponed their primaries because the responsible decision-makers in those states were exactly that – responsible, recognizing that

there was no need to cling to scheduled election dates in what were likely the early stages of America's worst pandemic since the influenza pandemic of 1918.

95.     Likewise, it is a matter of historical record that responsible, prudent governments have postponed elections that were scheduled to take place when emergencies struck. Residents of New York City were just starting to vote in the city's mayoral primary when the Twin Towers of the World Trade Center were attacked by terrorists on September 11, 2001. New York City stopped the election in progress and held the primary two weeks later.

96.     Hurricane Katrina destroyed much of New Orleans in late August 2005, and more than five months later, the city postponed its first round of mayoral voting, originally scheduled for February 4, 2006, so it could continue to deal with the devastation left in Katrina's wake. New Orleans ultimately held the mayoral primary on April 22, 2006.

97.     The United States Supreme Court has established a test, called "*Anderson/Burdick* Balancing*,"* to guide lower federal courts' decision making in challenges to state election law, regardless of the underlying legal theory used to support the challenge. This Court must weigh the character and magnitude of the injury to the plaintiffs' First and Fourteenth Amendment rights against the precise interests put forward by the state as justifications for restricting the right to vote, in light of the extent to which those state interests make it necessary to impair the plaintiffs' right to vote.

98.     In this case, this Court must strike the balance in favor of Plaintiffs.

99.     Plaintiffs' right to vote was not merely impaired or burdened. It was utterly destroyed. Defendants' refusal to postpone the election completely deprived Plaintiffs of their most fundamental right.

100.     Defendants likely will advance the standard interests of a State defending its election laws and procedures: they will claim that a partial or full revote as sought by Plaintiffs in this action will undermine the finality that candidates, voters, governments, and the society at large are entitled to after an election is completed. They will say that a partial or full revote will be too costly and too cumbersome. Defendants will contend that voters may be confused if the same set of issues that appeared on the ballots in the Spring Election is presented to them again. And, they will argue that a federal court should not delay state elections, pointing to Judge Conley's April 2, 2020 decision refusing to grant that relief and the United States Supreme Court's decision rejecting the much more narrow relief entered by the district court before the election.

101.     The last point is the most easily refuted: there is a long history of federal courts ordering a revote or special election to remedy clear constitutional violations of the right to vote. Preventing a citizen from voting at all is the clearest violation of the Constitution imaginable.

102.     Voters are not likely to be confused if a revote is ordered. The impact of COVID-19 on the Spring Election captured mass and social media attention in Wisconsin, across America, and around the world. Many of the stories dealt with the fundamental injustice done by Wisconsin to its voters who feared for their health and lives if they exercised the only option that the State made available to them. An order by this Court mandating a partial or full revote will surely get as much attention as the initial controversy, attracting the attention of the Wisconsin citizens who want to vote.

103.     Arguments against a revote based on cost and finality are the ultimate in cynicism, echoing the old story of the child who killed his parents and then begged the court for mercy because he was an orphan. It was clear well before the April 4, 2020 special session of the Wisconsin Legislature that prudence commanded postponing the election. As of the filing of this

Complaint, at least eighteen states and territories have postponed their Presidential primary elections or switched to mail-in voting, usually with extended deadlines. These states made responsible decisions to respect their citizens' health and lives, while at the same time fully preserving their fundamental right to vote. The cavalier attitude of the Legislative Defendants toward the lives and the fundamental rights of Wisconsin citizens should not be excused because it is too expensive to remedy the serious wrongs they have done.

104.    The failure of the Legislative Defendants to postpone the Spring Election violated the Plaintiffs' right to vote under the First and Fourteenth Amendments and should be remedied by an order of this Court ordering a revote.  All members of the Class who the Plaintiffs seek to represent were injured similarly.

105.    The Legislative Defendants acted under color of law to deprive the Plaintiffs and those they represent of their right to vote that is guaranteed under the U.S. Constitution. Accordingly, Plaintiffs are entitled to a declaration of their rights, injunctive relief, and attorneys' fees and costs pursuant to 42 U.S.C. § 1983.

