# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEMOCRATIC NATIONAL COMMITTEE, et al.,

      Plaintiffs,

      v.

MARGE BOSTELMANN, et al.,

      Defendants,                                           Civil Action No.: 3:20-cv-249-wmc

      and

REPUBLICAN NATIONAL COMMITTEE, et al.,

      Intervening Defendants.

---

SYLVIA GEAR, et al.,

      Plaintiffs,

      v.

MARGE BOSTELMANN, et al.,

      Defendants,                                           Civil Action No.: 3:20-cv-278-wmc

      and

REPUBLICAN NATIONAL COMMITTEE, et al.,

      Intervening Defendants.

---

CHRYSTAL EDWARDS, et al.,

      Plaintiffs,

      v.

ROBIN VOS, et al.,

      Defendants.                                           Civil Action No. 3:20-cv-340-wmc

      and

REPUBLICAN NATIONAL COMMITTEE, et al.,

      Intervening Defendants.

---

JILL SWENSON, et al.,

    Plaintiffs,

    v.

MARGE BOSTELMANN, et al.,

    and

REPUBLICAN NATIONAL COMMITTEE, et al.,

    Intervening Defendants

Civil Action No. 3:20-cv-459-wmc

**MEMORANDUM OF PLAINTIFFS DEMOCRATIC NATIONAL COMMITTEE AND DEMOCRATIC PARTY OF WISCONSIN IN SUPPORT OF MOTION FOR RENEWED PRELIMINARY INJUNCTION**

**Table of Contents**

Table of Authorities .................................................................................................... iii

Table of Abbreviations ................................................................................................. x

Introduction and Summary of the Argument .............................................................. 1

Statement of Facts ....................................................................................................... 10

      A.      Overview of the April 7 election. ...................................................... 11

      B.      The election-day receipt deadline continues to threaten to disenfranchise voters. ........................................................................................ 15

      C.      The continuing disenfranchising effects of the witness certification requirement. .................................................................................. 20

      D.      The continuing disenfranchising effects of the photo ID and proof-of-residence requirements. ................................................................ 22

      E.      The WEC defendants' June 25 Status Report. ................................. 24

ARGUMENT ............................................................................................................... 27

I.      This Court should extend the injunctive relief granted for the April 7 election to the November 3 general election. ................................................................ 27

      A.      This Court should again extend the online registration deadline, and should include by-mail registration in that extension. ...................... 28

      B.      This Court should again extend the election-day ballot-receipt deadline. ............ 31

II.     This Court should again grant limited injunctive relief against Wisconsin's witness-certification requirement, modified to resolve the Seventh Circuit's concerns. ............................................................................................... 34

      A.      The controlling decisions require a generous safety net. ..................... 35

      B.      This Court should follow *Frank III* in crafting appropriate relief. ........................ 42

III.    This Court should partially enjoin the ID and proof of residency requirements as applied to those who attest under penalty of perjury that they cannot meet those requirements after reasonable efforts. ................................................................ 46

IV.    This Court should order defendants to take further steps to ensure all Wisconsin voters have access to safe and secure in-person voting opportunities. .............................. 49

V.      The challenged provisions violate federal due process guarantees. ...................................54

VI.     The challenged provisions violate equal protection guarantees. .......................................56

VII.    Plaintiffs meet all other requirements for their requested preliminary injunctive relief. ...........................................................................................................................59

# Table of Authorities

**CASES**

*Am. Civil Rights Union v. Martinez-Rivera,*
166 F. Supp. 3d 779 (W.D. Tex. 2015) ................................................................. 62

*Bishop v. Lomenzo,*
350 F.Supp. 576 (E.D.N.Y. 1972) ......................................................................... 60

*Burdick v. Takushi,*
504 U.S. 428 (1992) ............................................................................................... 55

*Bush v. Gore,*
531 U.S. 98 (2000) ................................................................................ 56, 57, 58, 59

*Crawford v. Marion Cty. Election Bd.,*
472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008) ......................... 27, 35, 41

*Crawford v. Marion Cty. Election Bd.,*
553 U.S. 181 (2008) ......................................................................................... 36, 42

*Democratic Nat'l Comm. v. Bostelmann,*
20-cv-249-wmc, 2020 WL 1505640 (W.D. Wis. Mar. 28, 2020) ......................... 51

*Democratic Nat'l Comm. v. Hobbs,*
948 F.3d 989 (9th Cir. 2020) (en banc) ............................................................... 62

*DNC v. RNC,*
Nos. 20-1538 & 20-1546 (7th Cir. Apr. 3, 2020) ......................................... passim

*DNC v. RNC,*
140 S. Ct. 1205 (Apr. 6, 2020) (*stayed in part*) ............................................ 2, 7, 57

*Esshaki v. Whitmer,*
No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020) ..................................... 46

*Fair and Equal Mich. v. Benson,*
No. 20-000095-MM (Mich. Ct. Claims June 10, 2020) ....................................... 46

*Faulkner for Va. v. Va. Dept of Elections,*
No. CL-20-1456 (Va. Cir. Ct. Mar. 25, 2020) ..................................................... 46

*Fla. Democratic Party v. Detzner,*
4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ................. 55, 60

*Fla. State Conference of N.A.A.C.P. v. Browning*,
  522 F.3d 1153 ..............................................................................................57

*In re: Extension of time for Absentee and Mail-in Ballots*,
  No. 2020-003416 (Penn. Ct. Common Pleas, Delaware Cty. June 2, 2020) ..........................46

*In re: Extension of time for Absentee and Mail-in Ballots*,
  No. 2020-02322-37, slip op. (Penn. Ct. Common Pleas, Bucks Cty. June 2,
  2020) ..........................................................................................................46

*Frank v. Walker*,
  196 F. Supp. 3d 893 (E.D. Wis. 2016), *aff'd in part and rev'd on other
  grounds* 2020 WL 3496860 (7th Cir. June 29, 2020) .............................................52

*Frank v. Walker*,
  819 F.3d 384 (7th Cir. 2016) ..................................................................... passim

*Frank v. Walker*,
  Nos. 16-3003 & 16-3052, 2016 WL 4224616 (7th Cir. 2016) ................................38

*Frank v. Walker*,
  835 F.3d 649 (7th Cir. 2016) (en banc) ....................................................... passim

*Frank v. Walker*,
  768 F.3d 744 (7th Cir. 2014) ...................................................................42

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
  347 F. Supp. 3d 1251 (N.D. Ga. 2018) ...................................................33, 60

*Goldstein v. Sec'y of the Commonwealth*,
  484 Mass. 516 (2020) ..........................................................................46

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) .............................................................................27

*Idaho Coal. United for Bears v. Cenarrusa*,
  342 F.3d 1073 (9th Cir. 2003) ...............................................................57

*Jefferson v. Dane County*,
  2020AP557-OA ..........................................................................47, 49, 58

*LAJIM, LLC v. Gen. Elec. Co.*,
  917 F.3d 933 (7th Cir. 2019) .................................................................59

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
  No. 6:20-CV-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020).........................45

*Lewis v. Bostelmann*,
No. 20-cv-284-wmc ...........................................................................................................1

*Libertarian Party of Ill. v. Pritzker*,
No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020), *stay denied
pending appeal*, No. 20-1961 (7th Cir. June 21, 2020) .........................................46

*Luft v. Evers*,
___ F.3d ___, 2020 WL 3496860 (7th Cir. June 29, 2020)............................... passim

*Miller v. Thurston*,
No. 5:20-cv-05070 (W.D. Ark. May 25, 2020) .....................................................46

*Moreno v. Denney*,
No. 1:20-cv-00242 (D. Idaho May 23, 2020) ........................................................46

*Ne. Ohio Coal. for Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012) .................................................................................33

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ..........................................................................57, 59

*One Wis. Inst., Inc. v. Thomsen*,
198 F. Supp. 3d 896 (W.D. Wis. 2016) ......................................................6, 37, 62

*One Wisconsin Institute, Inc. v. Thomsen*,
No. 15-cv-324-jdp, ECF Nos. 261, 293, 305 .................................................. passim

*Paher v. Cegavske*,
No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) ...................62

*People First of Ala. v. Sec'y of State*,
No. 20-12184, slip op. (11th Cir. June 25, 2020) .................................................62

*People First of Alabama v. Sec'y of State of Alabama*,
No. 20-12184, 2020 WL 3478093 (11th Cir. Jun. 25, 2020)..............................6, 37, 44, 45

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)..............................................................................................42, 59

*Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*,
827 F.3d 333 (4th Cir. 2016) .................................................................................57

*Reclaim Idaho v. Denney*,
No. 1:20-CV-00268-BLW, 2020 WL 3490216 (D. Idaho June 26, 2020)............................46

*Rucho v. Common Cause*,
139 S. Ct. 2484 (2019)............................................................................................5

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202 (D.N.H. 2018)....................................................................55

*Taylor v. Louisiana.*,
    419 U.S. 522 (1975)..........................................................................................60

*Thomas v. Andino*,
    Nos. 3:20-cv-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020) ...................46

*U.S. Student Ass'n Found. v. Land*,
    546 F.3d 373 (6th Cir. 2008) .............................................................................61

*United States v. Berks Cty., Pa.*,
    250 F. Supp. 2d 525 (E.D. Pa. 2003) ..................................................................60

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012).................................................................60

*Wisconsin Right to Life, Inc. v. Barland*,
    751 F.3d 804 (7th Cir. 2014) .............................................................................51

*Zessar v. Helander*,
    2006 WL 642646 (N.D. Ill. Mar. 13, 2006)...........................................................55

*Zinermon v. Burch*,
    494 U.S. 113 (1990)..........................................................................................55

**STATUTES**

Wis. Stat. § 5.05 ...........................................................................................51, 53, 63

Wis. Stat. § 5.25 .......................................................................................................53

Wis. Stat. § 6.28 ...............................................................................................7, 29, 62

Wis. Stat. § 6.30 .......................................................................................................51

Wis. Stat. § 6.34 ............................................................................................... passim

Wis. Stat. § 6.86 ............................................................................................... passim

Wis. Stat. § 6.87 ............................................................................................... passim

Wis. Stat. § 7.08 .......................................................................................................51

Wis. Stat. § 7.15 .......................................................................................................53

Wis. Stat. § 7.31 .......................................................................................................51

Wis. Stat. § 7.60 ........................................................................................................34

Wis. Stat. § 7.70 ..................................................................................................34, 60

Wis. Stat. § 8.12 ........................................................................................................52

Wis. Stat. § 9.01 ........................................................................................................52

## RULES

Fed. R. Civ. P. 41(a)(2)................................................................................................1

Fed. R. Civ. P. 30(b)(6)....................................................................................30, 34, 60

## OTHER AUTHORITIES

42 U.S.C. § 1988 .......................................................................................................64

Alfred W. Crosby, *American's Forgotten Pandemic: The Influenza of 1918* (2d
    ed. 2003) ..............................................................................................................3

Article III, U.S. Constitution...................................................................................27

Ind.Code Ann. § 3–11.7–5–2.5(c) .............................................................................36

Wisconsin Election Protection *2020 Spring Election Report* (May 11, 2020) ............................48

Richard Cohn & Charlie Cook, *The Almanac of American Politics 2020* (2019)........................3

Seward W. Livermore, *Woodrow Wilson and the War Congress, 1916-18* (1966) .....................3

Sherrilyn Ifill, *Never Forget Wisconsin*, Slate
    (Apr. 8, 2020, 6:46 PM)........................................................................................50

Wisconsin Election Protection, *2020 Spring Election Report* .......................................58

## Table of Abbreviations

| | |
|---|---|
| DMV | The Wisconsin Division of Motor Vehicles of the Wisconsin DOT |
| DOT | The Wisconsin Department of Transportation |
| DNC | The full legal and juridical name of plaintiff DNC is DNC Services Corp./Democratic National Committee, but its d/b/a and trade names "Democratic National Committee (DNC)" are familiar and non-confusing, and used throughout this brief and accompanying submissions. |
| DNCFOF | DNC/DPW's accompanying proposed findings of fact |
| DPW | Democratic Party of Wisconsin |
| *Frank I* | *Frank v. Walker,* 768 F.3d 744 (7th Cir. 2014) |
| *Frank II* | *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016) |
| *Frank III* | *Frank v. Walker*, 835 F.3d 649 (7th Cir. 2016) (en banc) |
| GAB | Government Accountability Board, the WEC's predecessor |
| GOTV | Get out the vote |
| IDPP | The Wisconsin Identification Petition Process, which is administered by the DMV. The IDPP administers Wisconsin's chosen "safety net" to the voter ID law |
| RNC | Republican National Committee |
| *RNC v. DNC* | *Republican Nat'l Comm v. Democratic Nat'l Comm.*, Nos. 20-1538 & 20-1546 (7th Cir. Apr. 3, 2020), *stayed in part 5-4*, 140 S. Ct. 1205 (Apr. 6, 2020) (per curiam). |
| RPW | Republican Party of Wisconsin |
| SSA | U.S. Social Security Administration |
| USPS | U.S. Postal Service |
| WEC | Wisconsin Elections Commission |

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

This Court needs no introduction to the issues nor any detailed summary of the "lightning speed" of motions, hearings, and appeals during the first preliminary-injunction round from March 18 through April 6, 2020. ECF No. 217 at 1. Plaintiffs Democratic National Committee (DNC)[1] and Democratic Party of Wisconsin (DPW) filed this, the first of five cases the Court has now consolidated, on March 18. ECF No. 1; *see also* ECF Nos. 86, 233 (consolidating *DNC* with *Gear*, *Lewis*,[2] *Edwards,* and *Swenson*). In several orders in late March and early April, the Court denied DNC/DPW's preliminary injunction motions in some respects (without prejudice, pending the development of a more robust record), while in other respects granting critically needed equitable relief that enabled a conservative *minimum* of well over 140,000 eligible Wisconsin voters to register and/or cast their ballots. *See* ECF Nos. 37, 170, 179.[3] Although the Court's preliminary injunction was further narrowed on appeal by the Seventh Circuit and the Supreme Court, one of the most important parts of this Court's injunctive relief survived intact: the order enjoining defendants "from enforcing the requirement under Wis. Stat. § 6.87(6) that absentee ballots must be received by 8:00 p.m. on election day to be counted," and extending that deadline for receipt of absentee ballots by six days, provided that such ballots were mailed and postmarked on or before election day. *See* ECF No. 170 at 52 (April 2, 2020), *clarified & amended*, ECF Nos. 179-80 (Apr.

---

[1] The full legal and juridical title of plaintiff DNC is DNC Services Corp./Democratic National Committee, but its d/b/a and trade name Democratic National Committee (DNC) will be used throughout this brief and supporting submissions.

[2] The plaintiffs in *Lewis v. Bostelmann,* No. 20-cv-284-wmc, have, with this Court's leave, dismissed their claims as moot under Fed. R. Civ. P. 41(a)(2). *See* ECF No. 162 at 3.

[3] Over 57,000 Wisconsinites registered to vote during this Court's extension of the online registration date from March 18 to March 30. DNCFOF ¶ 197. In addition, this Court's extension of the ballot return deadline to 4:00 pm on April 13, 2020 resulted in an additional 79,054 ballots being counted for this election. WEC May 15 Report at 7; DNCFOF ¶ 198.

3, 2020), *stayed in part on other grounds sub nom. DNC v. RNC*, Nos. 20-1538 & 20-1546 (7th Cir. Apr. 3, 2020), *stayed in part*, 140 S. Ct. 1205 (Apr. 6, 2020). The defendants and intervening defendants did not challenge this extension of the ballot-receipt deadline, and the Seventh Circuit and Supreme Court both relied on the extension in denying "an additional extension, which would allow voters to mail their ballots after election day." 140 S. Ct. at 1208; *see* Order at 4, *DNC v. RNC*, Nos. 20-1538 & 20-1546 (7th Cir. Apr. 3, 2020), ECF No. 30 (extending ballot-receipt deadline to April 13 would give quarantined voters an additional six days to attempt to carry out the WEC and Seventh Circuit panel's suggestions for complying with the witness-certification requirement).