**Second Claim for Relief**
**Violations of The Voting Rights Act (As Amended)**
**42 U.S.C. §1983**

106.    Plaintiffs reallege Paragraphs 1 through 105 as if set forth in full. Wisconsin has a centuries-long history of discrimination against African Americans and Latinos that has interfered with their ability to participate in registration and voting. This history dates back to the State's founding in 1848; African Americans did not gain the right to vote until after the Civil War.

107.    As is set forth in greater detail below, the election statutes and procedures in place for the Spring Election disproportionally burdened African American and Latino voters.

108.   Wisconsin's striking history of racial segregation, which persists to the present, reinforces the burden on African American and Latino voters. In some studies, Wisconsin has been ranked the most segregated state in the nation, and it has made little progress in closing wealth, achievement, and voting turnout gaps. (*See, e.g.*, https://www.channel3000.com/wisconsin-is-the-most-segregated-state-in-america-according-to-new-report/).

109.   According to the U.S. Census Bureau, as of July 1, 2019, 81.1 percent of Wisconsin residents are self-identified white and not Hispanic or Latino; 6.9 percent are Hispanic/Latino, 6.7 percent Black/African American, and 2.0 percent identify as two or more races.

110.   However, African American and Latino voters are disproportionally concentrated into Wisconsin's population centers. By way of example, the City of Milwaukee's population as of July 1, 2019 was 35.3 percent white and not Hispanic/Latino; 38.8 percent Black/African American;18.8 percent Hispanic/Latino, and 4 percent two or more races. Milwaukee's total population is estimated at 592,025 as of July 1, 2018 (the most recent estimate for that figure as found at https://www.census.gov/quickfacts/milwaukeecitywisconsin). Nearly two-thirds of Wisconsin's African Americans live in Milwaukee.

111.   By comparison, nearby the City of Wauwatosa's population as of July 1, 2019 was 84.4 percent white and not Hispanic/Latino; 5.2 percent Black/African American, and 3.3 percent Hispanic/Latino, and 2.9 percent two or more races. Wauwatosa's population is estimated at 48,376 as of July 1, 2018 (https://www.census.gov/quickfacts/wauwatosacitywisconsin). These patterns are repeated all over the state, with African American and Latino voters concentrated in cities such as Beloit, Racine, and Kenosha, and white voters in suburban and rural locations.

112.   Racial discrimination and animus against minorities has existed since Wisconsin's statehood, but sadly it has not waned through passage of time. The Wisconsin Constitution as

originally enacted permitted African Americans to vote only by referendum of the State's electorate (i.e. white men). While the first such referendum passed, African American men did not gain the right to vote until 1866 (with women following on June 19, 1910).

113.    From 1913 until 2006, Wisconsin residents were only required to register to vote before voting if they lived in municipalities with more than 5,000 residents. As is the case today, African Americans and Latinos lived primarily in larger municipalities, and Wisconsin's registration requirements placed a disproportionate burden on African Americans and Latinos. This scheme was only banned in 2006 pursuant to the Help America Vote Act, 42 U.S.C. § 15438(a).

114.    Recent campaigns exemplify Wisconsin's entrenched racism, both explicitly and implicitly. During then-Supreme Court Justice Louis Butler's 2008 re-election campaign, his opponent's campaign released an infamous ad suggesting that Butler, as a public defender, had freed a client convicted of sexually assaulting a child, who then went on to reoffend. The ad featured Justice Butler and his client, each African American, in a manner that was characterized as "racist visually" by Justice Butler's former law clerk. The law clerk received racist and harassing phone calls following the ad (http://archive.jsonline.com/newswatch/230694661.html).  Similarly, during the 2012 gubernatorial recall election, then-Governor Scott Walker declared that "we don't want Wisconsin to become like Milwaukee," and used Willie Horton-esque attack ads to cast Milwaukee as a "cesspool of permissive misrule," and pit Black Milwaukee against its largely white suburbs   (https://nymag.com/intelligencer/2020/04/covid-19-hits-black-milwaukee-and-other-communities-hard.html).