This Court's April 2 preliminary injunction extending the ballot-receipt deadline from April 7 to April 13, even as modified, avoided the disenfranchisement of a *minimum* of **79,054** voters whose *valid* ballots were cast on or before election day but, absent judicial intervention, would have been rejected. *See* WEC May 15 Report at 7; DNCFOF ¶ 198. The Court's March 20 order (ECF No. 37) also enabled **57,187** eligible voters to register online between March 18 (the statutory cutoff) and March 30 (the deadline for in-person registration and voting). DNCFOF ¶ 197. These voters were able to register on-line rather than having to appear in-person either at county or municipal polling sites (those that were still open) or in-person at the voters' accustomed polling locations (those few that had not been "consolidated," often without adequate notice).

Now the focus shifts to the November 3, 2020 general election, which promises to be one of the most consequential elections in our Nation's history. It also will be the first presidential election *ever* conducted in the midst of a global pandemic reaching deep into every corner of our Nation and Wisconsin's 72 counties.[4] The number of valid ballots that would have been rejected

---

[4] The November 1918 mid-term elections were conducted during the Great Influenza of

but instead were counted because of this Court's April 2 order *exceeds* the margins of victory in *each* of the 2000, 2004, and 2016 Wisconsin presidential elections. In fact, the 79,054 ballots that were saved by this Court's order are nearly *twice* the sum of the margins of victory in *the 2000, 2004, and 2016 Wisconsin presidential elections combined.*[5]

Widely accepted predictions anticipate that public-health conditions in November are likely to be similar to, if not worse than, the April 7 election. DNCFOF ¶ 49. This has become especially pronounced in the days leading up to the filing of plaintiffs' motion, with reported cases skyrocketing in several States and steadily increasing in more than forty States, including Wisconsin. *Id.* ¶ 32; Umberger Decl., Ex. 78 (noting that "the United States saw a 27% increase in new cases of COVID-19 in the week ended July 5 compared to the previous seven days, with 24 states reporting positivity test rates above the level that the World Health Organization has flagged as concerning."). Many Wisconsin counties have rolled back their reopening plans in response to the spike in new cases and continue to warn against mass gatherings. DNCFOF ¶ 47. Thus, Wisconsin voters are likely to choose absentee voting at least at the same—and likely higher—rate than in the April 7 election. The WEC concedes that, "[i]f voting patterns from April hold true, the state could see more than **1.8 million requests for absentee ballots by mail**." *Id.* ¶ 51 (emphasis added).

---

1918-19, and national turnout was significantly depressed through the combination of the pandemic (the second wave of which was just then cresting) and the First World War (which was then only a few days away from the Armistice). But there has never been a presidential campaign and election conducted during a global pandemic—until now. *See generally* Alfred W. Crosby, *America's Forgotten Pandemic: The Influenza of 1918,* at 174-75 (2d ed. 2003); Seward W. Livermore, *Woodrow Wilson and the War Congress, 1916-18,* at 185-86, 227 (1966).

[5] The Gore margin of victory in Wisconsin in 2000 was 5,708 votes; the Kerry margin of victory in Wisconsin in 2004 was 11,384 votes; and the Trump margin of victory in 2016 was 22,748 votes. The total of these three margins of victory (39,840) is just slightly more than half of the 79,054 ballots that were counted because of this Court's April 2 injunctive relief. *See* Richard Cohn & Charlie Cook, *The Almanac of American Politics 2020,* at 1917 (2019).

Indeed, there is every reason to believe that the November election—particularly processing at least double the number of absentee ballots as in April—is going to pose even greater challenges than those seen in the April 7 election. The plans outlined in the WEC's June 25 report to the Court do not resolve these issues, and, as the WEC conceded, it is not aware of any steps the U.S. Postal Service (USPS) has taken to prevent a repeat of the problems seen in April, particularly when there will be a far greater number of anticipated absentee ballots going through the mail in November. DNCFOF ¶ 110, 132, 143-44. County clerks will continue to be overtaxed; issues posed by first-time absentee voters will continue; and the problems of delays and mishandling of absentee ballots by the USPS have not been fixed. *Id.* ¶ 87. The WEC itself concedes that its own forecasted demand for absentee ballots will "present terrific challenges for Wisconsin election officials at all levels." *Id.* ¶ 88. As a result, without this Court's intervention, the widespread disenfranchisement of voters in the April 7 election will happen again in November, this time on a much larger scale.

The DNC/DPW and their counsel have heard the Court's questions and concerns loud and clear, and have attempted to focus this brief and supporting materials on responding to them. As the Court will note, DNC/DPW have relied heavily on the *Swenson* and *Gear* briefing, proposed findings, expert reports, and supporting exhibits on many crucial issues. We have sought to avoid burdening the Court with repetitive evidence on the same topics that are being thoroughly and convincingly covered by other plaintiffs (*e.g.*, the epidemiological issues relating to the November 3 general election, certain statistical analyses of the adverse impacts of the challenged provisions in the April 7 election, expert testimony on Wisconsin election administration, etc.). We also have shifted many of the factual details and supporting evidence from this brief to the DNC/DPW's accompanying heavily annotated proposed findings of fact (DNCFOF), again to streamline the

4

presentation and focus on the concerns the Court shared in its June 10 Opinion and Order (ECF No. 217) and during the June 29 status and scheduling conference (ECF No. 231).

Counsel for the DNC/DPW also heard the Court's admonition during the June 29 status conference to cut to the quick in explaining how our proposed relief is consistent with the *Frank* line of decisions and other controlling Seventh Circuit precedent. That burden now also includes explaining how the proposed relief is consistent with the Seventh Circuit panel's long-awaited June 29 decision in the continuing *Frank* saga (now styled *Luft v. Evers*), which was finally issued together with the decision in the State's four-year-old appeal from Judge Peterson's July 29, 2016 injunction in the *One Wisconsin Institute* litigation. *See Luft v. Evers,* ___ F.3d ___, 2020 WL 3496860 (7th Cir. June 29, 2020).[6] *Luft* is a troubling decision in many respects, especially on the Fifteenth Amendment and Section 2 of the Voting Rights Act. *See id*. at *4–5. Its *dicta* that *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), might somehow justify partisan tinkering with *voting regulations* to "help its candidates," *id*. at *2, is flat wrong and unlikely to be followed by other courts. But on the *Anderson-Burdick* claims that the DNC/DPW are presenting to this Court, *Luft v. Evers* not only is consistent with our requested relief, but in several respects *reinforces* voters' entitlement to that relief. Judge Easterbrook's *Luft* opinion relies and expands upon his decision in

---

[6] The Seventh Circuit issued its opinion after three years and four months. During that period, Wisconsin has had a general election, multiple primary elections, several Wisconsin Supreme Court races, and many more local elections. The delay in *Frank* and *One Wisconsin* drew attention. *See* Patrick Marley, *'This is shocking to me': A voter ID case that could rattle Wisconsin's fall election has been on hold for more than 3 years,* The Milwaukee Journal (Jun. 19, 2020). And although a careful reading shows that Judge Easterbrook's opinion fully endorsed Judge Peterson's actions with respect to the ID Petition Process and the individualized, personal attention that each voter deserves, the opinion vacated and remanded back to Judge Peterson to continue supervising the IDPP and assemble a *new,* up-to-date record. *See Luft*, 2020 WL 3496860, at *11 ("The district court acted on a record assembled years ago. Instead of trying to evaluate the adequacy of a process, that the state once championed, but now wants to change, the best approach is to let it try and see what happens. Adequacy cannot be evaluated in the abstract.").

*Frank v. Walker,* 819 F.3d 384 (7th Cir. 2016), which emphasized that "[t]he right to vote is **personal** and is not defeated by the fact that **99%** of other people can secure the necessary credentials easily." *Id*. at 386 (emphasis added). We are not allowed to treat voters as "error rates" to be written off because they are so "small." For the minority of voters—whether the 1% hypothesized in *Frank II* or a much larger slice of the electorate—who cannot comply with generally applicable voting rules and eligibility requirements "with reasonable effort," the *State* must provide a "safety net" in one form or another that *must* demonstrably provide eligible voters with a genuine "path to cast a vote." *Luft,* 2020 WL 3496860, at *8; *see id.* at *10 (explaining that the *en banc* opinion in *Frank III* "says that the state's process, *as the state describes it,* is adequate to that end, *if reliably implemented*") (emphasis in original).

This is a non-delegable state duty that cannot be foisted off on the 1,850 municipal clerks and 72 county clerks who administer elections in Wisconsin, or on private voter-assistance efforts—let alone on aggrieved voters themselves. The State's elected leaders cannot fall back on exhortations to the elderly, the disabled, those at "high risk," and other citizens on the margins to try harder, travel further, wait longer, and accept more risk in the midst of the global pandemic. It also should be noted that *Luft* is a ringing endorsement of the Wisconsin district courts' continuing jurisdiction and responsibility to hold the State to its promises, including with respect to ensuring that the State's promised "safety nets" are "reliably implemented" *and* sufficiently advertised to the general public. *Id.* at *10-11; *see also One Wis. Inst., Inc. v. Thomsen,* 198 F. Supp. 3d 896, 964-65 (W.D. Wis. 2016); *Frank III,* 835 F.3d at 652.

Turning from the governing *Frank* and *Luft* framework to this litigation, the DNC/DPW make seven principal arguments in this brief and accompanying proposed findings.

*First,* this Court should grant the same injunctive relief that it did in connection with the

April 7, 2020 election, as modified by the Seventh Circuit and Supreme Court. Specifically, the Court should extend the online and by-mail registration deadlines in Wis. Stat. § 6.28(1) from October 14 to October 30, the Friday before the election. The Court also should extend the November 3 election day receipt deadline in Wis. Stat. § 6.87(6) to ten days after the election (November 13), so long as all absentee ballots are "postmarked" by November 3, as that term is defined in the footnote below.[7] These essentially were this Court's remedies that still governed the spring election after the Seventh Circuit and the Supreme Court majority completed their work on election eve. This relief should be the Court's jumping-off point, and thus is addressed in Part I below.

Part I also will show that this requested relief is fully consistent with the *Luft* decision. To use Judge Easterbrook's classification, this is a 99% issue, and the question is therefore whether "the state's election code *as a whole* impose[s] only reasonable burdens" as applied in the circumstances of the pandemic. 2020 WL 3496860, at *3 (emphasis in original). "Only when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules." *Id.* As demonstrated in Part I, the challenged deadlines once again threaten to harm not only individual voters, but the electoral system *as a whole.* We know how many voters would have been disenfranchised in April if the federal courts had not extended the absentee ballot-receipt deadline: 79,054. And the November 3 election—which could be one of the most fateful in our

---

[7] There was never a postmark requirement for absentee ballots until the 5-4 *per curiam* Supreme Court decision imposed one on April 2. *See RNC*, 140 S. Ct. at 1208. The Supreme Court left that term undefined, and the WEC on a tie vote refused to provide guidance on what to do. As used in this brief, the term "postmark" refers to any type of imprint applied by the U.S. Postal Service to indicate the location and date the Postal Service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark date, it should be presumed to have been mailed on or before election day unless the preponderance of the evidence demonstrates it was mailed after election day.

Nation's history—will involve many more voters and present even more of a receipt deadline challenge, particularly because of overwhelmed local election officials and a dysfunctional postal system whose problems, like the pandemic, appear to be getting worse—not better.

*Second*, as demonstrated in Part II, this Court granted the right relief on the witness-certification issue last time around, for all of the right reasons. Data from the April election proved it: **14,042** absentee ballots were rejected because of unspecified insufficient certifications; this does not include the much larger number of voters who received their absentee ballots but simply could not comply with all the certification and proof requirements. DNCFOF ¶ 96. The Court can meet the fraud-prevention concerns expressed in the Seventh Circuit's April 3 stay order through modest adjustments to this Court's earlier relief. *Luft* and the *en banc* decision it follows, *Frank III*, mark the path for getting there. *Luft* endorsed (once again) Judge Peterson's administration of the ID Petition Process (IDPP), the State's chosen "safety net" for the voter ID requirement. Part II demonstrates that the IDPP rests on five principles that have either been approved or required by the Seventh Circuit for the IDPP. We believe a court-ordered, WEC-issued and publicized form for claiming an exemption from the witness-certification requirement that follows these same principles should and will be approved under controlling Seventh Circuit precedent including *Frank II, Frank III,* and *Luft.* The staggering number of witness declarations on this issue being submitted today by the four consolidated plaintiff groups demonstrates the urgent demand for such relief, with ample lead time to implement such relief prior to November.

*Third,* as demonstrated in Part III, proof-of-identity requirements like those in Wis. Stats. §§ 6.34 and 6.86 are also subject to the *Luft* standard. Even though it should be relatively easy in ordinary times for most of us to meet the proof-of-identity requirements, these are no ordinary times. To repeat the obvious, we are in the midst of the worst global pandemic in over a century.

Significant numbers of voters now face "high hurdles" in satisfying requirements that may, in more normal times, be relatively easy for many (or even most) of them to meet. The *Frank* line of cases and the new *Luft* decision teach that, for these citizens, the State *must* provide an accommodation designed to ensure that *even these voters* can cast a ballot with *no more than* "reasonable efforts." This Court expressed hope in its April 2 Opinion that the option of claiming "indefinitely confined" status might provide voters with the necessary safety net. ECF No. 170 at 41. Those hopes were only partially and confusingly reached in the April election. The "indefinitely confined" option was plagued by the lack of clear and consistently applied standards, as well as the lack of any public education campaign targeted to those who might qualify and benefit from such status. As a matter of federal constitutional law, the State *must* fix this proffered safety net—fast—for it to be even remotely fair and equitable in the November election.

*Fourth*, as demonstrated in Part IV, this Court should order the defendants to take all reasonable steps *available to them* to ensure an adequate number of early in-person absentee voting sites and election-day polling places throughout the State to accommodate in-person voters in a safe and secure manner. DNC/DPW will let other plaintiffs take the evidentiary lead on this issue—especially the *Swenson* plaintiffs and their expert witness, former GAB Director and General Counsel Kevin Kennedy, who sets a gold standard in expertise on election administration. As for the law, Part IV addresses the spurious contention that DNC/DPW have sued the wrong defendants because WEC lacks any authority or control over enforcement of federal voting rights in Wisconsin's nearly 2,000 local election jurisdictions. The WEC has ample statutory authority and the *duty* to "administer" Wisconsin's election laws (other than on campaign finance matters), including through formal and emergency rules, guidance, public education, and other regulatory tools to carry out court orders to safeguard Wisconsin voters' constitutional rights. It

unquestionably has ample authority to carry out the injunctive relief requested by the DNC and DPW.

*Fifth*, the DNC/DPW acknowledge in Part V that the *Anderson-Burdick* and procedural due process analyses overlap in many important ways and *probably* will produce the same results in most cases. Nevertheless, we urge the Court to use both analyses in evaluating the constitutionality of each challenged provision for the reasons discussed in Part V.

*Sixth*, the dramatically inconsistent availability of safe and sufficient in-person registration and voting opportunities, the diverging standards across cities and counties with respect to the documents required to register and vote, the conflicting guidance on the witness requirement for absentee ballots, the absence of any statewide standards for implementing the "postmark" requirement, and the standardless discretion left to each voter in applying the confusing, ill-defined, and poorly explained "indefinitely confined" exception are depriving voters, including plaintiffs' constituents, of equal protection of the laws.

*Finally,* as demonstrated in Part VII, all other requirements for injunctive relief are readily met.

## STATEMENT OF FACTS

The adverse effects of the April 7 election on Wisconsinites were broad and severe. Thousands of people were disenfranchised, thousands more risked their health to vote, and thousands had their votes counted only because of this Court's extension of the deadlines for online registration and receipt of absentee ballots. The discussion that follows describes these events and, most importantly, demonstrates that the chaos and disenfranchisement of the April election will happen again in November absent intervention by the Court. The DNC/DPW establish many of these facts through declarations from 116 Wisconsin citizens who were directly affected by the

election day receipt deadline, the witness requirement for absentee ballots, and the other voting provisions the DNC/DPW are challenging. These declarations, in addition to the expert report of Dr. Barry Burden, the deposition testimony of WEC representatives, and other evidence are described in detail in the accompanying Proposed Findings of Fact (DNCFOF). A summary of this evidence follows.