115.    Voting in Wisconsin is racially polarized. African American and Latino voters in Wisconsin have historically voted at lower levels than white voters, and the gap is larger than in

other states. According to a study by the Center for American Progress, in the 2012 presidential election, 67.2 percent of white, non-college educated and 88.4 percent of white, college educated eligible voters in Wisconsin actually voted, while only 74 percent of eligible African American and 52.5 percent of eligible Latino voters did so at the time (https://www.americanprogress.org/issues/democracy/reports/2017/11/01/441926/voter-trends-in-2016/).

116.    By 2016, after stringent voter ID laws and other restrictions became law, turnout percentages across all demographic groups declined; however, the decline was more pronounced among minority groups than whites. According to the same study, in November 2016, 65 percent of eligible white, non-college educated and 86.1 percent of eligible white, college educated voters actually voted, a decline of 2.2 percentage points in each category. However, the percentage of eligible Latino voters who turned out dropped by 5.8 percent to 46.7 percent, and among eligible African American voters, turnout dropped a staggering 18.9 percent, to only 55.1 percent. The onerous restrictions may have kept up to 200,000 voters, disproportionately African American, from the polls in 2016. (*See* "Voter Suppression Analysis," Priorities USA/Civics Analytics, May 3, 2017, available at https://www.scribd.com/document/347821649/Priorities-USA-Voter-Suppression-Memo#.)

117.    Wisconsin's African Americans and Latinos have suffered numerous additional effects from discrimination and animus, ranging from housing redlining, educational and employment gaps, and, health disparities. These disparities hinder African Americans and Latinos from effectively participating in the political process.

118.    Wisconsin bears the unfortunate distinction of having the worst gap in academic achievement between African American and white students in any state; moreover, 82 percent of

African American students were considered economically disadvantaged. (*See* https://www.jsonline.com/story/news/politics/2019/10/30/wisconsin-student-test-scores-stagnate-black-white-gap-persists/4096609002/.)

119. Particularly relevant in this action are disparities in health between white and non-white populations in Wisconsin. According to a study by the Wisconsin Collaborative for Healthcare Quality released in September 2019, while Wisconsin ranks high in overall healthcare, African Americans are less likely than whites to have their high blood pressure and/or high blood sugar under control; the same is true for Latinos, compared to whites, with regard to high blood sugar. The black-white life expectancy gap in Wisconsin exceeds six years, well above the national average, with heart disease, cancer, and homicide contributing to this gap (https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-019-7145-y). Multiple hospitals serving predominantly central city neighborhoods and Milwaukeeans of color have closed over the last several decades, reducing access to health care for these populations.

120. The disparity in COVID-19 cases is no different. According to the Wisconsin DHS, as of April 8, 2019, Black/African Americans made up 26.9 percent of the state's confirmed positive cases of COVID-19, and 42.4 percent of its deaths, despite making up only 6.7 percent of its population. Middle aged and older African American men in Milwaukee have been particularly hard hit, and COVID-19 diagnoses have concentrated in Milwaukee neighborhoods that are predominantly African American and Latino. Milwaukee is not alone in this regard as black communities in urban centers throughout the United State are being hit especially hard by COVID-19 for the reasons alleged. (*See* Eugene Scott, "4 Reasons Coronavirus is Hitting Black Communities So Hard," *The Washington Post*, April 10, 2020, last accessed on April 12, 2020 at

https://www.washingtonpost.com/politics/2020/04/10/4-reasons-coronavirus-is-hitting-black-communities-so-hard/.)

121.    African Americans and Latinos have also been and remain underrepresented in elected offices in Wisconsin (particularly in the majority Republican caucuses) and those who have been elected have overwhelmingly been from Milwaukee. Not a single African American had served as a district attorney until Ismael Ozanne was appointed in Dane County in 2010. Only two African American individuals, Vel Phillips (Secretary of State, 1979-83) and Mandela Barnes (Lieutenant Governor, 2019-present), have ever served in statewide non-judicial office, and only one African American, Gwen Moore, has served as a member of the U.S. House of Representatives. Justice Louis Butler remains the only African American and only member of a racial or ethnic minority group to **ever** serve on the Wisconsin Supreme Court, and none have ever been elected to the Court (Justice Butler was appointed, and then lost reelection). The first African American judge to win election in Wisconsin was Carl Ashley in Milwaukee in 1999; the first Latino judge in Wisconsin, Juan Colas in Dane County, did not take the bench until 2008. According to a recent study, only 4 percent of Wisconsin judges are men of color. (https://www.wisbar.org/NewsPublications/InsideTrack/Pages/Article.aspx?Volume=10&Issue=7&ArticleID=26296.)