### A.      Overview of the April 7 election.

The intervening defendants and even some of the defendant Commissioners scoffed at concerns for voter safety and security in the run-up to the April 7 election, assuring that voting in person that day would be like "go[ing] to the store to get household products" or "engag[ing] in outdoor exercise." ECF No. 90 at 4. They also insisted there was "no evidence supporting [the DNC/DPW] claim that absentee ballots will overload the Post Office." ECF No. 23 at 14. Perhaps most incredibly, these same people have claimed post-April 7 that the election was "successful" and "refut[ed]" the plaintiffs' pre-election "baseless, pessimistic predictions," "overwrought claims," and "failed, sky-will-fall predictions." ECF No. 200 at 1-2.

It is an understatement to say that intervening defendants got it wrong. Wisconsin's infamous April 7 election was a voting rights and public health fiasco. People throughout the nation were horrified by images of thousands of Wisconsin citizens forced to stand in long lines for hours in order to cast their ballots, many wearing masks, gloves, and other protective gear as they congregated together to vote in the midst of the worst global pandemic in over a century. As of mid-May, 71 in-person voters and poll workers had tested positive for COVID-19 statewide. DNCFOF ¶ 6. Equally shocking was the breakdown in Wisconsin's absentee-voting process and USPS service, with thousands of voters never even receiving their requested ballots in time to vote by election day, thus forcing them either to go to the polls during the pandemic and risk exposure

to the COVID-19 virus or be disenfranchised altogether. *Id.* ¶¶ 3, 73-93.

In response to the pandemic, Wisconsin residents acted by requesting absentee ballots for the April 7 election at a rate never seen before in the State. *Id.* ¶ 98. The WEC reports that in the four spring elections from 2016 to 2019, the number of absentee ballots issued ranged from a low of 103,533 in 2017 to a high of 249,503 in 2016. *Id.* ¶ 99. In contrast, the April 7 election saw 1,303,985 ballots issued. *Id.* ¶ 100. Absentee ballots represented 73.8% of all ballots counted, a sea change from past elections when absentee votes never comprised more than one in five ballots and often represented less than 10% of ballots. *Id.* ¶ 101.

The shift to absentee voting, however, was not enough to prevent an overall drop in voter turnout during the pandemic. *Id.* ¶ 111. Because absentee voting is not sufficient for all individuals to participate, counties with a higher COVID-19 prevalence saw total voter turnout drop by an estimated 3.8 percentage points. *Id.* ¶ 112. The effect was even greater for older people, in predominantly Black and Hispanic communities, for those with less access to transportation, and among people who had never voted absentee. *Id.* ¶ 116.

Of the votes cast as absentee ballots, a much larger share was issued and returned by mail than in the past. *Id.* ¶ 102. In previous spring elections, absentee ballots were about as likely to be cast in person as by mail. *Id.* ¶ 103. For example, in the 2019 spring election, officials issued 80,577 absentees in person, but 89,218 absentees by mail. *Id.* ¶ 104. In 2018, officials issued 55,457 absentees in person, and 74,354 by mail. *Id.* ¶ 105. In contrast, data from the April 7 election indicate that 196,716 absentee ballots were issued in person and 1,116,833 were issued by mail, thus making mail ballots about 85% of the total absentee ballots issued in 2020. *Id.* ¶ 106.

The extraordinary volume of absentee ballots issued and returned by mail overwhelmed election officials and the USPS. Local election offices across the state were faced with large

backlogs of requests for absentee ballots in the final week before the election, resulting in tens of thousands of voters receiving their ballots too late to be able to mail them back in time to arrive by election day. Between April 3 and April 6 (the day before election day), local officials mailed more than 92,000 absentee ballots to voters across the State, all of which were too late to be mailed back by election day. *Id.* ¶ 74. Moreover, according to statistics from the WEC, as of April 7, there were 1,282,762 absentee ballot applications but only 1,273,374 absentee ballots sent out—a difference of **9,388** absentee ballots that had not even been sent to the requesting voters as of the day the voters had to mail them back. *Id.* ¶ 75.

Meanwhile, the USPS was losing track of thousands of ballots, many of which, to this day, have never turned up. A post-election analysis that the WEC conducted describes a disturbing sequence of events involving lost ballots. *Id.* ¶ 125. On April 8, a member of the WEC staff received a call from a USPS official in Chicago reporting that "three tubs" of absentee ballots— about 1,600 ballots—from the Appleton/Oshkosh area had been found in a postal office in Chicago. *Id.* Around the same time, a large number of voters in Fox Valley and Oshkosh reported they had not received the absentee ballots they had requested or that they received them after election day. *Id.* ¶ 126. And, in the Village of Fox Point, a bin containing about 175 ballots was delivered to the clerk's office on the morning of election day—all of the ballots were unopened and had never been received by the voters. *Id.* ¶ 127.

These events caused WEC Commissioner Spindell to admit that the 1.2 million mail-in votes in Wisconsin in April "completely overwhelmed our election system." *Id.* ¶ 78. Thousands of mail-in ballots, he stated, were "floating around" the post office and did not make it into the system. *Id.* ¶ 79.

Indeed, one voter described election day as "a crushing day" because the voter's sister, a

cancer survivor, never received her absentee ballot, the "[f]irst time she will not be voting." *Id*. ¶ 80. A couple requested their absentee ballots at the same time. While one ballot arrived, the husband "had to call three times and finally received it three weeks after [his spouse] did." *Id*. ¶ 81. Milwaukee voters reported their ballots did not arrive until the day after election day: "We weren't able to get them into the mail until the 9th, which guaranteed our votes would not be counted." *Id*. ¶ 82.

Those who decided—or were forced—to vote in person did not fare much better. Most infamously, major cities like Milwaukee and Green Bay consolidated hundreds of polling places—182 to five in Milwaukee, 31 to two in Green Bay—resulting in confusion, long wait times, lines stretching for blocks, and crowds. *Id*. ¶¶ 55-57. The result was "unacceptable," according to one Green Bay voter who waited in line for 3.5 hours. *Id*. ¶ 58. Another Green Bay voter "stood in the rain . . . 5 hours and [explained] I'm high risk for the virus and I'm scared." *Id*. ¶ 59. A Milwaukee voter describing a relative's three-hour wait called it "despicable that citizens are forced to choose between being healthy and voting." *Id*. ¶ 60. Some Wisconsinites simply could not vote, such as the Milwaukeean who "went to the voting site every two hours over the course of the day, but the line was always at least 300 people and at 81 years old with some lung issues, I could not join the end of the line." *Id*. ¶ 61.

Jeannie Berry-Matos, a 55-year-old African-American resident of Milwaukee, had a similar experience. *See id*. ¶ 62.[8] She suffers from asthma and is therefore at high-risk for complications if she were to contract COVID-19. She requested and received her absentee ballot

---

[8] As explained in the Declaration of David Kronig, submitted concurrently herewith, plaintiffs have also filed with their preliminary injunction filings approximately 116 declarations of approximately 220 declarations obtained from Wisconsin citizens that describe their experience trying to vote in the April 7, 2020 election (cited in plaintiffs' proposed findings as "Voter Declaration of __").

to avoid going to the polls in person, but when her ballot arrived, she discovered it was for the wrong ward. *Id.* She contacted both the Milwaukee city elections clerk and the state government to try to correct the error, but was unable to get the right ballot mailed to her. *Id.* She went to vote in person on April 7 at Washington High School, and found a line stretching several blocks and the only available parking a significant distance away. *Id.* There were no markers in the lines or poll workers to enforce proper social distancing, and, though she brought her own mask, many voters did not, and there was no way to sanitize the pens nor her photo ID. *Id.* All in all, it took her an hour and thirty-five minutes to vote. *Id.*

> **B.    The election-day receipt deadline continues to threaten to disenfranchise voters.**

As the discussion above demonstrates, the problems that local officials faced with unprecedented demand for absentee ballots, coupled with systemic dysfunction within the USPS, made the election day receipt deadline unworkable. This Court recognized this reality when it extended the deadline by six days and thereby saved the votes of a *minimum* of nearly 80,000 people. Now, with the November election looming, the same circumstances that caused the Court to act three months ago are present and are again threatening Wisconsin voters with massive disenfranchisement.

First, the worst global pandemic in over a century is getting worse by the day—worse around the world, worse in the United States, and worse in Wisconsin. DNCFOF ¶¶ 30-36.[9] The

---

[9] Intervening defendants have argued that the DNC/DPW's failure to seek injunctive relief for each of the four Wisconsin elections this year somehow constitutes an admission that the pandemic is not as bad as plaintiffs claim; otherwise, how could plaintiffs have passed up litigation over a special election to fill the vacancy in Wisconsin's CD-7 or a set of largely uncontested partisan primaries in mid-August? *See, e.g.*, ECF No. 144 at 4. To articulate that argument is to refute it. These two low-turnout elections are hardly comparable to the high-turnout, high-stakes April 7 spring primary or the vastly greater turnout expected in the November 3 election. The DNC/DPW simply do not have the war chest available to the RNC/RPW to fund endless rounds

trend lines are going up in too many respects, not down. *Id.* Decisions to reopen this State too soon are now reaping the whirlwind of a worsening crisis. *Id.* ¶ 40, 47. The approaching November 3 election threatens to be a train wreck not only because so many more people will be voting in November than in April (and there is a highly motivated electorate in this election), but because the pandemic will probably not be any better in November than it was in April. It could very well be much worse, particularly without the relief plaintiffs are seeking to protect both in-person and absentee voting. *Id.* ¶¶ 30-51, 132.[10]

The DNC/DPW will defer to the *Gear* and *Swenson* plaintiffs to present the facts and testimony necessary to address the epidemiological and public health issues, in particular to refute the intervening defendants' claims that recovery is just around the corner. The DNC/DPW

---

of scorched-earth motions and appeals. And clearly the DNC/DPW lack the statutory ability the Legislature granted itself (with the outgoing Governor's blessing) to hire multiple private law firms charging national rates, *and then charge the entire legal bill to state taxpayers*. Plaintiffs simply cannot match these deep pockets, and must choose their battles selectively.

[10] Intervening defendants also have taken periodic jabs at the DNC and DPW because of the long-scheduled upcoming Democratic National Convention in Milwaukee from August 17-20. The Legislature reasons that, since the DNC is planning on holding "the extremely large Democratic Nation Convention 'in person … in Milwaukee,'" Democrats must not really believe the pandemic is dangerous in this State. ECF No. 200 at 11; *see id.* at 2 ("Plaintiffs do not appear to believe what their lawyers are now arguing," since the DNC is holding its "extremely large, in-person" National Convention in Milwaukee). This comparison is spurious. The Democratic National Committee ("DNCC") has emphasized that the convention will "protect public health" by actually implementing recommendations from public health officials. And, while "Milwaukee w[ill] anchor events for the week," the Convention will include "both live broadcasts and curated content from Milwaukee and other satellite cities, locations and landmarks across the country." As part of this commitment to public health, the DNCC has brought on nationally recognized health experts to advise on the safety of the convention, has eliminated "several large-scale events attended by thousands of people" that have been mainstays in past conventions, and has "determined state delegations should not plan to travel to Milwaukee and should plan to conduct their official convention business remotely." Umberger Decl. Ex. 74. These measures underscore just how the DNCC is committed to protecting the health of Convention attendees and Wisconsinites.   Simply put, the DNC is trying to make it as easy as possible for delegates to participate and vote remotely.

especially call the Court's attention to the compelling (and deeply concerning) expert reports presented by the *Gear* and *Swenson* plaintiffs:

- Dr. Meghan Murray, Professor of Global Health at the Harvard Medical School and Professor of Epidemiology at the Harvard Chan School of Public Health, who is appearing as an expert for the *Gear* plaintiffs; and

- Dr. Patrick Remington, Professor Emeritus in the School of Medicine and Public Health, University of Wisconsin-Madison, who appears for the *Swenson* plaintiffs.

These experts' reports and testimony will comprehensively and convincingly refute the intervening defendants' irresponsible arguments that things may be back to normal by election day.

The intervening defendants repeatedly in recent weeks have questioned "the health risks that COVID-19 may cause" during the runup to the November 3 election. *E.g.*, ECF No. 200 at 18. They question whether "[t]he future course of the COVID-19 pandemic in Wisconsin" will be as bad as the plaintiffs' "sky is falling predictions," and suggest there may be new "types of treatments" by then. *Id*. They cite no medical experts for these irresponsible claims. The opinions of the only medical experts who are in this case establish persuasively that the virus will, unfortunately, continue to spread, that there is no vaccine on the horizon, and that the pandemic will continue to be a forceful, lethal presence in November.

Due in substantial part to the pandemic, the number of absentee ballots in the November election is expected to far surpass the volume of ballots that overwhelmed election officials and the USPS will be able to timely process in the April election. In comparison to the nearly 1.2 million absentee ballots cast in April, the WEC has already sent absentee ballot request forms to approximately 2.7 million voters for the November election and, as noted, WEC officials believe the number of absentee ballots cast easily could exceed 1.8 million if the April voting patterns hold. Because of the deliberate attempts to encourage absentee voting and the high turn-out associated with presidential elections, officials of the WEC are preparing for an unprecedented

level of absentee voting that will stretch election officials and the USPS well beyond what they experienced in April. Adding to the challenge, tens or hundreds of thousands of voters will be voting absentee for the first time, which materially increases the likelihood that large numbers of voters will be disenfranchised without relief from the absentee ballot deadline. DNCFOF ¶ 86. Commissioner Spindell put it bluntly, stating that the problems of ballots "not sent to voters on time" and "ballots not returned on time" . . . "**would only multiply and create more chaos and endless lawsuits in November**." DNCFOF ¶ 89 (emphasis added).

To make these dire predictions even worse, nothing appears to have been done to address the systemic problems at the USPS that led to so many lost and late absentee ballots. The WEC still has no answer or explanation for what led to the USPS's mishandling of these thousands of ballots. The USPS itself has given no indication that it has addressed any of the issues that occurred in the April election and no assurances to WEC that these same problems will not happen again in November. DNCFOF ¶ 84. As Commissioner Spindell testified, the handling of ballots by the USPS during the April election was the "wild, wild west," and he "still [doesn't] understand what happened." DNCFOF ¶ 141. Despite this, as Commissioner Spindell and Ms. Wolfe confirmed, the WEC is not engaged in *any* ongoing efforts with the USPS to develop a plan for avoiding the many problems that occurred in April. DNCFOF ¶ 144.

The cumulative effect of these factors is that the election-day receipt deadline again poses a clear and present danger that tens, if not hundreds of thousands of Wisconsin voters will face "high hurdles," *Frank II,* 819 F.3d at 386, in receiving and returning their absentee ballots through the USPS on a timely basis. Indeed, as Ms. Wolfe described, voters should assume for the November election that it will take two weeks for an absentee ballot to make its way through the mail from a clerk's office to a voter and back again. DNCFOF ¶ 142. This means that voters who

request absentee ballots in the final two weeks before the election – voters can request ballots until five days before election day – will not have sufficient time to mail their ballots back for arrival by election day. As described by Plaintiffs' expert, Barry Burden, the use of a strict ballot receipt deadline in this circumstance results in a system that is designed to fail, which of course presents the highest of hurdles. DNCFOF ¶ 146. Many voters will again suffer the totally unacceptable and unconstitutional injury that so many suffered in April—*e.g.,* timely requested absentee ballots that do not arrive in time to vote, and timely returned ballots that do not make it back to local election officials by the normal deadline. *See, e.g.*, Umberger Decl., Ex. 26 (discussing voters, such as a pregnant health care worker, who did not receive their absentee ballot by the deadline and could not vote in-person); *see also* Voter Decls. of Muawia Albanaweh, Hannah Gleeson, Rebecca Crowder, Neil Daniels, Patricia Sherman-Cisler, Susan Heinz, Elsie Thomas, Eric Vanvught, Lori Fares, Bridget Fogerty, Keri Petrie, Steven Reigle, Hannah Saxman, Eric Lind, Nathaniel Rendall, Katherine Ruh, and Delany Zimmer.