122.    No member of any racial or ethnic minority group has ever been elected U.S. Senator or Governor from Wisconsin. Currently, of 99 members of the Assembly, there are four Latino/Hispanic members (two from Milwaukee, one from Beloit, and one from Oak Creek), and six African American members (all from Milwaukee). Two of 33 members of the Senate are African American, and both are from Milwaukee. There are no Hispanic/Latino members of the

Senate. The entire Republican delegation to the Senate is white; there is one Republican member of the Assembly who is of Hispanic origin and the rest are white.

123.    African American legislators face obstacles due to their race, even after they are elected. For instance, in February 2019, a resolution sponsored by the Wisconsin Legislative Black Caucus honored various individuals in recognition of Black History Month, and the white, Republican majority objected and forced the removal of Milwaukee-born Colin Kaepernick's name from the resolution in what a member of the Caucus called a "slap in the face."

124.    The Spring Election reinforced these added burdens on minority voters, particularly African Americans and Latinos.

125.    Milwaukee's nearly 600,000 residents, and a substantial majority of the African American population of the state, faced a severe downsizing of in-person voting sites. Its voters crammed into merely **5** polling places, some many miles away from their homes. In a typical election, Milwaukee has **180** polling places throughout the city, easily accessible on foot to most voters. Civic and faith-based organizations routinely provide rides to the polls for voters who lack a way to get to the polls, but due to concerns over infection and liability, those organizations did not participate this year, leaving thousands of voters, largely African American and/or Latino, without a way to get to the polls in person.

126.    Those who did not timely receive absentee ballots, as alleged in this Complaint, were forced to make a Hobson's choice between their right to vote and their health or that of people they lived with and cared for. Despite attempts by election officials to enforce social distancing, the five Milwaukee polling places were extremely busy. Lines spanned blocks outside, and at one-point voters waited in a hailstorm. Waits of more than two hours were common.

127.   These "costs" of voting, including increased wait time at polling places and reduced convenience in getting to the polling places, historically depress turnout especially for racial and ethnic minorities. In addition, racial and ethnic minorities make up a disproportionate percentage of Wisconsin residents living in poverty, further compounding the barriers to voting.

128.   Increased health risks have proven to be another "cost" of voting during this pandemic era. Many voters, particularly African American and Latino voters, as well as older voters and those with health conditions, made the agonizing choice to stay home rather than risk their health and that of the community. For example, Plaintiffs Chrystal Edwards, as with many members of the VRA Class, routinely votes and acts as an example within her neighborhood. However, due to her family's serious health conditions as well as concern for her own health and safety, she had no real choice but to give up her right to vote in the Spring Election.

129.   By contrast, Wauwatosa had **10** locations open for the Spring Election, and the locations were "virtually empty as supply outpaced the demand."   Similar conditions were reported in Brookfield and Cedarburg, overwhelmingly white suburbs. (*See generally* https://www.nytimes.com/2020/04/07/us/politics/wisconsin-democratic-voters.html.)  In a similar vein, the predominantly white Milwaukee suburb of New Berlin, with a population of 39,740, maintained seven voting locations for the Spring Election; whereas the City of Milwaukee, with a population almost 15 times New Berlin's, had only five.