Unfortunately, the task of protecting these and the many voters like them will again fall to this Court, as there is no sign that either the WEC or the Wisconsin Legislature intends to address this issue for the November election. Commissioner Spindell made this clear when he testified in deposition that he sees no reason to extend the deadline for the November election. DNCFOF ¶ 90. But, as we learned in April and as the WEC acknowledges, the simple solution of extending the deadline by at least six days will not impose any meaningful burden on the WEC or election officials. On the contrary, as WEC Elections Administrator Meagan Wolfe testified, election officials were able to meet all post-election canvassing deadlines notwithstanding this Court's six-day extension of the deadline in April, and the extension gave election officials time to tabulate and report election results more efficiently and accurately. DNCFOF ¶195. And that modest, short

extension saved the timely cast, valid ballots of 79,054 Wisconsin citizens from being rejected.

### C.   The continuing disenfranchising effects of the witness-certification requirement.

Wisconsin's requirement that each voter submitting an absentee ballot have another adult witness sign their ballot puts tens of thousands of Wisconsin voters in an untenable situation and unconstitutionally burdens their right to vote. *See* Wis. Stat. § 6.87(2); *see also* DNCFOF ¶ 149. Over 600,000 Wisconsinites live alone, and even more live with an individual who is unqualified to be a witness (e.g., a child or non-citizen). DNCFOF ¶ 150. With the health risks of venturing out to find a witness during the COVID-19 pandemic, and any requirements of local orders regarding social distancing that may be in place at the time, a large number of voters who live alone—many of whom are elderly and vulnerable to COVID-19—will not have a witness to attest to their absentee ballots in November 2020. *Id.* ¶ 151.

As the Court will recall, the WEC's previously proposed "alternative suggestions" for fulfilling the witness requirement included having the witness observe the voter over Skype, the voter mail the completed ballot to the witness, and the witness sign and date the ballot. *DNC v. RNC*, Nos. 20-1538 & 20-1546, at *3. These proposed alternatives to fulfilling the witness requirement proved woefully insufficient during the April election. According to reporting by local election officials, **14,042** returned absentee ballots were rejected because of "insufficient" certification. DNCFOF ¶ 156. Moreover, there are strong grounds to believe that many of the **135,417** unreturned ballots—over 10% of all ballots sent out—were not returned because the voters who had requested them were unable to navigate the witnessing requirements in the midst of the pandemic and resulting isolation from others. *Id.* ¶ 157; *see also* the Voter Decls. of Elizabeth Trogdon, Dolores Garm, Susan Heinz, David Mouradian, Casey Hines, and Stephan Thomas that accompany this brief.

Dolores Garm is one such voter who received her ballot on time, but whose vote was never cast because of an inability to comply with the witness requirement. *See* DNCFOF ¶ 158. Being disabled with heart disease and other risk factors, she knew she could not go out during the pandemic. When she saw the witness portion of the ballot, she called the municipal clerk to ask if she had any option given that she lived alone. Unfortunately, given that the answer was no, Ms. Garm did not send in her ballot. She had no way to satisfy the witness requirement, and she knew her ballot would not be counted.

Elizabeth Trogdon was another voter stymied by the witness requirement in the time of a pandemic. *See* DNCFOF ¶ 159. As Ms. Trogdon explains, she could not vote in person given certain health conditions, and was also experiencing symptoms of COVID-19. She consulted with the Veteran's Administration and was told that, based on the symptoms described, she was considered positive for COVID-19 and should self-isolate. Ms. Trogdon was able to request and receive an absentee ballot in time to return it, but was not able to do so with a witness signature given her instructions to self-isolate. While she mailed in her ballot during a time when the witness requirement had been waived, that ruling was reversed and Ms. Trogdon's ballot was rejected as a result.

Although the Seventh Circuit suggested that one way for a voter to "satisfy the statutory signature requirement" might be "by maintaining the statutory presence requirement but not requiring the witness's physical signature," *DNC v. RNC*, Nos. 20-1538 & 20-1546, at *4, the WEC has not taken any steps to explore or implement that option. *See, e.g.*, Umberger Decl., Ex. 36. Nor has the WEC done anything in response to the Seventh Circuit's suggestion to consider other alternatives for voters to satisfy the requirement in a way that recognizes the realities of the public health crisis. Indeed, evincing a complete disregard for the pandemic and the people directly

affected by it, Commissioner Spindell testified that *even someone who has been diagnosed with COVID-19* should be required to interact with a witness to have her ballot signed because that is the law.  DNCFOF ¶ 154.

What is the explanation for the repeated disenfranchisement caused by this requirement? A fear of phantom "fraudsters" (this is the Legislature's word) apparently waiting to commit ballot fraud if the witness-certification requirement is modified or, as discussed below, the challenged proof requirements are waived for the duration of the pandemic. Yet there was not a single reported incident of voter fraud in connection with the election. *Id.* ¶ 180. Ms. Wolfe testified she was not aware of any, and Commission Spindell could not identify any either. *Id.* Indeed, while referring to "rumors" of improper voting and asserting that even the *availability* of absentee voting is a "hot button" issue for Republicans, Commissioner Spindell ultimately conceded that he knows of not a single incident of improper voting in April when approximately 1.2 million absentee ballots were cast. *Id.* ¶ 181.

> **D.** **The continuing disenfranchising effects of the photo ID and proof-of-residence requirements.**

Wis. Stat. §§ 6.86 and 6.87, which require a copy of a voter's photo identification to accompany a request for an absentee ballot, continue to burden voters. In the April election, many voters did not attempt to vote absentee because they could not meet these ID requirements, especially those without access to smartphones or the Internet. DNCFOF ¶¶ 162-63. Also burdensome is the requirement that copies of proof of residence accompany electronic and by-mail voter registration. Wis. Stat. § 6.34. Given the alarming increase in reported cases in recent weeks, it is unclear whether and to what extent most workplaces, public libraries, and copy shops will be open in October and November.  Even if those establishments remain open, many voters continue to be fearful of leaving their homes because of the health risks of the coronavirus pandemic, their

own doctors' recommendations, and the restrictions imposed under their respective county and local health orders. DNCFOF ¶ 164.

Nor do voters feel any more confident because of the so-called "indefinite confinement" safety net that this Court relied on in its pre-election decision. Many voters probably didn't even know about it, let alone understand what it *means*. The provision exempts from the voter ID requirement those who are facing a difficult time getting to the polls "because of age, physical illness, or infirmity, or is disabled." Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)(2). "Indefinitely confined" is not a self-defining term, and in the absence of explicit, prominent instructions on the absentee ballot request form, many voters are likely to misunderstand their entitlement to claim this status and, if they are otherwise unable to copy or upload an acceptable photo ID, may forego attempting to obtain an absentee ballot. *See* DNCFOF ¶ 170; Burden Rep. at 12-13. Those who even knew about this option in the April election were given vague, confusing, and often contradictory advice. Shortly after the election, the League of Women Voters of Wisconsin explained that "few voters" were aware of the law and there was not an "adequate, broad public education campaign" to assist voters who would qualify under it. DNCFOF ¶ 171. Instead, voters learned about it "in a piecemeal way," through groups like the League. *Id*. ¶ 172.

The "indefinitely confined" option gets only passing mention in WEC's currently proposed instructions to voters who request an absentee ballot for the November election. *Id.* ¶ 167. The WEC's proposed instructions do not tell voters that designation of indefinitely confined status is for each individual voter to make based on how they feel about their own current circumstances, nor are they told that a claim of indefinitely confined status does not require permanent or total inability to travel outside of their residence. *Id*. ¶ 168. The instructions to voters do warn, however, that they may be fined $1,000 or imprisoned up to 6 months for falsely making an assertion in

connection with the indefinitely confined option. *Id*. ¶ 169. And, both Ms. Wolfe and Commissioner Spindell are unaware of any plans the WEC has to modify its guidance on indefinitely confined status to clarify that COVID is a qualifying condition. *Id.* ¶ 173.

Moreover, this exception does not apply to the proof of residence requirement. Even individuals who are indefinitely confined must provide copies of proof of residence when they register to vote online or by mail.  Wis. Stat. § 6.34.

### E.     The WEC defendants' June 25 Status Report.

The plans and procedures outlined in the WEC's June 25 report to the Court do not resolve any of the DNC/DPW's claims. The DNC/DPW and their counsel have respect and appreciation for the WEC Executive Director and her staff, and for the thousands of local election officials, poll workers, and other election volunteers throughout Wisconsin's 1,852 local election jurisdictions whose heroic efforts mitigated the damage caused by the challenged provisions and the unyielding partisan gridlock in Wisconsin. The April 7 election could not have been conducted in the midst of an unprecedented global pandemic without their efforts. And the Status Report outlines several promising reforms that DNC/DPW appreciate and fully endorse.

That said, the Status Report acknowledges once again that the WEC has no authority to modify statutory deadlines or proof requirements like those challenged by the DNC/DPW. DNCFOF ¶ 204. That answers the question with respect to nearly all of DNC/DPW's claims, which with one exception all seek either extensions of deadlines or modification of proof requirements. On those matters, the Court must act because there nothing left for the Commission to do.

*First*, there is no real effort in the Status Report to address the multiple breakdowns in the Wisconsin voting system. To be sure, the WEC has taken some steps, and the report claims to be "studying" and "consulting" on various issues. But on key issues there is little discussion of what

the WEC will do itself, or recommends be done by others, so that all voters have reasonable access to reliable, safe, and convenient absentee voting, early in-person voting sites, and election day polling sites. For example:

- The Report does not address the fact that more than 80,000 ballots arrived after election day, through no fault of the voter, and offers no plan for dealing with the probable repeat of that problem. Relatedly, there is no request in the Report to the Governor or the Legislature to extend the ballot receipt deadline or take any other steps to address this impending crisis.

- There is no discussion of setting a minimum number of polling places and safety standards that must be available to each Wisconsin citizen.

- There is no discussion of proposed actions to address the dysfunction of the USPS. Nor is there even any attempt to provide the best-available answers to the many questions about what happened to so many ballots lost in the mail system and what the WEC should to in response given that November 3rd is rapidly approaching. There is no detailed explanation of what happened to the mail, and no suggested plan for dealing with those postal problems in November.

- Nor does the Report include a discussion of the fact that because of COVID, there is a strong need to allow voters to register longer than allowed by statute. There is no request to the Governor or the Legislature to extend the period for online registration even though extending that period in April allowed 55,000 additional people to register without imposing significant burdens on the WEC. DNCFOF ¶¶ 194-97.

*Second*, the Seventh Circuit stayed this Court's injunction regarding the witness

certification requirement, emphasizing that the WEC had just issued an *Absentee Witness Signature Requirement Guidance* several days earlier and expressing hope that voters could "take advantage of one or another of the Commission's suggestions for obtaining a signature." April 3 Order at 4. The Seventh Circuit encouraged the WEC to continue exploring ways to administer the witness-signature requirement in a way that respects the life-and-death need of many voters to isolate themselves from contact with others while ensuring that the purposes of the certification requirement are fulfilled. *Id.*

Remarkably, the Status Report is silent on these issues. The Report literally does not contain the words "*witness*," "*certify*," or "*certification*." There is no effort to evaluate the success of the WEC's pre-election *Guidance* in helping voters overcome the obstacles they encountered; no effort to take the Seventh Circuit up on its suggestion to consider other ways to help voters in overcoming difficulties with the witness-certification requirement; and no consideration of how better to educate voters (many of whom have never voted absentee before) on compliance with the requirement.

*Third*, the Report is completely silent on numerous interpretative issues. In the context of voting during the present pandemic, what does it mean to be "indefinitely confined"? How is that term interpreted? Who qualifies? And what about guidance concerning the U.S. Supreme Court's newly invented election-day postmark requirement? What does it mean to be "postmarked"? What if an envelope arrives on November 4, the day after the election, without a postmark on it? The envelope obviously was mailed on or before election day; why should it be discarded because it lacks a postmark? The 1,852 local election jurisdictions in Wisconsin desperately need guidance and leadership on these and many other urgent matters.

ARGUMENT[11]

I.     **This Court should extend the injunctive relief granted for the April 7 election to the November 3 general election.**

This Court's extensions of the online registration and election-day receipt deadlines were a smashing success. The extensions enabled an additional **57,187** Wisconsin voters to register online, safe and secure from the pandemic; and they saved the votes of **79,054** citizens who cast valid, timely ballots but would have been disenfranchised by the election-day receipt deadline, but for this Court's intervention. And according to state election administrators, these extensions were easy to accommodate and imposed few additional administrative burdens. And *no one* has pointed to any evidence that these extensions led to any voter fraud or other systemic problems. On top of that, turnout will be vastly larger in November, local election officials will probably be overwhelmed by the volume, and the USPS will continue to be unreliable. And the pandemic will still be with us on November 3.

There is, in short, *nothing* on the *Anderson-Burdick* scales to outbalance the many positive effects of this Court's extensions, including avoiding widespread disenfranchisements and helping to maintain at least degree of public confidence that a ballot cast will be a ballot counted. The

---

[11] This Court previously held that the DNC and DPW have Article III standing (1) "to assert the rights of [their] members who may face burdens to vote in upcoming elections"; and (2) to assert their own organizational injuries resulting from having to divert time, money, and other resources away from other party priorities to dealing with the challenged provisions' adverse impacts on party registration and GOTV activities. ECF No. 37 at 6-7; *see especially Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (Democratic Party had standing because of impact to members and its diversion of resources "to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"), *aff'd*, 553 U.S. 181, 189 n.7 (2008). The DNC and DPW have submitted updated evidence demonstrating that they continue to suffer both kinds of Article III injuries as the direct and proximate result of the state action in this litigation. *See* DNCFOF ¶¶ 16-22. We call the Court's attention in particular to the 116 signed declarations gathered by the DPW illustrating the severe, frequently disenfranchising burdens the challenged provisions have had upon its members throughout the State. *See* DNCFOF ¶ 48 n.14.

Seventh Circuit's new decision in *Luft* does not change the analysis in the least. Deadlines are extended if there are *systemic* crises that threaten to undermine the electoral process. *Luft* reminds us that "[c]ourts must weigh [any individual] burdens against the state's interests by *looking at the whole electoral system*," and that when an analysis of that "whole" system, taken together, shows that citizens' voting rights are in danger of being "*severely restricted*" on a widespread basis, the State must have "compelling interests" for its restrictions and ensure they are "narrowly tailored." *Luft,* 2020 WL 3496860, at * 3. As April 7 already has shown, the challenged deadlines "severely restrict" voting activity on a broad scale, and they serve no "*compelling interests*," especially in the midst of the COVID-19 pandemic. *Id.* The Court should grant the same relief it previously granted, as modified on appeal. It also should include by-mail registration in its extension of the online registration deadline.

> **A.** **This Court should again extend the online registration deadline, and should include by-mail registration in that extension.**

This Court enjoined enforcement of the March 18, 2020 online registration deadline and extended the deadline to March 30, finding in the context of the pandemic and the urgent need for people to avoid crowded places that the deadline imposed an undue burden on the right to vote. ECF No. 37 at 10-15.

> [T]he court cannot help but take judicial notice of the excruciating dilemma that will soon be faced by eligible voters who did not register by the March 18, 2020 deadline: either venture into public spaces, contrary to public directives and health guidelines or stay at home and lose the opportunity to vote. Moreover, while the Court recognizes the state's interest in the orderly administration of elections, a short extension of the registration deadline would on its face appear to impose only a minimal burden while potentially affording a great number of as yet unregistered voters the opportunity to exercise their franchise by safely voting absentee.

*Id.* at 11-12. The Court acknowledged that the WEC and local election officials could bear additional expenses and burdens in extending the online registration deadline, but concluded they

were "a reasonable downside to equitable relief that could increase both the robustness and health of the electorate, especially in light of the corresponding effect of having fewer, in-person voters to manage on election day." *Id.* at 13. Though "far from a perfect solution," the 12-day extension of online registration would help "individuals who either were not aware of the March 18, 2020 deadline, or learn of this court's extension of that deadline," to register online and thus avoid the potential exposure of having to register in person. *Id.* at 14.