130.   Defendant Vos almost comically claimed that voting would be "incredibly safe," and volunteered to work at a polling place in Burlington, with a population of less than 11,003 as of July 1, 2018. That population is 88.7 percent non-Hispanic white, and only 0.7 percent Black/African American and 8.9 percent Latino based on U.S. Census figures.  Nonetheless, and despite this claim of safety, Defendant Vos appeared at his sparsely populated, drive-through

polling place, clad head-to-toe with PPE not available to any voters in Milwaukee, including gown, mask, and gloves, belying his representation that voting was "incredibly safe." His claim to the *Racine Journal Times* that there was "less exposure here [at the Burlington drive-through voting place] than you would get if you went to the grocery store" may or may not have been accurate in Burlington, but it surely was inaccurate in Milwaukee where between 3,600 and 4,000 people voted at each polling place and lines stretched for blocks.

131.    Although reports of absentee ballots that were requested and did not arrive at voters' homes in time occurred statewide, thousands of these missing ballots were requested in Milwaukee, forcing the unconstitutional choice described above. Suburban and rural voters, who are overwhelmingly white, may have also needed to choose between going to the polls and not voting at all, but their polling places were far less crowded and far more accessible, as described in this Complaint.

132.    Moreover, overwhelmingly white and economically advantaged suburbs such as Whitefish Bay and Bayside (affluent suburbs of Milwaukee) had far greater per capita resources and were able to mail absentee ballot request forms to all of their registered voters and saw "sky-high rates of absentee voting." (See https://www.jsonline.com/story/news/politics/elections/2020/04/10/wisconsin-absentee-ballot-forms-sent-whitefish-bay-bayside-voters/5129125002/.)   This did not happen in Milwaukee, where voters had to rely on their own resources in order to know where and how to request an absentee ballot, and many were unable to do so, or did so with no effect.

133.    Based on the totality of the circumstances, the disproportionate burdens imposed on African-American and Latino voters from the Spring Election resulted in Wisconsin having

unequal access to the polls for them and less opportunity than other voters to participate in the political process, weigh in on referenda, and elect their representatives.

134.    The circumstances described in this Complaint do not materially benefit Wisconsin. In fact, said circumstances created a disaster—although Wisconsin had been "flattening the curve," the stage has been set for a rapid escalation in COVID-19 cases. Every voter who did show up at the polls increased their risk of contracting COVID-19 and transmitting it to others. Wisconsin DHS is cognizant of this fact and is now monitoring through contact tracing the relationship between new COVID-19 diagnoses and Wisconsin's April 7, 2020 voting in person over the coming weeks. (https://www.jsonline.com/story/news/politics/elections/2020/04/09/coronavirus-wisconsin-state-tracking-whether-cases-tied-voting/.)

135.    With African Americans becoming sick and dying from COVID-19 at a much higher rate than white individuals in Wisconsin and nationally, in-person voting has created a health catastrophe that will be borne by minority voters and minorities generally, in numbers wildly disproportionate to the population as a whole.  The burdens that the actions and inactions of the Wisconsin Legislature have imposed on voters generally, and African American and Latino voters in particular, outweigh any benefits of these actions and inactions.

136.    In Milwaukee, for example, the majority of the five polling stations were located in COVID-19 "hot spots" where voters were exposed to higher rates of COVID-19 infections and communal spread.  This reality led to higher risks of exposure to individuals who exercised the franchise and further exacerbated the fear of those trying to determine whether to do so. Milwaukee County's COVID-19 Dashboard bears this out. (*See* https://mcoem.maps.arcgis.com/apps/opsdashboard/index.html#/018eedbe075046779b8062b5fe1055bf, last accessed on April 13, 2020).

137.    The Milwaukee polling locations for the Spring Election were as follows: (a) Hamilton High School (6215 W. Warnimont Avenue, Milwaukee, WI 53220); (b) Milwaukee Marshall High School (4141 N. 64th Street, Milwaukee, WI 53216); (c) Riverside High School (1615 E. Locust Street, Milwaukee, WI 53211); (d) South Division High School (1515 W. Lapham Boulevard, Milwaukee WI 53204); and (e) Washington High School (2525 N. Sherman Boulevard, Milwaukee WI 53210). Data extracted from the above referenced Dashboard demonstrates the high rate of COVID-19 cases in the very zip codes where most of these polling stations where located as demonstrated on this map:



138.    The Legislative Defendants had every opportunity to enact measures to ensure safe and equal access to the polls prior to April 7, 2020, including but not limited to universal voting by mail and extending the deadline for ballots to be received, but chose to do nothing, placing their political ambition ahead of the health and safety of millions of their fellow citizens and constituents.