This Court should grant similar relief again, enjoining enforcement of the October 14 online registration deadline under Wis. Stat. § 6.28(1) and extending that deadline to October 30, the Friday before the election. Under Wis. Stat. § 6.28(1), the deadlines for registrations in person, by mail, and electronically all close on "the 3rd Wednesday preceding the election"—*i.e.*, 21 days before the election. This provision goes on, however, to authorize registrations in person (but not by mail or electronically) to continue for those voters who cast "in-person absentee ballot[s]" or vote at the polls on election day. *Id.* Thus, those casting in-person absentee ballots may continue to register until the Sunday before the election, *see id.*; *id.* § 6.86(b), and those voting at the polls may register on election day itself, but those seeking to register by mail or electronically must do so no later than three full weeks before the election. This will be before voters have even evaluated the candidates in the second and third scheduled Presidential debates this October, and before some voters will even decide whether to vote. DNCFOF ¶ 184.

Historically, Wisconsin voters have registered to vote in person in large numbers, relying heavily on same-day registration during in-person absentee voting or on election day. As a result, thousands of Wisconsin voters typically do not register before they vote. However, many Wisconsinites did not have viable in-person registration options for the April 7 elections. In-person absentee voting was shut down in many parts of Wisconsin. *Id.* ¶ 54. And many Wisconsinites

were understandably reluctant—if not altogether unable—to venture out in public to register and vote either through in-person absentee voting or at the polls, given the public health risks during the pandemic. *See, e.g.*, *id.* ¶¶ 48, 164, 188.  For these voters, failure to register 21 days prior to the election effectively meant they could not vote.

No valid, reasonable state interests are served by this disparity and discrimination against by-mail and electronic registration. If election officials can accommodate registrations as late as election day when done in person, there is no sufficient reason why they cannot accommodate by-mail and electronic registrations much closer to the election than "the 3rd Wednesday preceding" it. *Id.* ¶ 191.

That's exactly what the WEC has confirmed in its Rule 30(b)(6) deposition: the extension of the electronic registration deadline to March 30 imposed only minimal burdens while affording many voters the opportunity both to register and to vote without risking exposure to the COVID-19 virus. In fact, Ms. Wolfe confirmed that the WEC could have accommodated an extension of *both* the electronic and the by-mail registration deadlines to April 3, the Friday before the election. *Id.* ¶¶ 194-95. The Court's expressed concern about moving the deadline for by-mail registrations to April 3—that envelopes mailed on April 3 might keep trickling in for several days, too close to the election—could easily be resolved by making April 3 a *receipt* deadline for all by-mail and on-line registration requests, rather than following a "postmark" rule that would allow this late-arriving problem to occur.

Absent relief by this Court, unregistered but eligible voters who decide to register and vote shortly before the November election will face the same "excruciating dilemma" identified by this Court—"either venture into public spaces, contrary to public directives and health guidelines or stay at home and lose the opportunity to vote." ECF No. 37 at 11; DNCFOF ¶¶ 192, 200.

**B.      This Court should again extend the election-day ballot-receipt deadline.**

The Court should extend the deadline to receive absentee ballots to at least November 13, 2020, so long as the ballots are mailed by election day. This Court's extension of the ballot receipt deadline allowed nearly 80,000 Wisconsinites to vote in the April election without causing any administrative problems for elections officials. *See* WEC May 15 Report at 7; DNCFOF ¶ 129.

As described above, in the weeks leading up to the April election, an unprecedented number of ballot requests overwhelmed clerks and reports of slower mail service indicated that thousands of Wisconsinites would not receive their ballots in time to turn them in by election day. Over 9,300 voters had not received their timely requested absentee ballots by April 7. DNCFOF ¶¶ 75, 124.

This Court's extension was necessary but not sufficient, and the risk of disenfranchisement will only increase in November. Even with this Court's extension, almost 4,700 ballots arrived *after* the new deadline of April 13. *Id.* ¶ 73. The USPS performed so abysmally that Wisconsin's U.S. Senators made a bipartisan demand for the USPS Inspector General to begin an investigation into "absentee ballots not being delivered in a timely manner." *Id.* ¶ 83. A full discussion of these facts, including the unprecedented volume of absentee ballots expected in November, is set forth above and in the accompanying proposed findings of fact, and we will not repeat them here. *See Id.* ¶¶ 73-93, 122-46.

Moreover, April 7 in Wisconsin was not a one-time fluke that is unlikely to recur here or elsewhere. To the contrary, other states with elections since April 7 have reported significant problems with voters receiving absentee ballots on time and elections officials receiving timely mailed ballots. *Id.* ¶ 133. Almost 5,500 South Carolinians who timely requested absentee ballots for the June 9 election had not received them by the end of election day. *Id.* ¶ 134. During the June 9 primary, Georgia's overwhelmed system lost some voters' absentee ballot requests and some

31

Georgians reported they had not received their requested ballot on the eve of the election. *Id.* ¶ 135. Some Georgians who mailed in their ballots by the recommended time and even by overnight mail were surprised to learn that the ballots did not arrive on time to be counted. *Id.* ¶ 136. Georgia rejected at least 8,000 ballots for arriving late. *Id.* ¶ 137. Pennsylvania and New York extended their ballot receipt deadlines through judicial decisions, executive action, or both. *Id.* ¶ 138.

The increase in mail volume stretched the capacity of the USPS during Ohio's election on April 28. In Ohio, voters expressed frustration with delays in obtaining and submitting their absentee ballots. Five days before the April 28 election deadline, Ohio Secretary of State Frank LaRose wrote to the state's congressional delegation, informing them that problems with mail delivery were affecting absentee voting. LaRose explained that, "we are finding that the delivery of the mail is taking far longer than what is published by the United States Postal Service (USPS) as expected delivery times. Instead of first-class mail taking 1-3 days for delivery, we have heard wide reports of it taking as long as 7-9 days." Burden Rep. at 11-12.

The fact that hypothetical voters *could* send in their absentee ballots a month before the election does not cure the issue. The State permits voters to request absentee ballots up until five days before the election, as it should. Not only is it human nature to procrastinate, but also those who are forced to vote so early pay a price. Prospective voters who wish to participate in the November election but are reluctant or unable to vote in person on election day are in effect forced to cast ballots by mail before the presidential campaign has ended, during the crucial final weeks when so many voters first begin to pay attention to the campaign and the undecided are struggling to decide. The third and final 2020 Presidential Debate will occur on October 22, 2020—only 12 days before election day. DNCFOF ¶ 185. "The most intense period of a presidential campaign occurs in the final days before election day. For example, television advertising by presidential

campaigns generally . . . reaches its maximum volume in the week before the election." Burden Rep. at 12. "There may be" an "October surprise," "late-breaking news or events that influence voters' candidate preferences." *Id.* "For example, an analysis of the accuracy of polling from the 2016 presidential election found evidence of late breaking movement toward Donald Trump that might have been the result of an announcement on October 28 by FBI Director James Comey that his office would review new evidence in a probe of Hillary Clinton's email." *Id.* at 12-13.  In 2016, exit polls indicated that 10% of Wisconsinites decided how they would vote in "the last few days." *Id.* at 13.  A fair voting system accommodates those voters, especially during a pandemic.

Avoiding the complete disenfranchisement of tens of thousands of Wisconsinites far outweighs any administrative burden on the State from the extended deadline. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (disqualified provisional ballots that constituted less than 0.3% of total votes inflicted "substantial" burden on voters); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (severe burden existed where 3,141 individuals were ineligible to register). There is ample time to extend the ballot-receipt deadline to November 13 so that late-arriving ballots may be counted. Wisconsin law gives counties until November 10 to begin their canvasses, and until November 17 to complete them. Wis. Stat. § 7.60. The State itself need not complete its canvass until December 1. *Id.* § 7.70(3)(a). During the April 7 election, the State counted the ballots received by 4:00 pm on April 13 without issue and announced the results shortly thereafter. The WEC acknowledged in its Rule 30(b)(6) deposition that the administrative burdens caused by this Court's prior deadline extensions were modest and manageable. *See* DNCFOF ¶ 195. There is no reason to expect a different result in November.

A modest extension of the receipt deadline is "narrow" relief, ECF No. 170 at 50, that

already has survived one round of Seventh Circuit and Supreme Court review. Such relief will give voters maximum certainty as November approaches and avoid disfavored last-minute changes to election procedures. In the alternative, this Court could retain jurisdiction, require WEC to provide periodic reports, and later extend the ballot receipt deadline if doing so appears necessary at a later time. *See generally Luft*, 2020 WL 3496860, at *11 ("let [the State] try and see what happens"). We believe that all stakeholders would be better served by extending the deadline well in advance of November 3.

## II.     This Court should again grant limited injunctive relief against Wisconsin's witness-certification requirement, modified to resolve the Seventh Circuit's concerns.

The DNC/DPW believe this Court granted the right relief on the witness-certification issue last time around, for all of the right reasons, and that the Court can meet the concerns expressed in the Seventh Circuit's April 3 stay order through fairly modest adjustments to this Court's earlier relief. DNC/DPW believe this modified approach is not only consistent with the *Frank* line of decisions and the newly released decision in *Luft v. Evers*, but compelled by those decisions. Specifically, the Court should order the WEC to provide a form on which voters may claim an exemption from the witness-certification requirement because of certain specified conditions, provided that (a) the claim is signed by the voter under penalty of perjury, (b) the voter provides all available contact information so that local election officials can quickly follow up with any questions or concerns, and (c) the voter cooperates with local election officials. These modifications would bring the Court's contemplated relief fully into line with *Frank II, Frank III,* and *Luft.*

This Court previously enjoined defendants "from enforcing Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation *or other statement* that they were unable to safely obtain a witness certification despite reasonable efforts to do so, provided that the ballots

are otherwise valid." ECF No. 170 at 52 (emphasis added). The Court added that "[n]o magic words are required by a voter to successfully make this affirmation, and it will be left up to the individual discretion of clerks as to whether to accept a voter's excuse for not completing the witness certification requirement based on the written affirmation by the individual voter." *Id.* at 46. Though this part of the Court's relief was stayed on appeal, the DNC/DPW believe that, with very modest changes, the Court's earlier idea can be tweaked so that it fully complies with Seventh Circuit precedent, including *Luft.*

### A.     The controlling decisions require a generous safety net.

The Supreme Court, Seventh Circuit, and Wisconsin district courts repeatedly have held that, where individual voters cannot meet a voting requirement after "reasonable efforts," they *must* be given an alternative "safety net," *Frank II*, 819 F.3d at 387, often in the form of requiring some kind of statement under penalty of perjury together with the declarants' contact information so that state agents can follow up in the days after the election if there are any questions or concerns. *Frank II* pointed favorably to Indiana's affidavit option that was integral to Justice Stevens's controlling opinion in *Crawford*, which relied on the option of the voter "execut[ing] an appropriate affidavit" in concluding that Indiana's voter ID law did not "impose[] 'excessively burdensome requirements' on any class of voters." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 (2008); *see Frank II*, 819 F.3d at 387.[12] The Seventh Circuit, sitting *en banc*,

---

[12] Under the challenged Indiana provision, voters without sufficient ID could "cast provisional ballots that will ultimately be counted," provided they execute the appropriate affidavit at the circuit court clerk's office within 10 days. *Crawford,* 553 U.S. at 199. The relevant statute provided: "The affidavit must state that (1) the person executing the affidavit is the same individual who cast the provisional ballot on election day; and (2) the affiant is indigent and unable to obtain proof of identification without paying a fee or has a religious objection to being photographed. Ind.Code Ann. § 3–11.7–5–2.5(c). If the election board determines that the challenge to the affiant was based solely on a failure to present photo identification, the "county election board shall ... find that the voter's provisional ballot is valid." § 3–11.7–5–2.5(d)." *Crawford,* 553 U.S. at 199

embraced *Frank II* in its unanimous *Frank III per curiam* decision issued in late August 2016, ten weeks before the November 2016 general election. Of all the Seventh Circuit decisions, *Frank III* is the most significant because it represents the unanimous views of the full *en banc* court.[13]

*Frank III* is significant in other respects. It emphasized that Judge Peterson "ha[d] the authority to monitor compliance with [his] injunction" on voter ID and that "we trust that [he] will do so conscientiously between now and the November 2016 election." 835 F.3d at 652. Judge Peterson did just that, requiring periodic status reports and issuing follow-up orders as necessary when the State failed to live up to its many promises regarding the promised "safety net," in that case the IDPP.[14] The *en banc* decision in *Frank III* also ordered the State to "**adequately inform the general public** that those who enter the IDPP will **promptly** receive a credential for voting, unless it is plain that they are not qualified." *Id.* (emphasis added). Judge Peterson ultimately had to issue follow-up orders enforcing that court-ordered public educational relief as well. This Court has followed this same model of "monitor, report, and enforce" when necessary in the first preliminary injunction round, and in requiring the WEC to submit its June 25 statement. *See, e.g.,* ECF Nos. 37, 170-71, 179-80, 217.

The unanimous *en banc* decision in *Frank III* also embraced *Frank II*'s core principle that each citizen's "personal" constitutional right to vote "'is not defeated by the fact that 99% of other people can secure the necessary credentials easily,' and that the state may not frustrate this right

---

(Souter, J., dissenting).

[13] The unanimous *per curiam* decision was joined by Chief Judge Wood and Circuit Judges Posner, Flaum, Easterbrook, Kanne, Rovner, Williams, Sykes, and Hamilton. *See* 835 F.3d at 650.

[14] *See, e.g., One Wisconsin Institute, Inc. v. Thomsen,* No. 15-cv-324-jdp, ECF Nos. 261, 293, 305. The parties filed various motions, reports, declarations, and other materials relating to compliance with the Court's injunctive orders from late September through the election, as shown by a review of the ECF docket from that time.

for *any* eligible person by making it ***unreasonably difficult*** to obtain a qualifying photo ID." 835 F.3d at 651 (emphasis added). The full Court upheld Judge Peterson's determination that an "affidavit" option is not the only way Wisconsin can provide the "necessary safety valve" for Judge Easterbrook's hypothetical 1% who cannot with "reasonable efforts" meet the requirements that the other 99% of voters can meet with relative ease. *Frank III,* 835 F.3d at 651-52; *One Wisconsin Institute, Inc. v. Thomsen,* 198 F. Supp. 3d 896, 910-17 (W.D. Wis. 2016), *aff'd in part, rev'd in part and remanded by Luft v. Evers,* ___ F.3d ___, 2020 WL 3496860 (7th Cir. Jun. 29, 2020).  Judge Peterson held that, *at least in theory,* the IDPP provides an adequate "constitutionally required safety net" for the minority of voters who cannot with reasonable efforts meet all generally applicable requirements for obtaining a required ID card, and the *en banc* Seventh Circuit clearly endorsed that view as well. *See, e.g., One Wisconsin,* 198 F. Supp 3d at 913; *Frank III,* 835 F.3d at 651-52.

Five features of the IDPP are particularly relevant to the design of the required "safety net" here. *First*, there is an evidentiary presumption that voters claiming an exemption from generally applicable proof requirements are who they say they are, and are entitled to vote, unless and until the State demonstrates otherwise by a preponderance of the evidence. *Luft,* 2020 WL 3496860, at *10-11.

*Second*, an IDPP applicant must submit a claim to an objectively reasonable exemption and sign that claim under penalty of perjury. The IDPP is initiated through Wisconsin Form MV 3012, titled *DMV Administrator Petition—Unavailable Documentation,* which includes detailed personal disclosures and a personal signature confirming that "[t]he information that I have provided on this petition application is true under penalty of perjury and I am a resident of Wisconsin. (s. 343.14(5) Wis. Stats.)." DNCFOF ¶ 211. And the claimed exemption must be more

specific than the Judge Adelman-endorsed version that was excoriated in *Luft.*[15]

*Third,* the IDPP applicant must provide "contact information" including telephone number and email address, and is told that "Wisconsin DMV or Vital Records may contact you for any follow-up information which may be necessary to complete the verification process." DNCFOF ¶ 212.

*Fourth,* the State has long contended, and the Seventh Circuit confirmed in its June 29 *Luft* decision, that IDPP applicants must "comply with reasonable requests for information that is material to voting eligibility." 2020 WL 3496860, at *11.