139.    Upon information and belief, the Legislative Defendants have failed to pass legislation to ensure safe and equal access to the polls because the measures currently in place disproportionately burden and suppress the votes of African Americans and Latinos in Wisconsin.

140.    Despite the crowds, voter turnout was significantly depressed in Milwaukee, demonstrating this burden and suppression that disproportionately affects African American and Latino voters. (*See* https://urbanmilwaukee.com/2020/04/07/milwaukee-reports-lower-than-expected-voter-turnout/.)

141.    Section 2 of the Voting Rights Act of 1965 provides in part that, "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

142.    The failure of the Legislative Defendants to act despite ample opportunity, and instead require voters to make the choice between risking their health to show up at the polls for the Spring Election or not vote at all, has abridged and/or denied the voting rights of African Americans and/or Latinos in Wisconsin on account of race, and has had a disparate adverse impact on African Americans and/or Latinos in Wisconsin.

143.    If the requirements regarding absentee and in-person voting remain in force, the May 12, 2020 Special Election, August 11, 2020 Partisan Primary, and November 3, 2020 General and Presidential Election will continue to place African American and/or Latino voters at disproportionate risk, and their voting rights will continue to be abridged and/or denied on account of their race and the ongoing concerns surrounding COVID-19. This is particularly true given that health experts (including Dr. Fauci) currently proclaim that "normality" may not resume until at least November 2020.

144.     African Americans in particular have suffered disproportionately from COVID-19, bearing a greater proportion of the diagnoses and deaths.

145.     African Americans and Latinos in Wisconsin have suffered from, and continue to suffer from, discrimination on the basis of race, including through the electoral and political processes in the State of Wisconsin and its political subdivisions. The ongoing effects of this discrimination include socioeconomic disparities between African American and Latino Wisconsinites and white Wisconsinites.

146.     The interaction of the actions and inactions challenged here under Section 2 of the Voting Rights Act with the ongoing effects of discrimination in Wisconsin has caused and will continue to cause an inequality in the opportunity of African Americans and/or Latinos to vote in Wisconsin.

147.     Under the totality of the circumstances, the actions and inactions challenged under Section 2 have resulted and will result in less opportunity for African Americans and/or Latinos than for other members of the population in Wisconsin to participate in the political process and to elect candidates of their choice, and they violate Section 2 of the Voting Rights Act.

148.     The actions and inactions challenged under Section 2 have had and, if not declared illegal and enjoined, will continue to have a disparate adverse impact on African Americans and/or Latinos in Wisconsin.

149.     Accordingly, Plaintiffs are seeking declaratory and injunctive relief as described in this Complaint.

150.     The Legislative Defendants acted under color of law to violate the rights of the VRA Class in derogation of the Voting Rights Act. Accordingly, Plaintiffs are entitled to a

declaration of their rights, injunctive relief, and attorneys' fees and costs pursuant to 42 U.S.C. § 1983.

### Third Claim for Relief
### Violation of the Americans with Disabilities Act
### 42 U.S.C. § 12131 *et seq.*

151. Plaintiffs reallege Paragraphs 1 through 150 as if set forth in full.

152. Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, people with disabilities have been excluded from this core aspect of citizenship. People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities. People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp. People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.

153. Invaluable federal civil rights laws have been enacted to combat such forms of discrimination against those with disabilities and to protect the fundamental right to vote for all Americans. These laws include: The Americans with Disabilities Act (the "ADA"); The Rehabilitation Act of 1973 (the "Rehabilitation Act"); the VRA; the Voting Accessibility for the Elderly and Handicapped Act of 1984 (the "VAEHA"); the National Voter Registration Act of 1993 ("NVRA"); and the Help America Vote Act of 2002 (the "HAVA").

154. This action is brought by Plaintiffs and the Class to enforce Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35, against the State, the Legislative Defendants, and the Commission (which wrongfully implemented the Legislative Defendants' policy of inaction that required an in-person vote during the COVID-19 pandemic).