*Fifth,* Judge Peterson in *One Wisconsin* and the unanimous *en banc* Seventh Circuit in *Frank III* both emphasized the need for a robust public education campaign managed by the GAB (now WEC) "inform[ing] the general public that those who enter the IDPP *will* promptly receive a credential for voting, unless readily available information shows that the petitioner is not a qualified elector entitled to such a credential." *Frank III,* 835 F.3d at 651. The *en banc* Court emphasized it was denying petitions for initial hearing en banc on the express understanding that "**the State [will] adequately inform the general public** that those who enter the IDPP will promptly receive a credential for voting, unless it is plain that they are not qualified." *Id.* at 652 (emphasis added). And far from wanting Judge Peterson to abstain in favor of state proceedings,

---

[15] *Luft* characterized the affidavit approved by Judge Adelman as overbroad and vague, and as preventing the voter from being questioned about it. "The injunction allowed a voter to make his or her choice about how much effort was too much—some people might deem even one trip to a governmental bureau excessive—and barred the state from contesting any person's conclusion." *Luft*, 2020 WL 3496860, at *21. The affidavit even allowed the voter to check "Other" as the reason he or she could not obtain a photo ID. *See also Frank v. Walker,* Nos. 16-3003 & 16-3052, 2016 WL 4224616, at *1 (7th Cir. 2016) (entering initial stay of Judge Adelman's order "[b]ecause the district court has not attempted to distinguish genuine difficulties …, or any other variety of substantial obstacle to voting, from any given voter's unwillingness to make the effort that the Supreme Court has held that a state can require").

the full Seventh Circuit unanimously emphasized that "[t]he Western District has the authority to monitor compliance with its injunction, and **we trust that it will do so conscientiously between now and the November 2016 election**." *Id.* (emphasis added). Judge Peterson vigorously exercised this authority and responsibility in ensuring that the State complied with its IDPP promises. His monitoring and enforcement tools included several additional orders, periodic submission of joint status reports on how the IDPP injunctive relief was being implemented, and requiring the repeated submission of sworn declarations by key GAB and DMV officials. *See supra* n.16.

These are the constitutional minimum requirements for the "safety net" required for Judge Easterbrook's hypothesized "1%" of voters who may face "high hurdles" in meeting proof requirements that 99% of voters can meet with "reasonable effort." *Frank II,* 819 F.3d at 386. The "personal" right to vote "is not defeated by the fact that 99% of other people can secure the necessary credentials easily." *Id.* Far from excusing the State from having to adhere to these individualized *personal* standards, Judge Easterbrook's new panel decision in *Luft* reaffirms and expands on his reasoning in *Frank II*, using as his illustration one of the plaintiffs in the *One Wisconsin* litigation.

Mr. **Johnny Martin Randle**, an African-American voter, was 75 years old at the time of the May 2016 trial. He was born and spent his entire life in northeast Mississippi, but moved north to live with his daughter in Milwaukee when he got older. He had been trying to obtain his supposedly "free" voter ID since August 2015, but had been prevented from doing so for the sole reason that his Mississippi birth certificate from July 1941 records his name as "**Johnnie Marten Randall**." Even though the DMV Administrator herself conceded Mr. Randle is a U.S. citizen who was born in Mississippi on the date he said he was born, and even though there was abundant

evidence confirming his identity, DMV refused to give him his requested voter ID because of the errors in his birth certificate, unless he submitted a Common Law Name Change (CLNC) affidavit, even though his name has never been changed—he has *always* lived his life as Johnny Martin Randle. DNCFOF ¶ 213. Mr. Randle was far from the only voter who had been barred from voting because of trivial and inconsequential errors in his vital records—usually African-American or Latino "petitioners" being judged by white people. As of August 2016 about 2/3 of all Wisconsin voters who were forced to resort to the IDPP to "petition" to exercise their right to vote were people of color; of the petitions that were officially denied (like Mr. Randle's), *85% were from voters of color*. *One Wisconsin,* 198 F. Supp. 3d at 922.  This in a State that is about 6.2% African American and 6.8% Latino. *See* 2020 *Almanac of American Politics, supra* n.5, at 1917. The *One Wisconsin* trial record abounds with stories similar to Mr. Randle's.

Judge Peterson July 29, 2016 decision excoriated the State for its conduct of the IDPP, pointing to Mr. Randle's mistreatment and to many similar stories. The process was a voting rights "**disaster**" and "**a wretched failure**." *One Wisconsin,* 198 F. Supp. 3d at 903, 916. The IDPP (as of May 2016) repeatedly had led to "**real incidents of disenfranchisement**" where the State admitted it had no reason to doubt a voter's qualifications but nevertheless denied the "petition" for the credential required to vote. *Id.* at 903. Moreover, after studying hundreds of examples of voters who had to navigate the IDPP's overly bureaucratic rules, Judge Peterson emphasized that "even voters who succeed in the IDPP manage to get an ID only after surmounting **severe burdens**." *Id.* The process (again, as of July 2016) was "**complicated**," "**arduous**," "**unnecessarily difficult**," and "**imposes burdens that far exceed those contemplated in** *Crawford* or *Frank*." *Id.* at 913, 916, 950.

Judge Easterbrook's *Luft* decision highlights Mr. Randle's experience in explaining why

Judge Peterson should retain jurisdiction so that he can continue to monitor the State's compliance with its promises:

> Plaintiff Johnny Randle's experience shows why [a promised safety net] may be hard to implement reliably. The name he used for more than seven decades differs from that of his birth certificate in spelling but not in pronunciation. After submitting his petition, Randle needed more than a dozen telephone calls, two in-person visits, and responses to multiple requests for information. The state demanded that he legally change his name and then declined to issue a voting credential because it asserted inability to verify his statement that he had done that already. The state asked him to sign a declaration that he had changed his name's spelling at common law. It capped the five-month process by denying the petition when his agent did not produce a power of attorney.

> Wisconsin asserts that the procedures it has recently established would have short-circuited that process by allowing the employees who interviewed Randle to look up the records using his date of birth and his mother's maiden name, conclude that he had innocently been using a variation on the original spelling, and issue a voting credential. Wisconsin recognizes name changes at common law as long as the usage is consistent, continuous, and non-fraudulent. *State v. Hansford*, 219 Wis. 2d 226, 246–47 (1998). It asserts that the current version of its petition process, which it wants to implement, recognizes this and would simplify life for Randle and many others. Wisconsin allows common-law name changes for driver's licenses and the like, and its new petition process requires the officials to accept a name change when an applicant submits a statement declaring the common-law elements as well as the prior name and its discontinuance. Wis. Stat. §343.50(3)(c); Wis. Admin. Reg. CR 16-040 §§ 1–3.

> We stressed in *Frank III* that appropriate treatment of the petition process depends on how it works. Although that process has been a moving target from *Frank II* until today, we do not blame the state for displaying flexibility. It has had to see what problems are easy to solve and which are tougher. The district court acted on a record assembled years ago. Instead of trying to evaluate the adequacy of a process that the state once championed, but now wants to change, the best approach is to let it try and see what happens. Adequacy cannot be evaluated in the abstract.

*Luft,* 2020 WL 3496860, at *10-11. Although the State's interest in the "integrity and reliability of the electoral process" is strong, *Crawford*, 553 U.S. at 204; *Frank I*, 768 F.3d at 755, *Luft* emphasizes that **"[e]very citizen's interest in individual treatment *also* is strong. That's the holding of *Frank II*.**" *Luft,* 2020 WL 3496860, at *11 (emphasis added).

41

**B.      This Court should follow *Frank III* in crafting appropriate relief.**

Turning from *Frank* and *Luft* to this case, the Seventh Circuit stayed this Court's injunctive relief with respect to the witness-certification provision, concluding that (a) "the district court did not give adequate consideration to the state's interests in suspending this requirement"; (b) the *Purcell* principle counseled against relief given that the election was only days away; and (c) the "overbreadth of the district court's order . . . **categorically eliminates** the witness requirement applicable to absentee ballots." *DNC v. RNC*, Nos. 20-1538 & 20-1546, at *3 (emphasis added). The panel suggested the WEC's "alternative suggestions" for fulfilling the witness requirement (*e.g.,* having the witness observe the voter over Skype, the voter mail the completed ballot to the witness, and the witness sign and date the ballot) *might* be sufficient, especially given the extra time that voters had to obtain a witness signature because of this Court's extension of the ballot-receipt deadline. *Id.* The Seventh Circuit also urged this Court to let the WEC try to fix the problems first, before further judicial action.

WEC's proposed alternatives proved woefully insufficient. As described, approximately **11,944** returned ballots were rejected because of "insufficient" certification. DNCFOF ¶ 156. Moreover, there are strong grounds to believe that many of the **135,417** unreturned ballots—over 10% of all ballots sent out—were not returned because the voters who had requested these ballots were unable to navigate the witness requirements in the midst of the pandemic and resulting isolation from others. *Id.* ¶ 157. Today's combined submissions from the four plaintiffs' groups will put the individual stories of *hundreds* of Wisconsin citizens before this Court, many involving the suppressive effects of Wisconsin's witness-certification requirement during this pandemic, especially for senior citizens and other high-risk groups. Where is *their* safety net?

The DNC and DPW respectfully submit that, given the experiences in the April 7 election, both this Court and the Seventh Circuit should reconsider their views on this issue. The Seventh Circuit was concerned that this Court gave "no effect to the state's substantial interest in combatting voter fraud." *DNC v. RNC*, Nos. 20-1538 & 20-1546, at *3. That criticism is not fairly applied to this Court's April 2 decision, which emphasized the general validity of the witness-certification requirement; this Court was simply attempting to fashion, as best it could only days before the primary, the "safety net" required by *Frank II*. The *Frank* decisions and *Luft* point the way to how the Court can now design the safety net it envisioned that will satisfy the Seventh Circuit's concerns.

- The statement asserting an individual exemption from the witness-certification requirement must present an objectively reasonable explanation for why the voter needs the exemption, and must be signed by the voter *under penalty of perjury*. This was one flaw in the "other written statement"/"no magic words" relief this Court fashioned in its April 2 injunction. This is not meant as a criticism; the Court had no time to design a form or have it printed and distributed. Now there is time.

- The statement must provide best-available contact information so that local election officials can quickly contact the voter to investigate any questions or concerns, either during the post-election tabulations and canvass or thereafter.

- The voter *must* cooperate with any inquiries by local election officials—Judge Easterbrook was emphatic about that in the just-released *Luft* decision. *Id.* at *11.

- The State, in turn, *must* engage in a genuine public educational campaign to inform the public at large as well as targeted at-risk populations about the "safety net" available for registration and voting and what voters need to do to take advantage of

it.

With these modifications, the Court can provide appropriate relief from the occasionally onerous witness-certification requirement for those who need it, while protecting against potential voter fraud and meticulously tracking the "safety net" requirements spelled out in *Frank II, Frank III,* and *Luft.*

Although courts in recent months have disagreed on the issue, a growing number have modified witness signature and identity requirements for the duration of the pandemic. The Eleventh Circuit's recent decision in *People First of Alabama v. Sec'y of State of Alabama,* No. 20-12184, 2020 WL 3478093 (11th Cir. Jun. 25, 2020) (unpublished), *stayed*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020), is closely on point. There, the District Court for the Northern District of Alabama entered "a narrow injunction" applying only to "high-risk voters"—those (a) age 65 or older, (b) with a disability, or (c) who "suffer[] from an underlying medical condition that the CDC has determined places individuals at a substantially higher risk of developing severe cases or dying of COVID-19"—allowing these voters an exemption from Alabama's witness-certification and photo ID requirements if they submit a written statement signed under penalty of perjury that it is "impossible or unreasonable to safely satisfy" those requirements. 2020 WL 3478093, at *3. Two Eleventh Circuit judges, concurring in the panel's stay of the district court injunction, rejected the State's argument that compliance required just a "little bit of work":

> Appellants argue that the photo ID and witness requirements impose only a "little bit of work" on Alabamian voters. That misperceives the burden. The burden here is not the finding of two people or a notary to witness a signature or the finding of a location to copy one's photo ID. Instead, the burden is tied to the fact that Plaintiffs and those similarly situated must risk death or severe illness to fulfill Alabama's absentee voter requirements and, therefore, to exercise their right to vote. Despite Appellants' insinuations, that risk isn't comparable to the normal risk faced "when we leave home." **Sure, anyone may risk getting hit by a bus on the way to a polling station. But that doesn't mean we set up polling stations in the middle of the street.** Appellants' failure to acknowledge the significant difference

between leaving one's home to vote in non-pandemic times and forcing high-risk COVID-19 individuals to breach social-distancing and self-isolation protocols so they can vote reflects a serious lack of understanding of or disregard for the science and facts involved here.

2020 WL 3478093, at *7 (emphasis added). While acknowledging that "'combatting voter fraud' is certainly a legitimate interest," the panel majority concluded that interest could be adequately served by requiring voters to submit statements *under penalty of perjury*, given the "potential life-or-death burden placed on high-risk Alabamian voters." *Id.* The judges also noted that Alabama already has granted exceptions from the photo ID requirement for *some* voters—those over 65 or with physical disabilities that deter them from going to the polls—and concluded there was "no reason" under the *Anderson-Burdick* analysis to withhold a similar exemption for "voters who are at a high-risk of contracting a severe or deadly cases of COVID-19." *Id.* The Eleventh Circuit decision in *People First* has been stayed, No. 19A1063, 2020 WL 3604049, but continues to provide useful guidance.  Many other federal and state courts have enjoined the enforcement of various deadlines and proof requirements that, while permissible in normal times, must yield to right to vote in the midst of a global pandemic that threatens voters' lives and threatens to prevent them from registering and casting their ballots.[16]

---

[16] *See, e.g.*, *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020) ("In ordinary times, Virginia's witness signature requirement [for absentee ballots] may not be a significant burden on the right to vote. But these are not ordinary times . . . . Notwithstanding the proffered steps which could be taken to mitigate the risks to health in having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them—again, especially those who are elderly, immunocompromised, or otherwise at grave risk from the virus."); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) (applying *Anderson-Burdick* balancing in light of the pandemic, and alleviating Illinois signature and witnessing requirements for minor party candidates seeking to run for state or federal office), *stay denied pending appeal*, No. 20-1961 (7th Cir. June 21, 2020); *Thomas v. Andino*, Nos. 3:20-cv-01552-JMC, 2020 WL 2617329, at *39 (D.S.C. May 25, 2020) ("strong likelihood that the burdens placed upon [plaintiffs] by the" witness signature requirement "outweigh the imprecise, and (as admitted by SCEC Defendants)

III.    **This Court should partially enjoin the ID and proof-of-residency requirements as applied to those who attest under penalty of perjury that they cannot meet those requirements after reasonable efforts.**

This Court previously denied relief on the photo ID requirement (without prejudice) because it was "satisfied that the current proof of ID requirement, as being applied under the WEC guidance and state court order, does not impose an undue burden on the right to vote." ECF No. 170 at 49. The WEC guidance pertained to voters claiming "indefinitely confined status" under Wis. Stat. §§ 6.86(2)(a) and 6.87(4)(b)(2), and the reference to state court was to the Wisconsin Supreme Court's order in *Jefferson v. Dane County*, 2020AP557-OA, which endorsed and adopted the WEC's "guidance" on such status. This Court denied injunctive relief on the proof-of-residency requirement as "moot" because it was already April 2 and "voters are no longer able to

---

ineffective, state interests of combating voter fraud and protecting voting integrity"); *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) (affirming district court's conclusion that Michigan's enforcement of signature requirement for candidates was "not narrowly tailored to the present circumstances" involving the pandemic); *Goldstein v. Sec'y of the Commonwealth*, 484 Mass. 516, 571 (2020) (acknowledging that multiple-signature requirements "impose a severe burden on, or significant interference with, a candidate's right to gain access" to the ballot in light of pandemic); *Faulkner for Va. v. Va. Dept of Elections*, No. CL-20-1456 (Va. Cir. Ct. Mar. 25, 2020) (applying strict scrutiny to decrease signature requirements for candidates to appear on ballot because of COVID-19, applying strict scrutiny); *Reclaim Idaho v. Denney*, No. 1:20-CV-00268-BLW, 2020 WL 3490216, at *11 (D. Idaho June 26, 2020) (State could either give plaintiff 48 additional days to collect online—instead of physical—signatures or put initiative on November 2020 ballot with current number of signatures); *Miller v. Thurston*, No. 5:20-cv-05070 (W.D. Ark. May 25, 2020) (petitioner need not sign an initiative petition in the presence of a canvasser and canvasser need not sign and swear in the presence of a notary to his or her affidavit attesting to the genuine and compliant nature of the signatures on his or her initiative petition), *administratively stayed*, No. 20-2095 (8th Cir. June 15, 2020); *Moreno v. Denney*, No. 1:20-cv-00242 (D. Idaho May 23, 2020) (extending deadline to request absentee ballot by a week from May 19 to 26); *Fair and Equal Mich. v. Benson*, No. 20-000095-MM (Mich. Ct. Claims June 10, 2020) (extending deadline for validity of signatures to get initiative on ballot); *In re: Extension of time for Absentee and Mail-in Ballots*, No. 2020-02322-37, slip op. at 2 (Penn. Ct. Common Pleas, Bucks Cty. June 2, 2020) (extending deadline to accept ballots seven days after June 2, 2020 primary); *In re: Extension of time for Absentee and Mail-in Ballots*, No. 2020-003416 (Penn. Ct. Common Pleas, Delaware Cty. June 2, 2020) (extending deadline by ten days to accept ballots for voters who did not have mail-in or absentee ballots on morning of election day).

register by-mail for the upcoming election." ECF No. 170 at 50.