155.    Defendants are responsible for selecting facilities to be used as polling places for federal, state, and local elections and for overseeing the State's voting program.  In failing to protect Wisconsin residents with disabilities covered by the ADA during the Spring Election at the time of the COVID-19 pandemic, Defendants violated the ADA.

156.    At all relevant times hereto, the State, the Legislative Defendants, and the Commission violated the ADA because singularly or collectively they are a "public entity" pursuant to 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 , such that they are (A) any State or local government and/or (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government. As such, Defendants are subject to the requirements of the ADA, specifically 42 U.S.C. §§ 12131-12134.

157.    Certain of the Plaintiffs identified in this Complaint were individuals with disabilities, as defined by the ADA and the Rehabilitation Act, on and before April 7, 2020, the date of the Spring Election. Disabled individuals have been hit hard by COVID-19 and in certain instances have faced harm disproportionate to that of the general population from the pandemic. By insisting on allowing the Spring Election to proceed without consideration of that decision's impact on the disabled, the Defendants violated the ADA.

158.    One of the fundamental underpinnings and policies behind the ADA and the associated laws identified in paragraph 153 is **making voter registration accessible to all.**  Upon information and belief, Defendants violated said laws and the purpose behind the laws by failing to provide the appropriate opportunities to register to vote to Plaintiffs representing the ADA Class identified above, including assistance in registering to vote and participating in the vote given the pandemic, regardless of disability. By acting in this manner, Defendants harmed the ADA Class

by denying its members the same opportunities as nondisabled voters in person during the Spring Election and the right to otherwise participate equally in the electoral process.

159.     In communities large and small, people in Wisconsin cast their ballots in the Spring Election in a variety of facilities that temporarily serve as polling places, such as libraries, schools, and fire stations, or churches, stores, and other private buildings. The ADA requires that public entities ensure that people with disabilities can access and use their voting facilities.

160.     In some circumstances, when a public entity is unable to identify or create an accessible polling place for a particular voting precinct or ward, election administrators may instead use an alternative method of voting at the polling place. While absentee balloting can be offered to voters with disabilities, it cannot take the place of in-person voting for those who prefer to vote at the polls.

161.     Any alternative method of voting must offer voters with disabilities an equally effective opportunity to cast their votes in person.

162.     One of the fundamental underpinnings and policy behind the above laws is **ensuring policies and procedures do not discriminate against people with disabilities.**

163.     Public entities must ensure that they do not have policies, procedures, or practices in place that interfere with or prohibit persons with certain disabilities from registering to vote or voting based on their disability. For example, an election official cannot refuse to provide an absentee ballot or voter registration form to a person with a disability because the official knows the voter resides in a nursing home.

164.     In addition, the laws require public entities to modify their voting policies, practices, and procedures when such modifications are necessary to avoid discrimination on the basis of a voter's disability.

165.    One of the fundamental underpinnings and policies behind the above laws is **providing accessible voting systems and effective communication.**

166.    Federal elections are required to have a voting system that is accessible at each polling place. The accessible voting system must provide the same opportunity for access and participation, including privacy and independence, that other voters enjoy.

167.    Members of the ADA Class would have voted in the Spring Election if they had been afforded reasonable accommodations due to the COVID-19 pandemic.

168.    At all relevant times hereto, upon information and belief, Defendants intentionally, with malice and reckless indifference of the Plaintiffs seeking protection of the ADA, violated the ADA and Rehabilitation Act by refusing to accommodate their disabilities to allow them to vote, despite knowing that the ADA and Rehabilitation Act required such accommodations.

169.    At all relevant times hereto, upon information and belief Defendants' discriminatory conduct toward the ADA Class has caused and continues to cause the Plaintiffs to not be able to vote in the Spring Election. Such harms were so egregious in the State that they entitle Plaintiffs to injunctive relief allowing them to vote and for their votes to be counted in the Spring Election and future elections.