The DNC/DPW appreciate the Court's recent admonition that, "[a]bsent some extraordinary showing as to the impact of the current health crisis on those statutory provisions, this court is unlikely to overturn those decisions." ECF No. 217 at 13. Again, we understand that the Court cannot "overturn" those decisions, but it can ensure there is a genuine "safety net" that those decisions all promise.  Moreover, the impacts *are* "extraordinary," at least with respect to the minority of eligible voters who face "high hurdles" in complying with otherwise-reasonable requirements that 99% of voters can comply with. *Frank II*, 819 F.3d at 387. We are not asking the Court to "overturn" any decisions, simply to follow the logic of *Frank II* as it did before.  There is no principled reason for saying that some identification and proof requirements must have a "safety net," while allowing similar requirements to be enforced rigidly with an iron fist and no exceptions allowed, notwithstanding each person's constitutional right to "individual treatment" and "accommodation that will permit him or her to cast a ballot." *Luft*, 2020 WL 3496860, at **9, 11 (quotations and citations omitted).

The same analysis discussed in Part II in connection with the witness-certification requirement also compels an exception to the photo ID and proof-of-residence requirements, provided the voter is willing to claim an exemption subject to the same requirements discussed above—a signature under penalty of perjury claiming entitlement to a well-defined exemption, specific standards, suitable contact information, and cooperation with local election officials. No more may constitutionally be required, especially in a time of pandemic.

Despite the Court's hopes, the on-the-ground reality proved that the "indefinitely confined" option did not provide the sort of safety net required under *Frank II, Frank III,* and *Luft.* The May 11 Wisconsin Election Protection *2020 Spring Election Report*—an investigation conducted by

"non-partisan observers"—found that "Confusion about 'Indefinitely Confined' Voters" had been

a rampant problem in the weeks leading up to the April 7 election. The *Report* explained:

> The Wisconsin Elections Commission defines an indefinitely confined voter as a voter who has "a difficult time getting to the polls due to age, illness, infirmity, or disability." As a result of the global pandemic, an increased number of voters clearly qualified under this definition.
>
> However, few voters are aware of this provision, and there has not been an adequate, broad public education campaign by elections officials to raise awareness about it. Instead, to the extent voters learned about this exception at all it was in a piecemeal way, and the onus was on voters to seek out the information. Groups like LWVWI also attempted to share the information with a larger audience using the language approved by the WEC and sharing it publicly on their website and social media channels. Compounding the problem, days before the absentee ballot request deadline, the Wisconsin Supreme Court blocked the Dane County Clerk "from telling large groups of voters they could request absentee ballots without showing a photo ID because of the coronavirus pandemic." These responses further confused voters about their rights and the process to request an absentee ballot as indefinitely confined, and may have caused some voters who qualified as such to be reluctant to use it for fear of potential punishment.

Umberger Decl., Ex. 59; DNCFOF ¶ 214. The record includes similar evidence of the uneven,

confusing, and inadequate use of this option, the supposed "safety net" for the ID requirement in

this time of pandemic. *See* DNCFOF ¶¶ 165-73.

As discussed above, this key regulatory term, supposedly providing the required safety net

for the ID law, gets no mention in the June 25 *WEC Defendants' Status Report.* And the

"indefinitely confined" option gets only passing fine-print mention in the instructions given to

voters requesting an absentee ballot and in the WEC's planned mailer to certain voters. Voters are

not told in any of these materials that, according to the WEC and the Wisconsin Supreme Court,

designation of indefinitely confined status is for each individual voter to make based on how they

feel about their own current circumstances. Nor are they told that, according to the State,

"indefinitely confined" status "does *not* require permanent or total inability to travel outside of the

residence." *Jefferson*, No. 2020AP557-OA, at *2 (emphasis added). The WEC and Wisconsin

Supreme Court "guidance," such as it is, shows that "indefinitely confined" is *not* a self-defining term, and in the absence of explicit, prominent instructions on the absentee ballot request form, on the WEC's website and in other informational materials, voters are likely to misunderstand the scope of their entitlement to claim this status and, if they are otherwise unable to copy or upload an acceptable photo ID, may forego attempting to obtain an absentee ballot.

Thus, at a minimum, this Court should hold that materials for requesting absentee ballots, instructions for completing those ballots, and the WEC's own public education program must explicitly and prominently explain a voter's option to claim "indefinitely confined" status during the COVID-19 pandemic, including the WEC and Wisconsin Supreme Court explanations of what that term means.

## IV.   This Court should order defendants to take further steps to ensure all Wisconsin voters have access to safe and secure in-person voting opportunities.

The April 7 election demonstrated the dire need for further planning, resources, and leadership to ensure that Wisconsin voters are not once again left with no options for safe and secure in-person early voting and in-person voting at the polls on election day. For those like the intervening defendants who argue that in-person election-day voting is a safe and easy alternative to absentee voting, the April 7 experience teaches that in-person voting cannot provide such an alternative when the early-voting sites are closed, election-day polling sites are drastically consolidated, and voters who show up are too often forced to stand in long lines for hours in the midst of a pandemic. This was "[o]ne of the most shameful chapters" in American's voting-rights history, requiring voters "to make an unconscionable choice between their lives and their citizenship," and it cannot be allowed to happen again.[17]

---

[17]   Sherrilyn Ifill, *Never Forget Wisconsin*, Slate (Apr. 8, 2020, 6:46 PM), https://slate.com/news-and-politics/2020/04/never-forget-wisconsin.html.

The *Swenson* plaintiffs have done a comprehensive job in demonstrating the many ways this can be done. They have presented, among many other things, the expert views of Kevin J. Kennedy, who served as Wisconsin's Chief Election Officer for more than 33 years, and who knows as well as anyone how the voting process works at the polls and early-voting locations throughout the State. Mr. Kennedy presents numerous recommendations for what the WEC can and should be doing as the agency responsible for the administration and oversight of the State's election system. These include setting standards and monitoring compliance with COVID-19 social distancing guidelines and appropriate sanitization; working with local officials to implement a statewide policy for providing and staffing alternative polling places; developing and implementing a statewide policy for expanding the use of drive-through and curbside voting, early in-person voting at alternative sites, and other measures for in-person voting designed to prevent the spread of the virus, protect voters with disabilities or who are at high risk from COVID-19 who must vote in person (*e.g.,* those whose requested absentee ballots never arrived), and reduce crowding and long lines at the usual polling sites. *See generally* Kennedy Rpt.

DNC/DPW will not repeat the *Swenson* plaintiffs' or Mr. Kennedy's demonstration of how these goals can be met and what the WEC can and should be doing to make them happen. We do, however, respond briefly to the Court's jurisdictional concerns expressed during the June 29 status conference and to the intervening defendants' claims that DNC/DPW are suing the wrong defendants, and instead should be seeking direct relief from local election officials in 1,852 different local jurisdictions.

A suit against nearly 2,000 election officials would be chaotic, and, of course, unnecessary. DNC and DPW are seeking statewide standards and statewide relief. As this Court has observed, the WEC is the "governmental body charged by law with administering" Wisconsin's election

laws (other than with respect to campaign finance). ECF No. 85 at 7. In fact, the Legislature has granted to WEC "the *responsibility* for the administration of chs. 5 to 10 and 12 and other laws relating to elections and election campaigns, other than laws relating to campaign financing." Wis. Stat. § 5.05(1) (emphasis added); *see also Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 842 (7th Cir. 2014) (WEC's predecessor had "the authority to implement" election laws). Under this broad grant of authority, the WEC may "[p]romulgate rules . . . ***applicable to all jurisdictions*** for the purpose of interpreting or implementing laws regulating the conduct of elections or election campaigns . . . or ensuring their proper administration." Wis. Stat. § 5.05(1)(f) (emphasis added). The WEC's statutory "responsibility" for election "administration" includes many other oversight, planning, guidance, and other administrative tools for "administering" Wisconsin's election system.[18]

As part of its general duty to "implement" and "administer" Wisconsin's election laws, the WEC also "may direct municipal clerks to implement a court order pertaining to the state's election

---

[18] *See, e.g.,* Wis. Stat. § 5.05(e) (approve electronic data recording system and order exemptions for polling places' accessibility requirements); *id.* § 5.05(f) (promulgate rules applicable to all jurisdiction to implement election laws); *id.* § 5.05(2m)(a) (initiate investigations of violations of election laws); *id.* § 5.05(2m)(f) (require any person to submit reports relevant to commission's investigatory powers and order testimony to be taken under commission's investigatory powers); *id.* § 5.05(5e) (reporting obligation); *id.* § 5.05(6a) (issue advisory opinions); *id.* § 5.05(7) (conduct informational and training meetings); *id.* § 5.05(11) (adopt plan to "enable participation . . . in federal financial assistance programs" and provide financial assistance to counties and municipalities for election administration costs); *id.* § 5.05(12) (conduct voter education); *id.* § 5.05(14) (request information from local election officials relating to election administration); *id.* § 5.05(15) (design and maintain registration list and require all municipalities to use it); *id.* § 6.30(4) (prescribe voter-registration form); *id.* § 6.30(5) (maintain electronic voter-registration system); *id.* § 7.08(3) (prepare and publish election law manual); *id.* § 7.08(6) (audit performance of voting systems and, if necessary, take remedial action and order remedial action); *id.* § 7.31(1)-(5) (establish qualifications for chief inspectors, training requirements, and oversee chief inspector renewal); *id.* § 8.12(2) (design official ballots); *id.* § 9.01(ar)(3) (order recount). This is just a sample of WEC's duties.

procedures and federal law." *Frank v. Walker*, 196 F. Supp. 3d 893, 918-19 (E.D. Wis. 2016), *aff'd in part and rev'd on other grounds* 2020 WL 3496860 (7th Cir. June 29, 2020). Judge Adelman's analysis of this issue is both comprehensive and correct. Although the Seventh Circuit rejected Judge Adelman's required *remedy*—in that case, an open-ended affidavit of exemption discussed above in Part II—it did not question his jurisdiction to order such relief or the WEC's authority to implement it. 2020 WL 3496860, at *10-11. And the Seventh Circuit has upheld Judge Peterson's continuing supervisory authority over state officials for the statewide administration of the voter ID laws. *See Frank III*, 835 F.3d at 651-52 (en banc); *Luft,* 2020 WL 3496860, at *11. Judge Adelman's analysis was comprehensive and cogent:

> State law vests the commission with "the responsibility for the administration of [the Wisconsin Statutes governing elections] and other laws relating to elections." Wis. Stat. § 5.05(1). Carrying out a federal court's order concerning the state's election procedures would qualify as administering the state's election laws and "other laws relating to elections" (which includes federal laws relating to elections). Municipal clerks, who lack the power to administer election laws but only have the power to conduct elections in accordance with those laws, *see* Wis. Stat. § 7.15(1), could not disobey the commission's directive to make affidavits available to voters and to accept them in lieu of photo ID. The administrator of the Elections Commission points out that the commission might not have authority under state law to pass a formal administrative rule implementing the affidavit requirement. Haas Decl. ¶¶ 15–17. However, such a rule is unnecessary. Although the commission has rulemaking authority, *see* Wis. Stat. § 5.05(1)(f), that is just one manifestation of its general authority to administer election laws. Pursuant to its general authority, the commission may direct municipal clerks to implement a court order pertaining to the state's election procedures and federal law.
>
> I also note that the defendants had no difficulty implementing the injunctive relief that I granted in 2014. If the defendants were able to direct municipal clerks to stop requiring voters to present photo ID at the polls in 2014, then they will be able to direct municipal clerks to allow voters to cast a ballot by presenting an affidavit in lieu of photo ID in 2016. Accordingly, I reject the defendants' suggestion that uncertainty over whether they have power to require municipal clerks to implement an affidavit remedy is a reason not to grant that remedy in the first place.

This analysis is spot on. True, Wisconsin has delegated its authority to "establish[]" polling places and "conduct" elections to local governing bodies, Wis. Stat. §§ 5.25(2), 7.15(1), but the State cannot delegate its duty to ensure safe and sufficient in-person registration and voting facilities for all voters throughout the State. The defendants bear the statutory "*responsibility* for the *administration* of" Wisconsin's election laws, Wis. Stat. § 5.05(1), which at minimum requires defendants to develop and implement plans to coordinate available state, local, and private resources to ensure that all voters throughout the State are able to cast early in-person absentee votes and to vote in-person on election day in as safe and secure a manner as feasible. The WEC, for example, may set the baseline number of voting locations, Wis. Stat. § 5.25(2), as well as the minimum safety and public health standards that apply to those voting locations to ensure they do not become Petri dishes for COVID-19. *See* Kennedy Rpt. ¶ 65.

It is not for this Court to set the actual number of polling sites or prescribe all the standards in detail. That is the WEC's "responsibility," and this Court should order WEC to exercise that authority, subject to this Court's ongoing jurisdiction to require the WEC to report back on its compliance with the Court's orders. Although DNC/DPW do not necessarily agree with all of Mr. Kennedy's recommendations, they provide the necessary starting point for matters to address in the Court's order, standards and procedures the WEC needs to address, and what the WEC should address in future reports to the Court. As for this Court's exercise of its continuing jurisdiction, we respectfully submit that Judge Peterson's approach in the fall election of 2016, discussed in Part II above, provides an excellent model for this Court to follow, as do this Court's own orders leading up to the April 7 election.

**V.   The challenged provisions violate federal due process guarantees.**

The *Gear* and *Swenson* plaintiffs have done a comprehensive job in presenting the

procedural due process objections raised in all four of the pending consolidated actions. DNC/DPW will not add to those comprehensive arguments, but will respond to this Court's statement in its June 10 Opinion and Order that, "despite the *Mathews* and *Anderson-Burdick* tests involving a similar balancing analysis, plaintiffs do not explain how, if at all, their separate procedural due process claim is distinguished from their undue burden claim." ECF No. 217 at 14. The Court cautioned that, "unless plaintiffs [DNC and DPW] are able to articulate a specific legal or factual rationale for applying the *Mathews* test over the *Anderson-Burdick* test in evaluating a challenged provision," the Court would focus on the *Anderson-Burdick* claim. *Id.* at 15.

The DNC/DPW understand the Court's concerns and questions. The short answer is that we have not yet found a decision in which a court accepted an *Anderson-Burdick* claim while rejecting a due process challenge to the same provision; or rejected an *Anderson-Burdick* challenge while striking down the same provision as violating due process. The *Anderson-Burdick* and *Mathews v. Eldridge* analyses are both multi-factor balancing inquiries, some of the relevant factors will often overlap, and the results of the inquiries may often be the same. But the focus of the two analyses differs. *Anderson-Burdick* balances burdens on voting rights against states' justifications, while due process claims focus on the sufficiency of the process involved before the State deprives someone of their right to vote. Under the *Anderson-Burdick* framework, courts assess the burdens on the right to vote against the state's justifications for those burdens. The more severe a burden, the more compelling a justification must be. Severe burdens on voting rights "must be narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citation omitted).

The gravamen of a procedural due process claim, on the other hand, concerns whether a voter has obtained enough process to justify a deprivation of a right. "In procedural due process

claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citations omitted) (emphasis in original). An appropriate remedy orders more process if a court determines the existing procedures are inadequate or absent. *Id*. at 126 ("[I]t is necessary to ask what process the State provided, and whether it was constitutionally adequate.").