170.    At all relevant times hereto, upon information and belief, Plaintiffs had to retain legal counsel to bring this action and as such according to the ADA and the Rehabilitation Act the below identified attorneys shall be entitled to fair and reasonable attorneys' fees and costs incurred in bringing this action under the ADA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court order relief as follows:

a. Declaring that Plaintiffs and the Class were unconstitutionally disenfranchised by Defendants' decision to proceed with the Spring Election on April 7, 2020;

b. Ordering a complete revote of the Spring Election at a date and time determined by the Court to allow all registered and unregistered (but otherwise duly qualified electors) to safely participate in in-person and/or absentee voting after public health officials have determined that COVID-19 has sufficiently dissipated in Wisconsin so as to allow such voting to occur;

c. Ordering in the alternative to a partial revote using mail-in procedures to allow those who did not vote in the Spring Election to vote or register (and vote) by a date certain set by the Court and in accordance with reasonable procedures set by the Court;

d. Declaring that by allowing the Spring Election to proceed, the Defendants violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35 by limiting the ability of each member of the ADA Class to vote;

e. Declaring that by allowing the Spring Election to proceed as alleged in this Complaint, the Defendants violated Section 2 of the Voting Rights Act and disenfranchised members of the VRA Class;

f. Enjoining the Defendants, their agents and successors in office, and all persons acting in concert with them from failing or refusing promptly to comply with the requirements of the ADA, the VRA, and their implementing regulations;

g. Ordering the Defendants, their agents and successors in office, and all persons acting in concert with them to promptly develop a plan, within 20 days of this Court's order, to remedy the demonstrated violations of the ADA, the VRA, and their implementing regulations, and to fully and completely remedy the violations to allow the ADA Class and VRA Class to vote in the Special Election;

h. Prospectively requiring that the State establish mail-in voting procedures for all elections being held in 2020 to the extent COVID-19 remains a health risk for Wisconsin residents such that voters need not be required to choose between their health and safety and the right to vote, including (i) the May 12, 2020 Special Election for Congressional District 7; (ii) the August 11, 2020 Partisan Primary; and (iii) the November 3, 2020 General and Presidential Election;

i. Imposing all other preliminary, permanent, declaratory, and supplemental relief as alleged herein or otherwise pursued in this action;

j. Certifying each and every Class and Sub-Class as defined this this Complaint or hereafter established pursuant to Fed. R. Civ. P. 23;

k. Appointing the undersigned as Class counsel under Fed. R. Civ. P. 24(g);

l. Awarding attorneys' fees and costs to Plaintiffs pursuant to the statutory enactments alleged in this Complaint; and

m. Ordering such other appropriate relief as the interests of justice or this Court may require.

Dated this 13th day of April 2020.

**LAFFEY, LEITNER & GOODE LLC**
*Attorneys for Plaintiffs*


By:   <u>s/ Joseph S. Goode</u>
       Joseph S. Goode
       State Bar No. 1020886
       Mark M. Leitner
       State Bar No. 1009459
       John J. Laffey
       State Bar No. 1010885
       Sarah E. Thomas Pagels
       State Bar No. 1062162
       Jessica L. Farley
       State Bar No. 1065839
       325 E. Chicago Street
       Suite 200
       Milwaukee, WI  53202
       (414) 312-7003
       (414) 755-7089 (facsimile)
       jgoode@llgmke.com
       mleitner@llgmke.com
       jlaffey@llgmke.com
       stpagels@llgmke.com
       jfarley@llgmke.com


**URBAN & TAYLOR, S.C.**
Jay A. Urban
State Bar No. 1018098
Urban Taylor Law Building
4701 N. Port Washington Road
Milwaukee, WI 53212
(414) 906-1700
(414) 704-7207 (facsimile)
jurban@wisconsinjury.com

**HALLING & CAYO, S.C.**
Stacie H. Rosenzweig
State Bar No. 1062123
320 East Buffalo Street
Suite 700
Milwaukee, WI 53202
(414) 238-0197
(414) 271-3841 (facsimile)
shr@hallingcayo.com

**SALAWDEH LAW OFFICE, LLC**
Rebecca L. Salawdeh
State Bar No. 1027066
7119 W. North Avenue
Wauwatosa, WI  53213
(414) 455-0117
(414) 918-4517
rebecca@salawdehlaw.com