The *Anderson-Burdick* and due process analyses are like looking at the same object through different lenses. Sometimes a procedural due process analysis may help show systemic flaws that would not necessarily jump out under an *Anderson-Burdick* analysis. For example, due process post-deprivation cases are especially instructive here with respect to whether local election officials must contact voters about ballot problems and, if possible, give them opportunities to cure any problems before final rejection of the ballots.[19] To the extent this principle governs *Anderson-Burdick* claims as well, that would be wonderful. But to reach the right *Anderson-Burdick* result it sometimes is necessary to use a due process lens (likewise with an equal protection lens), and to acknowledge that due process helps point to the right result. That is hardly "redundant."

Moreover, the assertion in *Luft* that rules challenged under *Anderson-Burdick* must be judged "by looking at the whole electoral system," 2020 WL 3496860, at *3, seems out of step with the emphasis of due process on *every* individual's liberty interest in fair voting. It is helpful

---

[19] *See, e.g., Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D.N.H. 2018) (enjoining law requiring rejection of ballots due to signature mismatch without giving voters opportunity to cure); *Fla. Democratic Party v. Detzner*, 4:16cv607-MW/CAS, 2016 WL 6090943, at *9 (N.D. Fla. Oct. 16, 2016) (same); *Zessar v. Helander,* 2006 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006) ("Once rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing."); *see also id*. ("It is apparent that the risk of erroneous deprivation of the protected interest in absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serves to protect the fundamental right to vote.").

to have the due process issues front and center at all times: Are voters receiving adequate notice of election procedures? Is the State explaining ambiguous terms ("indefinitely confined") and clearly spelling out the availability of "safety nets" to be sure that all voters may vote with only reasonable effort? And is the election system providing sufficient process following the election regarding suspected ballot errors and omissions? DNC and DPW therefore respectfully urge the Court to use both an *Anderson-Burdick* and a due process analysis, if only to confirm that the two analyses both lead to the right result.

**VI.      The challenged provisions violate equal protection guarantees.**

"Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters" based on which county or local jurisdiction they live in. *Id.* at 106-07. There is no "emergency exemption" from this equal protection requirement. "The press of time does not diminish the constitutional concern. A desire for speed is not a general excuse for ignoring equal protection guarantees." *Id.* at 108-09; *see also id.* at 109 (shutting down the 2000 Florida recount because the recount process was "inconsistent with the minimum procedures necessary to protect the fundamental right of each voter").

The Legislature has argued that these equal protection principles apply only to "the one election" involved in *Bush v. Gore.* ECF No. 142 at 32 (quotation marks and citation omitted). That's nonsense. Courts repeatedly have relied on the equal protection principles enunciated in *Bush v. Gore* in a variety of election law circumstances. *See, e.g.*, *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 337 (4th Cir. 2016) (redistricting); *Obama for Am. v. Husted*, 697 F.3d 423, 428–29 (6th Cir. 2012) (restrictions on early voting); *Idaho Coal. United*

*for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 & n.7 (9th Cir. 2003) (ballot-initiative process); *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1185–86 (11th Cir. 2008) (Barkett, J., concurring in part) (voter registration).

Wisconsin's April 7 election abounded with many examples of unfair, unequal, and disparate treatment of Wisconsin voters depending on where they live. Safe and sufficient in-person registration, absentee voting, and election-day voting opportunities were available to some Wisconsin voters but not to others, depending on where they resided. DNCFOF ¶¶ 52-66; *see also* ECF Nos. 63-10, 63-12, 63-14; Exs. 10, 12, 14; ECF No. 39 at 2 (identifying closure of some, but not all polling places). Voters of color and the urban poor were disproportionately denied sufficient opportunities for safe in-person registration, early voting, and election-day voting. *Id.* ¶¶ 5, 16. Similarly, the application of the documentation requirements for registering to vote and requesting an absentee ballot varied broadly across cities and counties, resulting in some voters being subject to these requirements while others were not. *See, e.g.*, *id.* ¶¶ 71-72, 171-72. Voters also received conflicting guidance on the witness requirement for absentee ballots depending on where they lived and who they called. *See, e.g.*, *id.* ¶¶ 155-71; ECF No. 63-16 at 6 (quoting Madison officials). Many voters, particularly those who live alone, lacked access to a witness but were simultaneously being instructed by the authorities to stay at home and practice social distancing. DNCFOF ¶¶ 150-51, 153-61; *see also* ECF No. 66 ¶ 3; ECF No. 70 ¶ 3; ECF No. 75 ¶ 4.

Another example of disparate and non-uniform treatment involved the interpretation and administration of the U.S. Supreme Court's requirement that an absentee ballot be "postmarked by election day" in order to be counted. *RNC,* 140 S. Ct. at 1208. Wisconsin elections officials and the Postal Service do not follow uniform standards and procedures in postmarking absentee ballots. As a result, many absentee ballots were returned to local election officials by the Postal Service

with either no postmarks at all, postmarks without dates, or illegible postmarks. The six Commissioners of the WEC, on a 3-3 tie vote, largely failed to agree on how election officials should address these issues, leaving local election officials throughout Wisconsin to make these decisions without any uniform standards ensuring consistent treatment throughout the State, rather than through discretion exercised locality by locality. DNCFOF ¶ 215.

A further example of "arbitrary and disparate treatment [of] voters," *Bush*, 531 U.S. at 104-05, is the interpretation adopted by the WEC and the Wisconsin Supreme Court of Wis. Stat. §§ 6.86(2)(a) and 6.87(4)(b)(2), which exempt voters who are "indefinitely confined because of age, physical illness or infirmity" from many of the absentee voting restrictions and conditions. As discussed above, in response to conflicting advice from county and local election officials about what it takes to be "indefinitely confined" by the pandemic within the meaning of these statutes, the Wisconsin Supreme Court, in an original action, adopted the WEC's guidance that the "[d]esignation of indefinitely confined status is *for each individual voter to make based upon their current circumstances*. It does not require permanent or total inability to travel outside of the residence." *Jefferson*, No. 2020AP557-OA, at *2 (emphasis added). This "guidance" in no way provides "uniform" rather than "arbitrary and disparate treatment to voters." *Bush,* 531 U.S. at 106-07. If using a standard that "might vary . . . from county to county" or "within a single county" violates equal protection, *id.* at 106, so much more the case where the interpretation and application of the standard varies from voter to voter. The record amply demonstrates the confusing and "piecemeal way" in which this exemption was administered. Wisconsin Election Protection, *2020 Spring Election Report* at 9-10 (Ex. 59); DNCFOF ¶¶ 165-73, 207-09, 214.

In these and other respects, if this Court does not require "uniform rules" and "specific standards" in conducting the November 3 general election under pandemic conditions, there will

be an unacceptably high risk that Wisconsin will not satisfy "the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" to vote. *Bush*, 531 U.S. at 105-06. If anything, the equal protection risks are even greater here than in *Bush v. Gore*. There, the right to vote was at risk. Here, the risks are to the right to vote and to the right to life—our own and the lives of others.

## VII.   Plaintiffs meet all other requirements for their requested preliminary injunctive relief.

All the other requirements for granting injunctive relief are, once again, readily satisfied. This Court repeatedly has emphasized that "infringement on the fundamental right to vote constitutes irreparable injury," one for which "traditional legal remedies would be inadequate." ECF No. 37 at 18; *see* ECF No. 170 at 24-25 (citations omitted). Moreover, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006). Because "[t]he public interest … favors permitting as many qualified voters to vote as possible," that interest is "best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Obama for Am.*, 697 F.3d at 436-37 (citation omitted). These considerations are further magnified because of the imminent dangers to public health during the pandemic. "[T]he denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health … should be rare." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 942 (7th Cir. 2019).

This Court also has twice found that the balance of the equities favors the DNC and DPW, and it should so find again. ECF No. 37 at 19-20; ECF No. 170 at 25-28. The requested injunctive relief would protect public health and remove barriers to voting during an unprecedented global pandemic. On the other hand, the requested relief would cause some increased administrative burdens for the State and local election jurisdictions. But as the DNC/DPW have shown above,

those potential burdens can be minimized through appropriately crafted relief. Any remaining burdens are outweighed by the vindication of constitutional rights. *See Taylor v. Louisiana.*, 419 U.S. 522, 535 (1975) ("administrative convenience" cannot justify practices impinging on fundamental rights).[20]

As for the requested extension of the November 3 election-day receipt deadline, Wisconsin law gives counties until November 10 to begin their canvasses, and until November 17 to complete them. The State itself need not complete its canvass until December 1. Wis. Stat. § 7.70(3)(a). Accordingly, there would be ample time to extend the ballot-receipt deadline by up to ten days so that late-arriving absentee ballots may be counted. The experience of the April 7 election proves that such an extension can be carried out with a minimum of administrative inconvenience while avoiding the disenfranchisement of tens if not hundreds of thousands of voters. The WEC acknowledged in its Rule 30(b)(6) deposition that the administrative burdens caused by this Court's prior deadline extensions were modest and manageable. DNCFOF ¶¶ 194-95. There is no reason to expect a difference now.

---

[20] *See also, e.g., Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268 (increased administrative burden of "disseminating information" and "training poll managers. . . is minimal compared to the potential loss of a right to vote"); *Fla. Democratic Party,* 2016 WL 6090943, at *8 ("Any potential hardship [to the state] imposed by providing the same opportunity . . . for [] voters pales in comparison to that imposed by unconstitutionally depriving those voters of their right to vote and to have their votes counted."); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) ("The potential hardships that Georgia might experience are minor when balanced against the right to vote, a right that is essential to an effective democracy."); *United States v. Berks Cty., Pa.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("Although these reforms may result in some administrative expenses for Defendants, such expenses are likely to be minimal and are far outweighed by the fundamental right at issue."). Finally, *Bishop v. Lomenzo*, 350 F.Supp. 576 (E.D.N.Y. 1972) observed that, "[w]ithout minimizing the administrative burden upon the Boards of Elections, we must not lose sight of the fact that we are here dealing with a most fundamental aspect of our free and democratic society - the citizen's right to vote . . . [w]hen that is weighed in the balance against clerical inconvenience, the latter must give way. The state may not deny a voter the right to register (and hence to vote) because of clerical deficiencies." *Id.* at 587.

The DNC/DPW's requests for a relaxation of the witness certification and other proof requirements also strike the right balance of equities. No one disputes that the State has a strong interest in preventing potential voter fraud. But as *Luft* has just reminded us, "[e]very citizen's interest in individual treatment *also* is strong." 2020 WL 3496860, at *11 (emphasis added). The DNC/DPW's proposed relief protects that interest while eliminating barriers that are not necessary to the detection or prevention of fraud. If anything, the DNC/DPW's proposed form for requesting an exemption provides even *greater* protection against possible "fraudsters" than the witness requirement and the other challenged proof requirements. By requiring voters to declare under penalty of perjury their specific grounds of entitlement to an exemption, provide email and telephone contact information so that local election officials can follow up promptly with any questions or concerns, and cooperate with any such investigations, the requested relief protects against possible "fraudsters" while reducing the "high hurdles," *Frank II*, 819 F.3d at 386, that the witness-certification and proof requirements create for a significant percentage of voters hypothesized by Judge Easterbrook in *Frank II*.

On top of all this, there was *no* evidence of attempted voter fraud in the April 7 and May 12 elections, and there is no evidence that such fraud actually will be attempted in the November general election. DNCFOF ¶ 180. The State is entitled to police against this "miniscule" risk, but not by creating unnecessary restrictions that result in the disenfranchisement of "eligible voters." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388-89 (6th Cir. 2008) ("Because the risk of actual voter fraud is miniscule when compared with the concrete risk that [the State's] policies will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of [injunctive relief, which] eliminates a risk of individual disenfranchisement without creating any

new substantial threats to the integrity of the election process."). Federal and state courts throughout the country have repeatedly found there is no evidence of attempted voter fraud.[21]

## PRAYER FOR RELIEF

The DNC and DPW therefore respectfully request that this Court enter judgment:

A.      Declaring that in the context of the current coronavirus crisis, Wisconsin's current by-mail and electronic registration deadlines, Wisc. Stat. § 6.28(1); requirements that copies of proof of residence and voter photo ID accompany electronic and by-mail voter registration and absentee applications, *id.* § 6.34, 6.86, respectively; requirement that polling places receive absentee ballots by 8:00 p.m. on election day to be counted, *id.* § 6.87; and requirement that an absentee voter obtain the signature of a witness attesting to the accuracy of personal information on an absentee ballot, *id.* § 6.87(2); together with defendants' failure to ensure that all citizens have safe and sufficient opportunities to register and vote in person, are unconstitutional in violation of the First and Fourteenth Amendments;

B.      Enjoining defendants and their respective agents, officers, employees, and

---

[21] *See, e.g.*, *People First*, 2020 WL 3478093, at *7 (concluding that state's "interest for maintaining the photo ID and witness requirements do not outweigh" burdens on voters where evidence "suggests that Alabama has not found itself in recent years to have a significant absentee-ballot fraud problem"); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1036 (9th Cir. 2020) (en banc) (rejecting fraud-based justification for ballot collection ban where "[t]here has never been a case of voter fraud associated with ballot collection charged in Arizona" (quoting *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 852 (D. Ariz. 2018))); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *1, 6 & n.10 (D. Nev. Apr. 30, 2020) (finding that plaintiffs' "claim of voter fraud is without any factual basis"; the State's "interests in protecting the health and safety of Nevada's voters and to safeguard the voting franchise in light of the COVID-19 pandemic far outweigh any burden . . . premised on a speculative claim of voter fraud."); *One Wis. Inst., Inc.*, 198 F. Supp. 3d at 912  (noting that "there is utterly no evidence that [there] is a systematic problem" of multiple voting); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789, 802–03 (W.D. Tex. 2015) (rejecting standing argument where alleged injuries, "undermined voter confidence and the risk of vote dilution, are speculative").

successors, and all persons acting in concert with each or any of them, from rejecting electronic and by-mail registrations that are received by the relevant clerk's office by Friday, October 30, 2020.

C.      Enjoining defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked on or before November 3, 2020 and arrive at the municipal clerk's office within a minimum of ten days thereafter, subject to the definition of "postmarked" discussed on page 7 n.7 above;

D.      Enjoining in part the enforcement of the witness requirement in Wis. Stat. § 6.87(2) as applied to those absentee voters who certify under penalty of perjury that they are unable after making reasonable efforts to obtain a witness signature and provide contact information for local election officials to follow up immediately if they have any questions or concerns.

E.      Enjoining in part the enforcement of the photo identification requirements in Wis. Stat. §§ 6.86 and 6.87 and the proof of residency requirement in Wis. Stat. § 6.34 for voter registrations until the COVID-19 crisis is over, as applied to those absentee voters who certify under penalty of perjury that they are unable after making reasonable efforts to obtain a witness signature and provide contact information for local election officials to follow up immediately if they have any questions or concerns.

F.      Ordering defendants to exercise their statutory authority and responsibility, *see* Wis. Stat. § 5.05(1), to develop and implement regulations, plans, and/or other administrative steps to (a) coordinate available state, local, and private resources to ensure that all voters throughout the State are able to cast early in-person absentee ballots and to vote in-person on election day in a safe and secure manner; and (b) conduct a continuing public information campaign informing

voters of their in-person and absentee voting options and requirements, with defendants required to report back to the Court on its progress in implementing this relief and plans for future steps through the election;

G.     Awarding plaintiff their costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

H.     Granting such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ *John Devaney*
Marc E. Elias
John Devaney
Bruce V. Spiva
Amanda R. Callais
Zachary J. Newkirk
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
jdevaney@perkinscoie.com
bspiva@perkinscoie.com
acallais@perkinscoie.com
znewkirk@perkinscoie.com

Charles G. Curtis, Jr.
Michelle M. Umberger
Sopen B. Shah
Brandon M. Lewis
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53703-3095
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
CCurtis@perkinscoie.com
MUmberger@perkinscoie.com
SShah@perkinscoie.com
BLewis@perkinscoie.com

*Counsel for Plaintiffs in Case No. 20-cv-249-wmc*